# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ROBERT CIARCIELLO, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> BIOVENTUS INC., KENNETH M. REALI, MARK L. SINGLETON, GREGORY O. ANGLUM, WILLIAM A. HAWKINS III, PHILLIP G. COWDY, GUIDO J. NEELS, GUY P. NOHRA, DAVID J. PARKER, SUSAN M. STALNECKER, and MARTIN P. SUTTER, <br><br> Defendants. | Case No. 1:23-cv-00032-CCE-JEP <br><br><br> **AMENDED COMPLAINT — CLASS ACTION** <br><br> **JURY TRIAL DEMANDED** |

**BLEICHMAR FONTI & AULD LLP**
Javier Bleichmar*
Joseph A. Fonti (appearance forthcoming)
7 Times Square, 27th Floor
New York, NY 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
jfonti@bfalaw.com

* reflects attorneys appearing pursuant to
LR 83.1(d)

*Counsel for Lead Plaintiff Wayne County
Employees' Retirement System and
Lead Counsel for the Proposed Class*

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ....................................................................... 2

II.    JURISDICTION AND VENUE ................................................................ 9

III.   PARTIES ................................................................................................... 10

       A.  Lead Plaintiff ................................................................................... 10

       B.  Defendants ........................................................................................ 10

IV.    FACTUAL ALLEGATIONS ................................................................... 13

       A.  Bioventus Relied on Sales of HA Products and Was Required to
           Accurately Track Rebates and Deduct Them from Revenue .......... 13

       B.  Bioventus's Deficient Controls Created a Materially Heightened Risk of
           Inaccurate Financial Statements and Material Revenue Reversals from
           Rebate Claims ................................................................................... 16

           1.  Bioventus Was Required to Recognize Revenue in Accordance with
               ASC 606 ..................................................................................... 16

           2.  Bioventus Violated GAAP and Its Internal Controls Suffered from
               Material Weaknesses .................................................................. 19

           3.  Nonetheless, Bioventus Falsely Claimed to Recognize Revenue in
               Accordance with ASC 606 and Defendants Completed the
               February 2021 IPO ..................................................................... 22

       C.  While Plagued with Material Control Weaknesses, Bioventus Raced to
           Acquire Other Companies ................................................................. 24

       D.  In 2022, Saddled with Debt and Struggling Acquisitions, Bioventus Touted
           Rapid HA Product Sales Growth and Reali Falsely Denied Any Impact
           from Medicare Price Reductions ...................................................... 26

           1.  New Medicare Regulations Threatened
               Bioventus's HA Product Pricing ................................................ 28

           2.  With No Factual Basis, Reali and Singleton Falsely Assure Investors
               that the Shift to ASP Is "Net-Neutral" for Bioventus ............... 29

       E.  The Truth Emerges:  Defendants Admit Material Controls Weaknesses and
           Reverse Material Amounts of Revenue Based on Large Rebate Claims, and
           Reduced ASP Pricing Slashes Bioventus's Revenues and Profit ..... 34

i

1. November 8, 2022:  Weak Earnings and a Purportedly Unexpected Rebate Claim ................................................................. 35

2. November 16, 2022:  Defendants Admit a Material Weakness in Internal Controls Driven by Rebates ........................................ 36

3. November 21, 2022:  Bioventus Materially Reverses Revenue Due to the Rebate Claims, Admits that Its Disclosure Controls and Procedures Were Not Effective, and Takes a $189 Million Impairment Charge ................................................................. 37

F. Post-Class Period:  Reali Admits that Bioventus Cannot Timely Track Customer-Specific Rebates or Sales Volume; Bioventus Continues to Decline and Reali Is Terminated ..................................... 40

V.  FORMER EMPLOYEE ALLEGATIONS ............................................. 42

VI.  THE INDIVIDUAL DEFENDANTS ARE SUBJECT TO CONTROL PERSON LIABILITY .......................................................... 46

VII.  SECURITIES ACT ALLEGATIONS ..................................................... 47

A. False and Misleading Statements Regarding Bioventus's Revenue Recognition and GAAP Compliance ................................. 48

B. Defendants' Material Omissions Violated SEC Item 303 ................. 51

VIII.  CLASS ACTION ALLEGATIONS ......................................................... 54

IX.  INAPPLICABILITY OF STATUTORY SAFE HARBOR .................................. 56

X.  CLAIMS FOR RELIEF PURSUANT TO THE SECURITIES ACT .................... 57

COUNT I ................................................................................................. 57

COUNT II ................................................................................................ 59

XI.  EXCHANGE ACT ALLEGATIONS ..................................................... 60

A. Exchange Act Materially False and Misleading Statements and Omissions .... 61

1. False and Misleading Statements Regarding Bioventus's Revenue Recognition and GAAP Compliance ............................... 62

2. False and Misleading Statements Regarding Revenue, Net Sales, and EBITDA that Bioventus Materially Inflated in Violation of GAAP .......... 69

3. False and Misleading Statements Regarding the Purported Effectiveness of Bioventus's Disclosure Controls and Internal Controls Over Financial Reporting ............................................. 71

4. False and Misleading Statements Regarding the Purportedly "Net-Neutral" Shift from WAC to ASP Pricing ...........................................77

5. The Exchange Act Defendants' Material Omissions Violated SEC Item 303 ...........................................................................................88

B. Additional Allegations of Scienter .................................................................88

1. Defendants Received Internal Reporting on the Company's Inability to Account for Rebates and Grossly Deficient Controls ............................88

2. Defendants' Statements Indicate Knowledge Regarding the WAC-to-ASP Shift ................................................................................90

3. HA Products Were Core Operations Central to Bioventus's Business.......92

4. The Officer Defendants Were Motivated to Conceal the Fraud to Complete a Series of Acquisitions ..............................................................93

5. Reali's Termination Supports Scienter .....................................................95

6. Corporate Scienter ..................................................................................96

C. Loss Causation ...............................................................................................97

1. November 8, 2022 ....................................................................................99

2. November 16, 2022 ................................................................................101

3. November 21, 2022 ................................................................................101

D. Presumption of Reliance and Fraud-on-the-Market Doctrine ......................103

XII. CLAIMS FOR RELIEF PURSUANT TO THE EXCHANGE ACT .................105

COUNT III .........................................................................................................105

COUNT IV .........................................................................................................106

XIII. JURY DEMAND.................................................................................................107

XIV. PRAYER FOR RELIEF .......................................................................................107

Court-appointed Lead Plaintiff Wayne County Employees' Retirement System ("WCERS" or "Plaintiff") alleges: (i) strict liability and negligence claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), and (ii) fraud-based claims under Sections 10(b) and 20(a) of the Exchange Act of 1934 (the "Exchange Act") for a class period of February 11, 2021 to November 21, 2022, both inclusive (the "Class Period"), against Bioventus Inc. ("Bioventus" or the "Company"), Kenneth M. Reali (former CEO), Mark L. Singleton (CFO), Gregory O. Anglum (former CFO), and members of Bioventus's Board of Directors ("Board") who signed the Registration Statement.

Plaintiff, by and through its counsel, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters based on, among other things, the independent investigation conducted by and through Lead Counsel. This investigation includes, but is not limited to, a review and analysis of public filings by Bioventus with the Securities and Exchange Commission ("SEC"); transcripts of Bioventus conferences with investors and analysts; press releases and media reports concerning the Company; analyst reports concerning Bioventus; other public information and data regarding the Company; and interviews with former employees of Bioventus conducted in Lead Counsel's investigation.[1]

---

[1] Emphasis is added and citations are omitted unless otherwise noted.

## I.    NATURE OF THE ACTION

1.    This Securities Act and Exchange Act class action arises from Defendants'
material misstatements and omissions about the pricing and revenue from Bioventus's
largest products, Bioventus's violations of U.S. Generally Accepted Accounting Principles
("GAAP"), and Bioventus's admitted material weaknesses in internal controls and
disclosure controls.  As a result of these misstatements and omissions, Bioventus's stock
price declined catastrophically from $13.00 in its February 2021 IPO to just $1.81 on
November 22, 2022, leaving investors with enormous losses.

2.    GAAP compliance and effective controls are crucial to ensure that public
companies like Bioventus issue reliable, accurate financial statements and public
disclosures that investors can rely on and trust.  Indeed, federal law requires Bioventus's
CEO and CFO to personally certify the effectiveness of its controls every quarter.  Without
effective controls, investors are exposed to the risk of material misstatements that
exaggerate and distort the company's true financial performance and business.  That is
exactly what happened here.

3.    Bioventus is a medical device and drug company whose financial
performance is dependent on selling injections to treat osteoarthritis, known as hyaluronic
acid ("HA") products.  In particular, Bioventus was highly reliant on selling three HA
products that accounted for over 50% of its total revenue in 2019 and 2020.  As a result,
the HA products' pricing and revenue are key drivers of Bioventus's stock price.

4.     Crucially, Bioventus's revenue from HA products is heavily influenced by millions of dollars in rebates that Bioventus is contractually required to pay back to third-party payers—private insurance companies and government programs like Medicare.

5.     GAAP requires Bioventus to deduct these rebates from its reported revenue to provide investors with an accurate picture of financial performance, and the Company claimed to do so.  Specifically, under GAAP's Accounting Standards Codification ("ASC") 606, Bioventus may only recognize revenue for which it is "probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period."  In other words, Bioventus is not permitted to recognize—and report to investors— significant amounts of revenue that it will later have to reverse (*i.e.*, remove from its financial statements) based on paying out rebates and the like.

6.     Bioventus claimed to follow these rules and to "report sales net of contractual allowances, rebates and returns."  Because third-party payers may demand rebates after a given reporting period, Bioventus purported to determine the rebate amounts based on "historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns."

7.     On February 10, 2021, Bioventus went public through a $104 million initial public offering (the "IPO").  From the time of its IPO, Bioventus lacked the necessary controls to reliably deduct rebates and recognize revenue in compliance with GAAP. Rather than analyze historical rebate data and contractual requirements to calculate rebate amounts, as it was required to do, the rebate amounts that Bioventus deducted were simply dictated by senior management.  The resulting numbers were "crazy" and inaccurate,

largely because Bioventus was not capable of accurately determining the amount of rebates it owed.  (FE-1.)[2]  This crucial control deficiency was enabled by antiquated systems that were dependent on large Excel files and manual work, in stark contrast to the modern software and automation that large public companies use to prepare accurate financial statements quickly and efficiently.

8.     Bioventus's significant problems with inaccurate rebate forecasting were well known to Officer Defendants Ken Reali, Greg Anglum, and Mark Singleton— Bioventus's CEO and CFOs during the Class Period.  At Quarterly Finance Meetings, Monthly Financial Close Meetings, and through direct objections by employees, senior leadership was apprised of the Company's inaccurate rebate forecasting, its improper revenue recognition, and that its financial systems were a "mess."  (FE-2.)

9.     With full knowledge of the severe deficiencies internally reported to them, the Officer Defendants concealed the truth from investors.  To make matters worse, they falsely certified in Bioventus's Forms 10-K and 10-Q filed with the SEC that:

- "[T]he Company's internal control over financial reporting is effective";

- Bioventus's financial statements "fairly present in all material respects the financial condition, results of operations and cash flows";

- They had disclosed "All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting"; and

- Bioventus's "disclosure controls and procedures were effective at the reasonable assurance level."

---

[2] "FE" refers to Former Employees of Bioventus who are referenced herein and identified as FE-__.  Allegations regarding the Former Employees' roles, tenure, and the information provided by them are summarized in Section V.

10. None of this was true, and the reality of Bioventus's material weaknesses left investors exposed to the risk of material misstatements and errors in Defendants' SEC filings and other public statements. In particular, the absence of effective controls and inability to accurately deduct rebates, coupled with CEO Reali's incompetent leadership, allowed Bioventus to overstate revenue and EBITDA by material amounts.

11. Bioventus materially overstated revenue and EBITDA for at least a year, in violation of GAAP and, in November 2022, revealed a significant reversal of 15% of U.S. Pain Treatments revenue ($8.4 million) and nearly 19% of EBITDA ($4.3 million) during the third quarter of 2022. This significant reversal was driven by admitted material weaknesses in controls: Bioventus admitted on November 16, 2022, that "its internal controls related to the timely recognition of quarterly rebates were inadequate," and admitted on November 21, 2022, that its "internal control over financial reporting was not performed at a sufficient level of precision to ensure that the third quarter 2022 rebates accrual was complete and accurate" and that its "disclosure controls and procedures were not effective as of October 1, 2022." The same material weaknesses had existed since the IPO.

12. Analysts immediately questioned the large reversal, with an analyst report from Craig-Hallum noting that the "restatements" were driven by "the rebate snafu that appeared in Q3 where BVS was receiving too high of HA payments from an insurer for at least a year – this amount was incorrect." Craig-Hallum further explained that given the "restatements and uncertain financials – it suggests we could see more errors coming, just as we said there was no room for error. . . . The rebate question above does add questions

5

to the financial infrastructure backbone at BVS and if more 'rebate adjustments' are necessary elsewhere." Indeed, in the very next quarter, another large rebate claim again materialized and reduced revenue below expectations.

13. In parallel, Bioventus faced an existential threat from new Medicare regulations that would severely reduce prices on its most lucrative HA products, Durolane and Gelsyn. Defendants Reali and Singleton falsely and fraudulently claimed that the pricing reduction was "net-neutral" for Bioventus, when in truth it was a disaster.

14. Specifically, the new regulations—which went into effect on July 1, 2022—provided that Medicare's payments for these drugs would be based on Average Sale Price ("ASP") rather than the drugs' higher Wholesale Acquisition Cost ("WAC"). Significantly, ASP is a lower pricing metric than WAC. Because Medicare accounted for 40% of Bioventus's HA business, and its pricing also influenced the prices for large private insurers, analysts were intensely focused on whether the shift from higher WAC to lower ASP pricing would reduce Bioventus's revenues and profits.

15. In a series of earnings calls during 2022, CEO Reali assured analysts and investors that the shift was "net-neutral," and that Bioventus had analyzed the issue "very carefully" and offset any reduced pricing by lowering "all of our rebates on our contracted business." Reali made these misstatements both before and after the shift occurred:

- On March 10, 2022, CEO Reali claimed that "*[w]e've looked at this very carefully . . . it's a net-neutral for Bioventus*. While we may lose a little on the ASP reimbursement, we gain by paying less rebates because of that reimbursement change."

- On May 10, 2022, Reali again claimed that "*[w]e've run these calculations very carefully*, and we feel strongly that *not only will we be basically neutral*

*through this process, but we can gain market share* as we go forward in the medium term." According to Reali, Bioventus performed an "*analysis of volume in our business, volume of syringes, the actual reduction in rebates offsets any reduction in reimbursement, specifically based on ASP reporting.*"

- On August 11, 2022, after the shift to ASP went into effect, Reali declared: "*We've been able to adjust all of our rebates on our contracted business* . . . to a lower amount that net effect [] *negates any impact on the ASPs* because we're paying less rebates on our contracted business. So as we've modeled that over the past several months *that turned out exactly the way we thought it would*." Reali further claimed that Bioventus saw "no indication of impact on [] volume" and reiterated that "*all of our ASP impact has been negated* by our ability to renegotiate our rebates on a contracted business."

16. These statements were materially false and misleading. In truth, the shift from WAC to ASP reporting had decimated Bioventus's HA business and was far from "net-neutral." Indeed, without basic controls, Bioventus lacked the ability to perform any meaningful analysis of pricing or volume changes. As Reali later admitted (on January 1, 2023), "*when we ship out our HA syringes, we have no insight into where they're going. We don't know that they're going to a United patient or Cigna or Blue Cross, Blue Shield or Aetna, we don't get that information until quarters later, 2 quarters or even later sometimes depending on the lag of the rebate.*" Without this information, Reali's statements to investors had no factual basis. Moreover, the Company later admitted that it had not adjusted "all of [its] rebates" on "contracted business" to "negate[]" "all of" the impact of lower ASP; instead, lower rebates were increasing rebate amounts, directly contrary to Reali's prior statements.

17. The truth about Bioventus's material controls weaknesses, GAAP violations, and the WAC-to-ASP shift was revealed in a series of partially corrective disclosures.

18.     <u>First</u>, on November 8, 2022, Bioventus reported financial results for the third quarter of 2022.  Just three months after claiming that "all of our ASP impact has been negated," the Company reported dismal earnings and slashed guidance because of the shift to ASP pricing, as well as what Reali claimed were "higher than normal rebate claims due to unexpected prior period rebate charges from a private payer who found errors in their earlier claims reporting."  The stock immediately plunged 57.5% in a single day.

19.     <u>Second</u>, on November 16, 2022, the Company announced that it would be unable to timely file its 3Q22 Form 10-Q, admitted that its "internal controls related to the timely recognition of quarterly rebates were inadequate," and disclosed that, as a result of the stock drop caused by the pricing decline and rebate errors disclosed on November 8, 2022, Bioventus expected to take an impairment charge in the range of $185 million to $205 million.  The stock plummeted another 33%.

20.     <u>Finally</u>, on November 21, 2022, the Company disclosed the $8.4 million revenue reversal detailed above; incurred an $189 million impairment; revealed that the large rebate had a "cascading effect on future revenue projections [that] materially impacted the Company's evaluation of its ability to meet debt covenants, resulting in liquidity and going concern disclosures in the" Form 10-Q; and admitted material weaknesses in internal controls over financial reporting and disclosure controls and procedures.  The stock dropped another 3.7%.

21.     After the Class Period, on March 31, 2023, Bioventus reported full-year 2022 financial results, with a 3.5% decline in sales "primarily driven by a decline in price resulting from higher than expected rebate claims," with purportedly "[u]nanticipated

rebate claims from one private payer," "lower than previously expected" ASP "for both Durolane and Gelsyn," and for Durolane, "double-digit price loss" and revenue that "declined high single digits for the quarter." The accompanying Form 10-K revealed that Reali's prior claims that Bioventus had "negated" "all of" the lower ASP by adjusting "all of [its] rebates" on "contracted business" were false: instead, Bioventus added a new statement that "due to the manner in which rebates are calculated and paid under certain of our contracts with private payers, changes in the ASP for our HA viscosupplements may result in larger than expected rebates payments for the sale of these products."

22.    That large rebates and price declines hit the HA business in two consecutive quarters (the third and fourth quarters of 2022) was no coincidence. Rather, it was the direct result of Bioventus's longstanding control deficiencies and basic inability to accurately account for rebates and the actual net prices of its HA products. On April 5, 2023, Bioventus reported that Reali—who had presided over the Company's catastrophic decline from its IPO at $13.00 per share in February 2021 to just $1.81 per share on November 22, 2022—was terminated as CEO.

## II.    JURISDICTION AND VENUE

23.    This Court has jurisdiction over the subject matter of this action pursuant to: (i) Section 22 of the Securities Act of 1933 (15 U.S.C. § 77v); and, separately, (ii) Section 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa). In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

24.     Venue is proper in this District pursuant to: (i) Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)); and, separately, (ii) Section 27 of the Exchange Act (15 U.S.C. § 78aa).  In addition, venue is proper pursuant to 28 U.S.C. § 1391(b) because the acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District.  Bioventus's Class A common stock trades on the NASDAQ.

25.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiff

26.     Lead Plaintiff Wayne County Employees' Retirement System is a public pension fund established in 1944 to administer retirement and related benefits to public employees of Wayne County, Michigan.  WCERS manages more than $1.2 billion on behalf of nearly 10,000 active and retired members.  As set forth in the certification filed on March 13, 2023 (ECF 21-1), WCERS purchased Bioventus Class A common stock traceable to the Registration Statement and Bioventus Class A common stock during the Class Period.

### B.    Defendants

27.     Defendant Bioventus is a Delaware corporation with principal executive offices located at 4721 Emperor Boulevard, Suite 100, Durham, North Carolina 27703.

The Company's Class A common stock trades on NASDAQ under the ticker symbol "BVS." Bioventus issued Class A common stock in the IPO.

28.  Defendant Kenneth M. Reali ("Reali") served as Bioventus Chief Executive Officer ("CEO") and a Director of the Company from April 2020 and September 2020, respectively, until he was terminated effective April 4, 2023. Defendant Reali signed the Registration Statement. He served as CEO of Clinical Innovations, LLC, a medical device company, from 2015 until its sale in February 2020.

29.  Defendant Mark L. Singleton ("Singleton") has served as Bioventus's Senior Vice President ("SVP") and Chief Financial Officer ("CFO") since March 21, 2022. He was previously the Vice President Finance at Teleflex Incorporated, which he joined in 2014. Prior to that, he worked for nearly two decades at Lenovo/IBM.

30.  Defendant Gregory O. Anglum ("Anglum") served as Bioventus's SVP and CFO from August, 2017 until April 2022. Anglum signed the Registration Statement. Prior to joining Bioventus, Anglum held CFO positions at Overture, a technology company, and StrikeIron, a Software-as-a-Service Company. He also spent several years in public accounting roles with Arthur Anderson and Grant Thornton.

31.  Defendant William A. Hawkins III ("Hawkins") has been Chair of Bioventus's Board since 2020. Hawkins signed the Registration Statement. He is a Senior Advisor to EW Healthcare partners, a life sciences private equity firm which he joined in 2017. From October 2011 to July 2015, Hawkins served as President and CEO of Immucor, Inc. Hawkins served as President and CEO of Novoste Corporation from 1988 to 2002.

32.     Defendant Phillip G. Cowdy ("Cowdy") has been a member of Bioventus's Board since 2020.  Cowdy signed the Registration Statement.  He is the Chief Business Development and Corporate Affairs Officer for Smith & Nephew plc, a medical equipment manufacturing company, since 2018.  Cowdy joined Smith & Nephew in 2008. Prior to that, he worked in corporate finance for 13 years at Deutsche Bank.

33.     Defendant Guido J. Neels ("Neels") has been a member of Bioventus's Board since 2020.  Neels signed the Registration Statement.  He has been with EW Healthcare Partners, a healthcare growth equity and venture capital firm, since August 2006, where he has served as Operating Partner since 2013.  Prior to that, Neels served as COO for Guidant, a developer of cardiovascular medical products, from 2004 to 2005.

34.     Defendant Guy P. Nohra ("Nohra") has been a member of Bioventus's Board since 2020.  Nohra signed the Registration Statement.  In 1996, he co-founded Alta Partners, a life sciences venture capital firm.

35.     Defendant David J. Parker ("Parker") was a member of Bioventus's Board from September 2020 until December 20, 2021.  Parker signed the Registration Statement. He has been a General Partner at Ampersand Capital Partners since 2010, a private equity firm, which he joined in 1994.  Prior to joining Ampersand, Parker worked at Bain & Company and Mercer Management Consulting.

36.     Defendant Susan M. Stalnecker ("Stalnecker") has been a member of Bioventus's Board since September 2020.  Stalnecker signed the Registration Statement. She has been a Senior Advisor at Boston Consulting Group, a global management

consulting firm, since Mach 2016. Stalnecker served as VP of E.I. duPont de Nemours and Co. from December 1976 until she retired in 2016.

37.     Defendant Martin P. Sutter ("Sutter") has been a member of Bioventus's Board since 2020. Sutter signed the Registration Statement. He is a founding Managing Director of EW Healthcare Partners, a life sciences and healthcare focused venture capital firm, which he formed in 1985.

38.     Defendants Reali, Anglum, Hawkins, Cowdy, Neels, Nohra, Parker, Stalnecker, and Sutter are collectively referred to herein as the "Individual Defendants." Defendants Reali, Singleton, and Anglum are collectively referred to herein as the "Officer Defendants." Bioventus and the Officer Defendants are collectively referred to herein as the "Exchange Act Defendants."

## IV.     FACTUAL ALLEGATIONS

### A.     Bioventus Relied on Sales of HA Products and Was Required to Accurately Track Rebates and Deduct Them from Revenue

39.     Founded in 2012, Bioventus is a medical device company focused on joint health, bone graft substitutes, and fracture treatment. At the time of the IPO, Bioventus had three business segments that the Company referred to as "verticals": (i) osteoarthritis ("OA") joint pain treatment and joint preservation (sometimes called the "Pain Treatments" vertical); (ii) bone graft substitutes; and (iii) minimally invasive fracture treatment.

40.     Bioventus's key revenue source was three hyaluronic acid products within the Pain Treatments vertical: (i) Durolane, a single injection therapy launched in 2018; (ii) Gelsyn-3 ("Gelsyn"), a three-injection therapy launched in 2016; and (iii) Supartz FX

("Supartz"), a five-injection therapy first launched in the U.S. in 2001. Bioventus was highly reliant on its sales of these three drugs, which accounted for 53%, 54%, and 49% of its total revenue for the years ended December 31, 2020, 2019, and 2018, respectively.

41. As detailed below, investors relied on Bioventus to accurately track and report the revenue it generated from these drugs. A key component of accurately recognizing revenue is accounting for the impact of rebates: contractual arrangements where Bioventus agrees to pay third-party payers (such as insurance companies) negotiated rebate amounts for sales of its drugs. These rebates directly reduced Bioventus's net revenue. As a simplified example, if Bioventus sold an HA product to a healthcare provider for $100, the patient's insurance company would subsequently request a $30 rebate from Bioventus, with the result that Bioventus only earned $70 in net revenue on that sale.

42. GAAP imposes two key requirements to ensure that the Company accurately recognizes revenue based on a reliable determination of rebate amounts.

43. <u>First</u>, under GAAP, Bioventus may not recognize the entire amount of gross sales as revenue. Instead, it may only recognize revenue from drug sales ***net*** of expected rebates. In the example above, Bioventus may only recognize the net revenue of $70, not the gross revenue of $100.

44. <u>Second</u>, in terms of calculating the correct net revenue to be reported, ASC 606 of GAAP requires that Bioventus only recognize the amount of revenue for which it is "probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period." A "reversal" means that Bioventus must remove revenue already recognized in its financial statements. To the extent there is any

uncertainty about the amount of rebates, Bioventus is required to be conservative and to only recognize revenue that it will not need to pay back.

45.     As detailed below, Bioventus violated these GAAP requirements and improperly recognized revenue that was subject to rebates, resulting in a significant revenue reversal.

46.     Bioventus's violations were enabled by the fact that it lacked effective internal controls over financial reporting and effective disclosure controls.   Internal controls over financial reporting ("ICFR") ensure that public companies provide investors with complete and accurate information about financial results in their public filings. According to the SEC, ICFR include "policies and procedures" that "(1) [p]ertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the registrant; [and] (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with [GAAP]."   SEC Release No. 33-8238.

47.     Disclosure controls and procedures are "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the [Exchange] Act . . . is recorded, processed, summarized and reported within the time period specified" by the SEC.   17 C.F.R. § 240.13a-15(e).

**B.    Bioventus's Deficient Controls Created a Materially Heightened Risk of Inaccurate Financial Statements and Material Revenue Reversals from Rebate Claims**

**1.    Bioventus Was Required to Recognize Revenue in Accordance with ASC 606**

48.    ASC 606, issued by the Financial Accounting Standards Board ("FASB"), sets forth the core principle that an entity may only recognize net revenue in an amount that reflects the consideration to which the entity expects to be entitled in exchange for the goods.  This required Bioventus to recognize revenue net of any so-called "variable consideration" like discounts, rebates, or other chargebacks.

49.    ASC 606-10-05-4 permits a company to recognize revenue only after completing a five-step process:  (i) identify the contract(s) with a customer (Step 1); (ii) identify the performance obligations in the contract (Step 2); (iii) determine the transaction price (Step 3); (iv) allocate the transaction price to the performance obligations in the contract (Step 4); and (v) recognize revenue when (or as) the entity satisfies a performance obligation (Step 5).

50.    Bioventus's rebates affected Step 3—determining the amount of the transaction price.  GAAP refers to these rebates as "variable consideration" that reduced the contracted price for HA products.  Under ASC 606, the transaction price used as the basis to recognize revenue must reflect a deduction for the expected amount of variable consideration from the contracted price.  (ASC 606-10-32-5.)  With respect to the example above, this is shown as follows:



51.     Bioventus claimed to estimate the expected amount of variable consideration using factors such as historical experience, then-current contractual requirements, known market events, industry data, and payer forecasts, as set forth below.  GAAP required Bioventus to deduct sufficient variable consideration from the transaction price so that it was probable a significant reversal in the amount of cumulative revenue recognized would not occur when the uncertainty associated with the variable consideration was subsequently resolved, *i.e.*, when the rebate claim was required to be paid.[3]  (ASC 606-10-32-11.)

52.     Put another way, companies may include variable consideration "in revenue *only when there is a high degree of confidence that revenue will not be reversed in a subsequent reporting period*."  (FASB Accounting Standards Update No. 2014-09, at ¶BC204 (Basis for Conclusions).)

---

[3] "Probable" has the same meaning as used in ASC 450-20:  "the future event or events are likely to occur."  Put differently, GAAP requires that it be ***unlikely*** that the amount of revenue that Bioventus recognized at the time of sale (contract price minus estimated variable consideration) will differ from the net revenue Bioventus ultimately receives from that sale (*e.g.*, once Bioventus has paid any rebate owed in the year following the sale).

53.     To the extent there is any uncertainty about the rebate amounts, the variable consideration must be excluded from revenue.  Grant Thornton, Bioventus's auditor during the Class Period, has issued guidance to companies on the application of ASC 606, advising that, with regard to retrospective volume-based rebates like Bioventus's, "[i]f an entity cannot reasonably estimate the total quantity of goods . . . that the customer will purchase, it should use the minimum price per unit to determine the transaction price" so as to avoid "a significant revenue reversal if the customer ultimately purchases sufficient volume to achieve the minimum price per unit."   PricewaterhouseCoopers ("PwC"), Bioventus's auditor pre-Class Period, has also issued guidance, explaining that, "[w]hen management cannot reasonably estimate the amount of rebates that customers are expected to earn, it still needs to consider whether there is a minimum amount of variable consideration that should not be constrained."  Similarly, Ernst & Young has advised that if a company cannot arrive at a probable estimate, "the amount of variable consideration that must be included in the transaction price is **limited to the amount that *will not* result in a significant revenue reversal**."  (Italics in original.)

54.     These requirements dictate that companies carefully analyze rebates based on contractual requirements, historical experience, industry data, and other factors, and that they be conservative in estimating and reporting recognized revenue:  if they cannot reasonably estimate the amount of rebates that are probable, they may only recognize the revenue that "will not result in a significant revenue reversal" even if the full rebate amount is claimed.  This is for good reason, as a failure to be conservative can result in reporting materially inflated—and therefore materially inaccurate—revenue to investors.

## 2. Bioventus Violated GAAP and Its Internal Controls Suffered from Material Weaknesses

55.     Reali became Bioventus's CEO in April 2020.  Reali arrived at Bioventus with a checkered past:  in connection with his role as CEO of a medical device company called TranS1, Reali was accused of securities fraud in a complaint sustained by the Fourth Circuit.  *Singer v. Reali*, 883 F.3d 425 (4th Cir. 2018).  Later, TranS1 merged with Baxano Surgical, Inc., and Reali—still its President and CEO—drove the company into bankruptcy in 2014.

56.     At Bioventus, Reali presided over GAAP violations and material weaknesses in the Company's disclosure controls and internal controls over financial reporting.  The Company admitted in November 2022 that "its internal controls related to the timely recognition of quarterly rebates were inadequate," its "internal control over financial reporting was not performed at a sufficient level of precision" and its "disclosure controls and procedures were not effective."

57.     The same state of affairs existed before the February 2021 IPO and throughout the Class Period.  In particular, the Company's process for calculating variable consideration was grossly unreliable and even non-existent:  instead of rigorously tracking rebate data and historical trends to determine the amount of revenue that was unlikely to be reversed, and thus could be recognized, the Company simply recognized all revenue from HA product sales and only removed the actual amount of rebates received to date. This crude approach failed to account for the known fact that rebate requests often came in to Bioventus months after sales had occurred, which Bioventus was then required to pay.

This fundamental, known error led the Company to overstate revenue by material amounts and created the risk of a significant revenue reversal.

58. The problem started with the fact that the Company issued revenue and rebate forecasts without input from relevant departments. That is, Bioventus leadership simply handed down "crazy" and inaccurate forecasts for revenue and rebates despite that Bioventus lacked any system or process to track revenue or rebates, and lacked effective controls over these functions. (FE-1, FE-2.)

59. Specifically, Bioventus lacked any system or process to track revenue, rebates, and discounts for each insurer. (FE-1.) Similarly, the financial team charged with tracking and forecasting rebates was clear that the Company had "no controls" as to which customers were asking for rebates or how much they were asking for. (FE-2.) Instead, there were thousands of lines, and they were trying to do it in an Excel file, without any kind of system in place. (FE-2.) It was "a real mess." (FE-2.)

60. At the same time, the expected rebate amounts were readily determinable under the customer contracts based on information readily available to the Company. (FE-1.) The total amount of rebates was negotiated between Bioventus and each private payer insurer and formally set in a contract. Further, under these contracts, the insurers had a year to submit their rebate requests. Thus, if a quarterly rebate request was lower than the contractually-mandated amount owed based on sales, the insurer would predictably submit higher rebate requests in the subsequent quarters such that, within any given year, the total rebate requests evened out to equal the contractual amount owed. (FE-1.) For example, if a payer consistently had $1,000 in claims per quarter, but then

claimed rebates for just $700 in the next quarter, the Company should be ready for an additional $300 within the next year. (FE-1.)

61.     Underlying all of this were antiquated systems that required heavy use of time-intensive manual calculation for simple tasks. Bioventus never correctly set up SAP and Oracle PBCS software that could have assisted with financial monitoring, tracking, and forecasting, and thus lacked the automation and functionalities that would have allowed the Company to quickly access accurate data. (FE-2.) As a result, the Company's ability to track, report, measure, and monitor things was severely limited. (FE-2.) For example, employees had to devote weeks every year to helping the Company try to manually track salary and payroll expenses (a major expense at the Company). (FE-2.) This practice was "insane" because, at a good company, these functions can be performed in an hour, or a few minutes each. (FE-2.)

62.     The significant problems with inaccurate rebate forecasting were well known to senior leadership, including the Individual Defendants. Every month, at Monthly Financial Close Meetings, CFO Anglum (later CFO Singleton), VP of Finance Ben Fishburn, Director of FP&A and Business Intelligence Diane Schabinger, and the FP&A group, and others heard problems with the Company's rebate estimates and that the Company's systems were a mess. (FE-2.) Similarly, during Quarterly Finance Meetings held at Bioventus's headquarters, the sales team expressed concerns with inaccurate rebate forecasting and improperly recognizing revenue. (FE-1.) Given the poor systems and uncertainty over rebates, they urged that Bioventus should be more conservative to avoid

reversing or lowering its revenue figures when the Company was later hit with rebate requests.  (FE-1.)

63.    Even though the pervasive control failures were raised directly with Bioventus's senior leadership, they were never fixed.  To the contrary, the deficiencies actually grew worse during the Class Period, as set forth in detail below.

### 3.    Nonetheless, Bioventus Falsely Claimed to Recognize Revenue in Accordance with ASC 606 and Defendants Completed the February 2021 IPO

64.    Despite the existing, known control failures, Defendants pushed forward with the IPO to raise cash by taking Bioventus public and, in doing so, falsely claimed that Bioventus recognized revenue and accounted for rebates in compliance with GAAP.

65.    On January 20, 2021, Bioventus filed a registration statement on Form S-1 that, after several amendments, was declared effective by the SEC on February 10, 2021 (together, the "Registration Statement").  On February 12, 2021, Bioventus filed a prospectus on Form 424B4 with the SEC, which incorporated and formed part of the Registration Statement (the "Prospectus").

66.    On February 11, 2021, Bioventus commenced the IPO and its stock began to trade on NASDAQ.  In the IPO, Bioventus issued 9.2 million shares of Class A common stock at the IPO price of $13.00 per share, including 1.2 million shares that were issued as a result of the underwriters exercising their option to purchase additional shares. The Company received gross proceeds of $119.6 million.

67.    The Registration Statement falsely claimed that Bioventus's revenue recognition policy was only to record revenues that were "net of estimates of variable

consideration resulting from discounts, rebates, returns, chargebacks, [and] contractual allowances." The Company further claimed "these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns." Bioventus also claimed to "regularly review all reserves and update them at the end of each reporting period as needed."

68. For rebates in particular, the Company claimed to determine "the most likely amount the customer will earn, based on historical buying trends and forecasted purchases." Bioventus claimed that "[w]e reduce revenue and record the reserve as a reduction to accounts receivable" based on these rebate estimates.

69. These statements told investors that Bioventus was following GAAP requirements in calculating and reporting its revenue. Moreover, Bioventus also claimed that its revenue recognition practices complied with ASC 606, stating in the Prospectus that "[t]he amount of variable consideration is included in the transaction price," and thus recorded as revenue, "only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period."

70. These statements were false and misleading when made. As detailed herein, with grossly defective controls and accounting systems, Bioventus could not possibly arrive at a reasonable estimate of variable consideration resulting from rebates, and was not doing so. Instead, Bioventus's reported revenue on HA products was the product of "crazy" and inaccurate forecasts; rebates and discounts were not subject to any controls;

and masses of data were crudely combined into Excel files. Moreover, concerned employees communicated these problems to the Officer Defendants at regular internal meetings and through direct objections.

71. Bioventus's material weaknesses in controls violated GAAP, left the Company subject to a materially heightened risk of large revenue reversals, and led to material overstatements of revenue and EBITDA for at least a year.

### C. While Plagued with Material Control Weaknesses, Bioventus Raced to Acquire Other Companies

72. Instead of using the proceeds from the IPO to fix the material weaknesses in controls and ensure reliable financial statements, Defendants went on a shopping spree in 2021, acquiring two additional healthcare companies (Bioness and Misonix), and making a $50 million escrow deposit with the intent to acquire a third (CartiHeal).

73. These deals required Bioventus to maintain its stock price and create the appearance of healthy sales of its key HA products. Bioventus used its stock as a portion of the consideration paid to acquire Misonix, motivating Defendants to maintain the stock price to close the deal. Two of the deals required future milestone payments (Bioness and CartiHeal), and two would require Bioventus to take on debt (Misonix and CartiHeal), which Bioventus would need to pay for using income earned from the sale of its core HA products. Indeed, CEO Reali was adamantly focused on acquisitions and there was significant pressure on employees to keep Bioventus's stock price high in order to finance acquisitions and pay for them. (FE-1.)

74. **Bioness**:  Bioness was a company with a product portfolio focused on rehabilitation therapies.  Bioventus acquired Bioness on March 30, 2021 for $48.9 million cash.  The deal would also require Bioventus to pay an additional $50 million in cash by the end of 2024 and/or first half of 2025 if certain contingencies were met.

75. During Bioventus's May 12, 2021 earnings call, Anglum acknowledged that the Bioness acquisition would not be "accretive" to income for at least a year.  In the meantime, the Company incurred tens of millions of dollars in costs to integrate Bioness in 2021.

76. **Misonix**:  On July 29, 2021, Bioventus announced that it would acquire Misonix, Inc. ("Misonix"), a provider of ultrasonic technologies and regenerative medicine, in a cash-and-stock transaction.  Bioventus completed the Misonix acquisition on October 29, 2021 and paid Misonix shareholders (a) $182,988,467 in cash and (b) 18,340,790 shares of Bioventus Class A common stock.  The total consideration was $525.3 million.  Because Bioventus did not have the cash, it borrowed $223.1 million in a term loan to finance the cash consideration, transaction costs, and ongoing operating expenses.  In total, Bioventus had over $360 million in debt as of the end of 2021.

77. As with Bioness, Bioventus spent tens of millions of dollars to integrate Misonix, and Defendants did not expect to achieve the integration, including planned synergies, until the end of 2022.

78. **CartiHeal**:  In July 2020, Bioventus entered an Option and Equity Purchase Agreement with CartiHeal, a company working to produce a knee implant, that gave Bioventus the option to purchase CartiHeal under certain conditions.

79.     Bioventus was required to spend cash to continue pursuing the CartiHeal acquisition.  On August 2, 2021, Bioventus deposited $50 million in escrow towards the future purchase of CartiHeal.  On November 9, 2021, Reali told investors that Bioventus intended to move forward with the deal, but planned to "finance the remaining portion of the potential acquisition of CartiHeal with additional debt."

80.     Bioventus's 2021 Form 10-K filed on March 11, 2022, stated that Bioventus "expect[ed] to acquire all of the shares of CartiHeal, excluding those we already own, for $314.9 million, payable at closing in the second quarter of 2022.  Upon the achievement of certain sales milestones, an additional $135.0 million could become payable after closing."

**D.     In 2022, Saddled with Debt and Struggling Acquisitions, Bioventus Touted Rapid HA Product Sales Growth and Reali Falsely Denied Any Impact from Medicare Price Reductions**

81.     By early 2022, Defendants' buying spree left Bioventus swimming in more than $360 million in debt, anticipating hundreds of millions of dollars in future milestone payments, and burning tens of millions in cash to try to integrate the acquired companies. To keep Bioventus afloat, the Company needed to convince investors that sales of its HA products would remain strong enough to pay for the acquisitions and maintain the Company's bottom line until the newly acquired businesses could provide value.

82.     On March 10, 2022, the Company issued guidance that projected large growth, particularly from sales of HA products.  During the earnings call the same day, Reali touted Bioventus's "HA business where we continue to gain market share with

Durolane, our single injection, and Gelsyn, [] our 3 injection, and we see that continuing. The HA market is very strong." The Company projected that in 2022, revenues would grow approximately 26% to 31% year-over-year, reaching a range of $545 million to $565 million. FE-2 described this revenue forecast as "crazy," and said CEO Reali "should never have said that." At that time, sales of the HA products, which made up 60 percent of the company's revenue, were not growing (FE-1).

83.     Not only was HA growth stalling, but Bioventus faced existential risk from new federal regulations that would reduce pricing and reimbursements from Medicare for Bioventus's two main HA products, Durolane and Gelsyn, and thereby slash its revenues and profits—including on the private, non-Medicare side of the business, which was heavily influenced by Medicare pricing.

84.     Despite this reality, Defendants Reali and Singleton repeatedly told investors that the shift from WAC to ASP pricing would have no impact on Bioventus, claiming that it was "net-neutral" because the Company had "offset lower pricing" by lowering "all of our rebates on our contracted business," and declaring that the Company had "looked at this very carefully," including by analyzing the "volume in our business." After the shift, they claimed that "all of our ASP impact has been negated" and it "turned out exactly the way we thought it would." This was fraud.

### 1. New Medicare Regulations Threatened Bioventus's HA Product Pricing

85.    Historically, Bioventus had used a regulatory loophole that permitted it to report only WAC prices on Gelsyn and Durolane to CMS.[4]  WAC is list pricing that does not reflect rebates and discounts, whereas ASP is net pricing that does.[5]  As a result, Bioventus's WAC pricing was significantly higher than ASP for its HA products. Reporting only WAC pricing resulted in Medicare and Medicaid paying higher reimbursement prices for these drugs, which inured to Bioventus's benefit.

86.    To close the loophole, Congress passed a new law as part of The Consolidated Appropriations Act, 2021, that required manufacturers like Bioventus without a Medicaid drug rebate agreement to report ASP information to CMS for each calendar quarter starting on January 1, 2022.  The intended effect of this law was to reduce the amount of money the government would pay manufacturers like Bioventus.  CMS issued its final rule implementing the new law on November 19, 2021.

87.    As a result, starting on January 1, 2022, Bioventus was required to start reporting ASP for Gelsyn and Durolane to CMS.  With ASP data in hand, beginning in July 2022, CMS would be able to utilize the new pricing data to reduce its payments for

---

[4] Specifically, because Bioventus did not have a Medicaid drug rebate agreement with the government, it was not required to report ASP to CMS.  Without that data, CMS calculated its Medicare reimbursement for Bioventus based on higher WAC prices.

[5] Wholesale Acquisition Cost is defined by federal regulation as "the manufacturer's list price for [a] drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price."  42 U.S.C. § 1395w-3a(c)(6).  Average Sale Price, in contrast, is a manufacturer's average sale price to all purchasers, net of discounts, rebates, chargebacks, and any other variable consideration.

Durolane and Gelsyn. This would result in Medicare paying Bioventus significantly lower prices for these key drugs.

88. This government shift from WAC-based pricing to ASP-based pricing was highly material because Bioventus was heavily reliant on payments from Medicare. In a March 8, 2021 report, analysts from J.P. Morgan wrote that Bioventus's HA business was split between "~40% Medicare and ~60% commercial payors." Further, Medicare pricing heavily influenced private payers like insurance companies, who looked to lower pricing to negotiate lower prices under their own contracts with Bioventus: as Bioventus's Registration Statement explained, "Private payers may adopt coverage decisions and payment amounts determined by CMS as guidelines in setting their coverage and reimbursement policies." Thus, reduced Medicare pricing on Gelsyn and Durolane—its most lucrative drugs in its largest business line—was an existential threat for Bioventus, akin to an iceberg directly in the path of the Titanic.

> **2. With No Factual Basis, Reali and Singleton Falsely Assure Investors that the Shift to ASP Is "Net-Neutral" for Bioventus**

89. Investors and analysts were keenly focused on whether the shift to ASP would reduce Bioventus's revenues and profits from its key HA products. In response, Defendants Reali and Singleton claimed that Bioventus had conducted a detailed analysis showing that the shift was "net-neutral" because Bioventus had secured lower rebates with private payers that offset any reduced pricing. After the shift occurred, they claimed things had "turned out exactly the way we thought it would."

90.     These statements had no factual basis.  In reality, Bioventus lacked even basic capabilities to track where its HA products were going, much less to reliably model the impact of reduced pricing, purportedly lower rebates, and changes in volume.  As Reali later admitted (on January 21, 2023), "***when we ship out our HA syringes, we have no insight into where they're going.***  We don't know that they're going to a United patient or Cigna or Blue Cross, Blue Shield or Aetna, we don't get that information until quarters later, 2 quarters or even later sometimes depending on the lag of the rebate."  In other words, due to its antiquated systems and grossly ineffective controls, Bioventus was not capable of timely determining where its HA products were being sent.  This left Bioventus with no reliable basis to determine how shifts in pricing and volume would impact its bottom line.

91.     Ultimately, after the pricing shift, private payers demanded and obtained lower pricing, materially reducing Bioventus's revenues and profit, as the Company began to reveal in November 2022.

### a.     March 10, 2022 Earnings Call

92.     On March 10, 2022, during Bioventus's Q4 and FY 2021 earnings call, a Morgan Stanley analyst noted "concerns from investors that Medicare might be potentially cutting prices in the not-too-distant future," and asked "how Bioventus might be better situated versus competitors?"  In response, Reali assured the analyst that Bioventus had "very carefully" modeled the impact of the shift and that it would have a "net-neutral" impact on the Company because Bioventus would make up for the lost CMS pricing "by paying less rebates" to its private payer customers.

93. Analysts believed Reali. A March 11, 2022 Morgan Stanley report stated, "Bioventus anticipates potential reimbursement changes would be a net neutral," because it would pay "less rebates to payers resulting in a neutral topline and margin impact for the company." Investment firm Craig-Hallum Capital Group LLC issued a report on March 31, 2022 that the shift would "have minimal impact" on Bioventus.

### b.      May 9, 2022 Earnings Call

94. On May 9, 2022, Bioventus announced that it was maintaining its aggressive guidance for 2022. On May 10, 2022, Reali repeated his assurances regarding the WAC to ASP pricing shift during the 1Q22 earnings call. A Goldman Sachs analyst again asked "how that pricing change could affect your business." Rather than admit the truth—that the impact was disastrous, and Bioventus had not secured lower rebates or performed any reliable modeling—Reali claimed:

> We've run these calculations very carefully, and we feel strongly that ***not only will we be basically neutral through this process, but we can gain market share as we go forward in the medium term***. . . .

95. Analysts continued to believe Reali. In a May 10, 2022 report, J.P. Morgan analysts wrote that "any reduction in reimbursement" due to the shift to ASP reporting "should be offset by lower rebates within the [C]ompany's contracted business."

### c.      August 11, 2022 Earnings Call

96. After the ASP shift went into effect on July 1, 2022, Reali falsely claimed that it had turned out "exactly the way we thought it would." Prior to Bioventus's 2Q22 earnings call, Defendants had issued a Form 8-K in which they maintained the Company's

31

prior, aggressive 2022 guidance, merely narrowing the range of expected revenue growth to 27% to 31%, compared to the prior range of 26% to 32%.

97.     In his introductory remarks on the 2Q22 earnings call on August 11, 2022, Reali acknowledged that the shift had occurred and stated, "As expected, we have been able to lower our reimbursement rebate rates on all of our preferred contracts with private payers, which has offset lower pricing for other areas of our HA business." He claimed that the modification to the rebates were "consistent with our modeling exercises," and even claimed that the shift had created "potential opportunities to increase our market share" because competitors could no longer offer lower pricing than Bioventus.

98.     During the call, an analyst from Craig-Hallum Capital asked if Bioventus "HA volumes and the price that you could charge the doc[tor]s [were] relatively consistent with the first half?" Reali stated that, "per our planning," Bioventus had "**been able to adjust all our rebates . . . to a lower amount**" that "negate[d] any impact on the ASPs because we're paying less rebates." He emphasized that this was what Bioventus had "modeled [] over the past several months that **turned out exactly the way we thought it would**."

99.     The truth was far different: Bioventus had not been able to "adjust all" of the rebates. The Company later admitted in its 2022 Form 10-K that "due to the manner in which rebates are calculated and paid under certain of our contracts with private payers, **changes in the ASP for our HA viscosupplements may result in larger than expected rebates payments** for the sale of these products." In other words, far from Bioventus

*reducing* its rebates across the board, the shift to ASP meant rebates would *increase*, reducing the Company's revenue and profit.

100.    Unaware of the truth, an analyst from Morgan Stanley again asked about the impact of the WAC to ASP shift, the extent to which Bioventus's guidance relied on HA product volumes, and whether Bioventus saw "any initial signs" of "preference changes" to competitor HA products as a result.  Reali claimed that Bioventus had "seen ***no indication of impact on the volume***" of HA products sold, and reiterated that "***all of our ASP impact has been negated by our ability to renegotiate our rebates***."  He touted that this purported result was "***true to our model***."

101.    Again, analysts believed Reali's false statements.  In an August 11, 2022 report, Canaccord Genuity affirmed, "While HA reimbursement shifted to reported ASPs vs WAC at the end of June***, BVS offset this development via lower reimbursement rebate rates on its preferred HA contracts with private payers (which was as expected)***."  J.P. Morgan issued an analyst report that same day, which stated, "Reimbursement for HA has shifted from wholesale acquisition cost to average selling price, though this has not fundamentally impacted the growth opportunity as ***management has been able to offset lower pricing with lowered rebates on its contracted business***."  In an August 12, 2022 report, Morgan Stanley analysts wrote, "Investor focus centered on Medicare reimbursement pricing implications on HA products, however, the company expects a neutral impact . . . .  ***[M]anagement has not seen an impact on underlying HA utilization trends.***"

102. On September 14, 2022, Singleton participated in the Morgan Stanley Global Healthcare Conference. The Morgan Stanley analyst asked if Singleton had any concerns "that there is going to be disruption in the HA market as a result of the change," *i.e.*, the shift to ASP reporting. Singleton reiterated Reali's prior assurances about Bioventus's model, stating, "[I]t's progressing as we had it expected and have modeled into our numbers. And so that's kind of as expected."

103. The Morgan Stanley analyst also asked specifically about Bioventus's contracts with two of its largest private payer customers, UnitedHealthcare and Cigna, and the impact of the shift. Rather than acknowledge that the Company lacked a reliable basis to determine there would be no impact—and that the shift to lower ASP was increasing, not decreasing, rebates—Singleton claimed with regard to Cigna that Bioventus had "adjusted our contract with them from the standpoint of the rebates favorability that was associated with the WAC going to the ASP world."

### E. The Truth Emerges: Defendants Admit Material Controls Weaknesses and Reverse Material Amounts of Revenue Based on Large Rebate Claims, and Reduced ASP Pricing Slashes Bioventus's Revenues and Profit

104. Starting on November 8, 2022, the truth emerged in piecemeal fashion as Bioventus's grossly deficient controls and GAAP violations impacted the Company's earnings and led to a material reversal of revenue and admissions of material weaknesses in controls. Further, the Company's failure to reliably model the impact of the ASP shift and failure to offset reduced ASP pricing with lower rebates materialized when the

34

financial performance of HA products steeply declined. As the truth emerged, Bioventus's stock price declined in precipitous fashion.

1. **November 8, 2022: Weak Earnings and a Purportedly Unexpected Rebate Claim**

105. On November 8, 2022, Bioventus filed a Form 8-K announcing dismal 3Q22 financial results. Specifically, Bioventus reported total revenue of $137.1 million and EBITDA of $22.7 million—well below consensus estimates of $141.6 million and $25.3 million—and $55.419 million in net sales for its Pain Treatments vertical and U.S. geographic region, and that demand for the 3-injection Gelsyn treatment plummeted, causing revenue from the company's pain business to decline approximately 13% quarter over quarter. Given this material underperformance, Defendants slashed guidance to net sales of $527 million to $532 million, well below the prior range of $547.5 million to $562.5 million.

106. During that day's earnings call, Reali admitted that the "revenue shortfall" was "primarily . . . attributed to transitory headwinds related to GELSYN," calling out (1) "higher than normal rebate claims due to unexpected prior period rebate charges from a private payer who found errors in their earlier claims reporting," and (2) "the recent change in pricing to average selling price, or ASP, from wholesale acquisition cost, or WAC."

107. Nonetheless, Reali tried to cabin the issues, claiming that the negative pricing "dynamic did not impact Durolane," and that the rebate claim was due to a single "private payer who found errors in their earlier claims reporting." Reali's statements obscured the

fact that Bioventus had been receiving incorrect payment amounts from this payer for at least a year and recognizing the excess amounts as revenue, in violation of GAAP.

108. Reali also continued to claim that Bioventus had a reliable model of pricing on its key HA products: "So we model this out, and we have a full understanding of where our pricing is going to go over the next year . . . . We certainly know the competition. We know the markets and we know where the pricing is going to be."

109. On this news, the share price of Bioventus Class A common stock declined 57.5% in a single day, from $7.06 to $3.00 at the close of trading on November 8, 2022.

110. Analysts were shocked at the announcement. A November 8, 2022 Canaccord Genuity analyst report said the results were "***thesis changing***," and that it was "clear the shift to ASP reporting from WACC has impacted the commercial stability here; this comes in ***sharp contrast to prior management commentary that called for ASP declines to be offset by reduced rebate levels***."

### 2. November 16, 2022: Defendants Admit a Material Weakness in Internal Controls Driven by Rebates

111. On November 16, 2022, Bioventus announced that it would be unable to timely file its 3Q22 Form 10-Q and that it may be forced to take "an impairment charge in the range of $185 million to $205 million." According to the Company, this was because of "the recent decline in the Company's market capitalization subsequent to its previously announced financial results for the third quarter of 2022."

112. Bioventus also revealed that it was "seeking resolution" of the validity of a "revised invoice" for "rebate claims from a large private payer in relation to our Pain

Treatments vertical," and that the "recognition of additional rebates may impact Bioventus's recently announced revenue guidance."

113. While Bioventus did not quantify the impact of the rebate claims, it admitted that Bioventus's "internal controls related to the timely recognition of quarterly rebates were inadequate specifically for the period ended October 1, 2022." Further, the Company revealed that it was "evaluating whether [it] will be able to meet all of its financial obligations as they come due within one year . . . ."

114. On this news, the price of Bioventus's stock declined over 33%, or $1.00 per share, to close at $1.97 per share on November 17, 2022.

115. A November 18, 2022 Morgan Stanley analyst report noted that Bioventus had "received an invoice for rebate claims" which Morgan Stanley expected "will be a multiple of the ~$2m headwind stated on the 3Q22 call for '22 guidance." Morgan Stanley also removed its rating and price target for Bioventus Class A common stock.

> 3. **November 21, 2022: Bioventus Materially Reverses Revenue Due to the Rebate Claims, Admits that Its Disclosure Controls and Procedures Were Not Effective, and Takes a $189 Million Impairment Charge**

116. On November 21, 2022, Bioventus filed its 3Q22 Form 10-Q and revealed that the rebate claims had resulted in an $8.4 million reduction in the revenue previously reported for 3Q22 and a $4.3 million reduction in EBITDA. This significant revenue reversal—attributed to "open rebates and accruals"—drove a 16% year-over-year revenue decline ($8.953 million) in U.S. Pain Treatments revenues. The Company also disclosed that the material decline in U.S. Pain Treatments revenues was "due to more treatments

being sold under contracts with major issuers at lower prices and price competition within the osteoarthritic joint pain treatment market." This attribution of the decline further revealed that "lower prices" and "price competition" were damaging Bioventus's HA business, contrary to Reali and Singleton's prior claims that the ASP pricing shift was "net-neutral," "all of our ASP impact has been negated," and the Company had "seen no indication of impact on the volume" after the shift.

117.    Bioventus also announced a $189.2 million "non-cash impairment charge required by U.S. generally accepted accounting principles" "due to the recent decline in our market capitalization," an admission that Bioventus's business was worth materially less as a result of the reduced ASP pricing and material controls weaknesses.

118.    Bioventus also elaborated on its previously disclosed material weakness in internal controls, stating that the "internal control over financial reporting was not performed at a sufficient level of precision to ensure that the third quarter 2022 rebates accrual was complete and accurate." The Company admitted that when it received the large invoice, "there were not processes in place to ensure it was reviewed timely in order to update the [third quarter rebates] accrual." Moreover, Bioventus stated that "the process undertaken to estimate the expected reduction in revenue from rebates was consistent with the Company's historical practice," indicating that the material weaknesses in that "process" that led to the material overstatements of revenue and EBITDA were also "consistent with the Company's historical practice."

119.  This disclosure confirms that the Company in fact received the invoice before October 1, 2022, but did not appropriately account for its impact before releasing inflated revenue and EBITDA numbers on November 8, 2022, over a month later.

120.  Further, because of the material weakness in internal control over financial reporting, the Company admitted that "our disclosure controls and procedures were not effective as of October 1, 2022."

121.  Bioventus also detailed purported remediation efforts that further demonstrated the scope of the material weaknesses.  The Company admitted it was: (i) "[r]eassessing open rebates accruals and changing the estimation method for calculating the rebate accruals"; (ii) "[i]mplementing enhanced controls and status tracking to ensure that rebates invoices . . . are received and reviewed timely;" and (iii) "[i]ncreasing rigor of documenting key conversations with payers."  Bioventus admitted that these new and purportedly enhanced controls "have not operated for a sufficient amount of time to conclude that the material weakness has been remediated," indicating that the Company did not even know if the material weakness had been fully addressed.

122.  Crucially, the Company further revealed that the $8.4 million decrease in revenue "related to the rebates accrual adjustment for 2022 and [sic] cascading effect on future revenue projections materially impacted the Company's evaluation of its ability to meet debt covenants, resulting in liquidity and going concern disclosures in the" Form 10-Q.  Bioventus revealed that recent "conditions and events raise substantial doubt about the Company's ability to continue as a going concern," meaning the Company would run out of money and face liquidation.

39

123.    On this news, the price of Bioventus Class A common stock declined $0.07, or 3.7%, to $1.81 at the close of trading on November 22, 2022.

124.    In a November 22, 2022 report, analysts from Craig-Hallum wrote, "*[W]e learn there are in-fact more errors in store and are moving to the sidelines* until faith in financials/operating business can be restored and hard decisions around BVS' future are made," downgrading the stock to a "Hold" rating.  The report noted that one of the main dynamics causing the "restatements" was "the rebate snafu that appeared in Q3 where BVS was receiving too high of HA payments from an insurer for at least a year – this amount was incorrect."  The report also stated, "The rebate question above does *add questions to the financial infrastructure backbone at BVS and if more 'rebate adjustments' are necessary elsewhere.*"

F.    **Post-Class Period:  Reali Admits that Bioventus Cannot Timely Track Customer-Specific Rebates or Sales Volume; Bioventus Continues to Decline and Reali Is Terminated**

125.    On January 11, 2023, Reali participated in the JPMorgan Healthcare Conference and admitted that Bioventus generally received rebate invoices after "2 quarters lag time," *i.e.*, after the product was sold, and the Company had "no insight into where they're going," *i.e.*, the Company had no meaningful way of tracking volumes and related pricing.

126.    In reporting Bioventus's 4Q and FY 2022 results, Defendants revealed an additional $4 million in rebate claims from United, one of Bioventus's largest private payer customers, and that Durolane pricing (and revenues) had in fact been impacted by the ASP

shift. It was no coincidence that, in two consecutive quarters after the shift from WAC to ASP reporting, Bioventus had to reverse revenue from two of its largest payers as pricing dropped on two of its largest HA products. This was the direct result of the deficient controls that existed and had persisted since the IPO.

127. On March 31, 2023, Bioventus announced its 4Q and FY22 financial results. In the press release, Reali was quoted, "Our results reflect additional pressure in our Pain Treatments vertical, primarily due to additional rebate claims previously not billed to us from a private payer, which offset the double-digit growth we are seeing in the Surgical Solutions vertical." The press release reported Bioventus's Q422 net sales: "Total net sales were $125.8 million compared to $130.4 million for the fourth quarter of 2021, a decrease of $4.6 million, or 3.5%, year-over-year, due to a decline in the Pain Treatments vertical, primarily driven by a decline in price resulting from higher than expected rebate claims."

128. In his introductory remarks on that day's earnings call, Reali stated that Bioventus's financial performance "fell below our expectations" due to "continued pressure across our HA franchise" and supposedly "[u]nanticipated rebate claims from one private payer," *i.e.*, United, "along with lower volume growth and decreased selling price across our HA business." Reali admitted that Bioventus had received "rebate claims of approximately $4 million" from United Optum, "which represent claims previously not billed to us. United Optum recently notified us that they had found these unbilled claims in their system through their internal audit of their rebate process in the fourth quarter, which revealed that they had underbilled us." Reali also noted that, as a result of the rebate claims, Bioventus's "average selling price, or ASP, for both Durolane and Gelsyn is now

lower than previously expected," that Bioventus experienced "double-digit price loss" on Durolane, and that "Durolane revenue declined high single digits for the quarter."

129. Because of Bioventus's weakened financial state, Reali acknowledged that Bioventus had renegotiated the CartiHeal deal to release Bioventus from the milestone payment obligations and return CartiHeal to its prior owners in exchange for a payment of $10 million to CartiHeal's shareholders.

130. Also on March 31, 2023, Defendants filed Bioventus's 2022 10-K, reporting U.S. Pain Treatments net sales had declined to $194.830 million in 2022 compared to $201.068 million in 2021, a decline of 3.1%. The 2022 10-K stated that the decline was "due to more treatments being sold under contracts with major insurers resulting from higher than expected rebate claims and price competition within osteoarthritic joint pain treatment market, partially offset with an increase in sales volume."

131. Just five days after disclosing these disappointing financial results, on April 5, 2023, the Company announced that the Board of Directors had informed Reali that he would be fired as CEO and, as a result, Reali had resigned as an officer and director on April 4, 2023.

## V.  FORMER EMPLOYEE ALLEGATIONS

132. Together with the allegations attributed to the FEs herein, this section provides an overview of the basis for the FEs' personal knowledge and the basis for the allegations herein.

133. **FE-1** served as National Account Director of Market Access at Bioventus from November 2018 to January 2023. In this capacity, FE-1 had responsibility for

42

negotiating contracts between Bioventus and insurance companies, and primarily Bioventus's contracts for its HA products (Durolane, Gelsyn, and Supartz). According to FE-1, based on personal knowledge:

(a) <u>CEO Ken Reali was "incompetent" and his revenue forecast for 2022 was "crazy"</u>: CEO Reali was "incompetent" and made a lot of bad mistakes. Reali was adamantly focused on acquisitions and there was significant pressure on employees to keep Bioventus's stock price high in order to finance acquisitions and pay for them. In early 2022, FE-1 was surprised when CEO Reali announced the Company was raising its revenue forecast for the year. The revenue forecast was "crazy," FE-1 said, and CEO Reali should never have said that. At that time, sales of the HA products, which made up 60 percent of the Company's revenue, were not growing; Exogen had been performing poorly for years; and none of the newly acquired products performed well. In sum, the Company was not growing. The Company's claim in November 2022 that it was hit by an unexpected, large rebate request was incorrect, and used as a scapegoat for the Company's inability to meet CEO Reali's exaggerated revenue forecast.

(b) <u>Rebate requests were predictable based on information available to the Company</u>: Customers had a year to submit their rebate requests, and over the course of a year, the rebate requests evened out to equal the contractual amount owed for payments made. So if a quarterly rebate request was lower than the contractually-mandated amount owed based on sales, the customer will predictably submit higher rebate requests in the subsequent quarters such that, within any given year, the total rebate requests evened out to equal the contractual amount owed. For example, if a payer consistently had $1,000 in claims per quarter, but a particular quarter claimed rebates for just $700, the Company should be ready for an additional $300 within the next year. FE-1 was skeptical of the suggestion that Bioventus could not have anticipated the large rebate request that came in after the books closed in Q3 2022. The Company should have expected the rebate because the Company could have determined the amount of rebates Bioventus would need to pay each customer based on contractual agreements.

(c) <u>Bioventus had no system or process to track revenue, rebates, and discounts for each insurer</u>: FE-1 was not aware of Bioventus ever

having any system or process to track revenue, rebates, and discounts for each insurer.

(d) <u>Bioventus held Quarterly Finance Meetings where the sales team expressed concerns with inaccurate rebate forecasting and improper revenue recognition</u>: At Quarterly Finance Meetings held at Bioventus's headquarters, the sales team expressed concerns with inaccurate rebate forecasting and improperly recognizing revenue. Given the poor systems and uncertainty over rebates, they urged that Bioventus should be more conservative to avoid reversing or lowering its revenue figures when the Company was later hit with rebate requests.

134. **FE-2** was a Financial Planning and Analysis Manager at Bioventus from October 2021 to June 2022. Prior to that, FE-2 worked at Misonix from January 2021 until it was acquired by Bioventus in October 2021. According to FE-2, based on personal knowledge:

(a) <u>Bioventus had poor financial monitoring, tracking, and forecasting systems</u>: When Misonix was acquired, FE-2 was surprised by the lack of sophistication in Bioventus's financial management and forecasting systems. The ability to track things and report things accurately, and to measure and monitor things, was severely limited due to how poor the Company's system was. It was "like they were in the stone age."

a. Bioventus used an SAP system for accounting. From previous experience with SAP accounting systems at other companies, FE-2 was aware of how sophisticated and automated that accounting software can be when done right. But Bioventus's SAP system had none of that sophistication and automation. Bioventus's SAP system could not do a number of actions that are routine at other companies, such as allocations and reverse entries. By failing to implement proper accounting software, Bioventus lacked use of any of the true functionalities, which would have given the Company much more accurate data, and more quickly.

b. Bioventus used another software system, Oracle PBCS, for forecasting. FE-2 also had experience with Oracle PBCS

software at a previous job, and was familiar with its capabilities. But at Bioventus, the forecasting system was not set up right. The Company was barely using any functionality and "I was kind of mind blown," FE-2 explained. To make matters worse, the Company's IT department wanted nothing to do with Oracle and was not improving functionality, which was "scary" because the Company relied on the Oracle system in order to populate its financial statements.

(b) <u>Bioventus lacked any system to track headcount and payroll expenses, and instead calculated Company expenses by forcing employees to spend a few weeks each year to try to gather this information</u>: FE-2 worked on a special project to get a better handle on the Company's headcount and payroll costs, but the Company put that project on pause. Salary and payroll was a major expense at Bioventus, yet the Company lacked a system that could quickly and accurately report how many employees worked at the Company and how much the Company was spending on payroll. Instead, Bioventus was trying to manage this data on an Excel spreadsheet, and Bioventus employees were forced to spend a few weeks every year trying to gather the right information and data to identify the company's headcount and calculate its payroll costs. This practice was "insane" because, at a good company, these functions can be performed in an hour, or a few minutes each.

(c) <u>Bioventus's rebate tracking and forecasting system was "a real mess"</u>: The financial team charged with tracking and forecasting rebates reported to FE-2 and others that the Company had no controls on which customers were asking for rebates or how much they were asking for. Instead, there were thousands of lines, and they were trying to do it in an Excel file, without any kind of system in place. It was "a real mess."

(d) <u>FE-2 told CFO Singleton and Other Executives that the Company's financial systems were in dire need of improvement</u>: FE-2 was vocal regarding FE-2's concerns about the Company's poor systems for managing its finances. "I flagged it to them immediately" and "I kept bringing it up," FE-2 said. Bioventus also did not have the systems and processes in place to take on two major acquisitions. Among other things, FE-2 reported these concerns about the poor systems directly to Diane Schabinger, Director of FP&A and Business

45

Intelligence, and also to CFO Mark Singleton.  In fact, FE-2 told Singleton that the financial systems were a "mess."

(e) Bioventus's CFO was kept informed of these deficiencies at Monthly Financial Close Meetings:  FE-2 attended Monthly Financial Close Meetings to review the Company's financial performance, budget, and forecasting on a monthly basis, including forward-looking metrics.  Attendees also included CFO Anglum (later CFO Singleton), VP of Finance Ben Fishburn, Director of FP&A and Business Intelligence Diane Schabinger, and the FP&A group, among others.  This monthly meeting kept the CFO informed on key issues, including the transition from WAC to ASP pricing for HA products and problems with the Company's rebate estimates.  When Mark Singleton came in as CFO, he "walked into a shitshow."  The Company's systems were a mess, but there was no clear discussion or resolution to improve or correct them.  For each Monthly Financial Close Meeting, FE-2 worked with others to prepare a PowerPoint that was circulated to attendees and presented at the meeting.

## VI.  THE INDIVIDUAL DEFENDANTS ARE SUBJECT TO CONTROL PERSON LIABILITY

135.  Plaintiff incorporates and realleges the allegations set forth above.  In addition, the following allegations demonstrate the Individual Defendants' control over Bioventus at the time of the IPO and throughout the Class Period.

136.  The Individual Defendants had control of Bioventus by virtue of their positions as directors and officers of the Company.  As its directors and officers, the Individual Defendants were responsible for monitoring the operations of the Company on a regular basis and for authorizing the Company to take important actions, such as conducting the IPO.

137.  The Individual Defendants each authorized the content of and signed the Registration Statement.

138.   The Officer Defendants had control of Bioventus due to their executive positions and their roles in management, their preparation and signing of Bioventus's SEC filings, and their direct involvement in its day-to-day operations.

139.   The Officer Defendants held the top management positions within Bioventus and thereby controlled the Company.  Specifically: (i) Reali was Bioventus's CEO and a member of its Board throughout the Class Period; (ii) Singleton has served as Bioventus's SVP and CFO since March 21, 2022; and (iii) Anglum served as Bioventus's SVP and CFO from August 2017 until April 2022.

140.   The Officer Defendants prepared and signed Bioventus's SEC filings throughout the Class Period.  Specifically, Defendants Reali and Anglum signed the Registration Statement, 2020 10-K, 2021 10-K, 1Q22 10-Q, and 2Q22 10-Q; and Defendants Reali and Singleton signed Bioventus's 1Q22 10-Q and 2Q22 10-Q.

141.   The Officer Defendants also spoke on behalf of the Company during conference calls with investors during the Class Period.  Defendant Reali presented Bioventus's financial results and answered analyst questions during the earnings calls on March 10, 2022, and Defendants Reali and Singleton presented Bioventus's financial results and answered analyst questions during the earnings calls on May 10, 2022, August 11, 2022, and November 8, 2022.  Defendant Singleton also participated and presented in the September 14, 2022 Morgan Stanley Global Healthcare Conference.

## VII.   SECURITIES ACT ALLEGATIONS

142.   In this section of the Complaint, Plaintiff asserts strict liability and negligence claims based on Sections 11 and 15 of the Securities Act of 1933 on behalf of

all persons and entities who purchased or otherwise acquired Bioventus's Class A common stock pursuant and/or traceable to the Registration Statement. Plaintiff expressly disclaims any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately from Plaintiff's Exchange Act claims.

143. All of the statements and omissions in the Registration Statement that Plaintiff alleges to be actionable are included in this section.

144. The Registration Statement violated the Securities Act because it (1) contained materially false and misleading statements regarding Bioventus's revenue recognition and GAAP compliance; and (2) in violation of Item 303, omitted the known, material uncertainties created by Bioventus's material weaknesses in internal controls.

### A. False and Misleading Statements Regarding Bioventus's Revenue Recognition and GAAP Compliance

145. The Prospectus incorporated into the Registration Statement stated:

We report sales net of contractual allowances, rebates and returns.

This statement was materially false when made because Bioventus did not "report sales net of contractual allowances, rebates and returns." In truth, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP. This statement was also materially misleading when made because it gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was violating

GAAP and suffered from a material weakness in internal controls and ineffective disclosure controls and procedures, as the Company later admitted.

146. The Prospectus incorporated into the Registration Statement stated:

***Revenue recognition***

*Sale of products* . . . . [Emphases in original.]

We recognize revenue at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude from revenues taxes collected from customers and remitted to governmental authorities.

Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements and certain distribution and administration fees offered in our customer contracts and other indirect customer contracts relating to the sale of our products. We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed. Adjustments arising from the change in estimates of variable consideration were not significant for the years ended December 31, 2019 and 2018.

The Prospectus repeated these statements in substantially identical form in the notes to the financial statements provided therein (at F-13).

These statements were materially false when made because Bioventus did not:

(i) determine the "transaction price" as "the contracted price net of estimates of variable

consideration"; (ii) "establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales"; (iii) have "estimates" that "t[ook] into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns"; (iv) include "[t]he amount of variable consideration . . . in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period"; or (v) "regularly review all reserves and update them at the end of each reporting period as needed."   In truth, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP.  These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was violating GAAP and suffered from a material weakness in internal controls and ineffective disclosure controls and procedures, as the Company later admitted.

147.    The Prospectus incorporated into the Registration Statement stated:

**Discounts and rebates** [Emphasis in original.]

. . . We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount

the customer will earn, based on historical buying trends and forecasted purchases.

The Prospectus repeated these statements in substantially identical form in the notes to the financial statements provided therein (at F-14).

These statements were materially false when made because Bioventus did not "reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases."  In truth, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP.  These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was violating GAAP and suffered from a material weakness in internal controls and ineffective disclosure controls and procedures, as the Company later admitted.

### B. Defendants' Material Omissions Violated SEC Item 303

148.    Item 303 of Regulation S-K ("Item 303") required that the Management Discussion and Analysis section of the Registration Statement describe "any known trends or uncertainties that have had or that [Bioventus] reasonably expects will have a material

favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).[6]

149. The failure to disclose a material trend or uncertainty in violation of Item 303 is an omission that is actionable under the federal securities laws.

150. The SEC's May 18, 1989 interpretive release (No. 33-6835) provides a two-step test to determine whether disclosure under Item 303 is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

151. In violation of Item 303, the Registration Statement omitted the known, material uncertainties that, with material weaknesses in internal controls, Bioventus was violating GAAP and recognizing significant amounts of revenue that would later be reversed. This known uncertainty materialized in November 2022, as set forth herein.

152. The material uncertainty was known to Bioventus's management because, as set forth above and in detail in Section XI.B herein: (i) Bioventus's management knew

---

[6] Although certain amendments to Item 303 became effective on February 10, 2021, they did not apply to the Registration Statement because it did not include financial statements issued after the amendment. The language of the amendments is substantially similar to that quoted above.

that Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP; (ii) Bioventus lacked a system to track revenues, rebates, and discounts for each private payer and could not accurately forecast rebates; (iii) the deficient controls and inaccurate rebate calculations were reported up to senior management, including the Officer Defendants; and (iv) sales of HA products and proper revenue recognition were central to Bioventus's business, strongly indicating that Defendants Reali and Anglum were aware of the improper revenue recognition and material controls weaknesses at the time of the IPO.

153. The known uncertainties were materially unfavorable. Bioventus's longstanding material weaknesses in internal controls left it exposed to the risk of violating GAAP by improperly recognizing significant amounts of revenue that the Company would later have to reverse when payers submitted large rebate claims.

154. The known uncertainties were highly material. They led to a significant reversal of 15% of U.S. Pain Treatments revenue ($8.4 million) and nearly 19% of EBITDA ($4.3 million) for the quarter and drove a 16% year-over-year revenue decline in Bioventus's U.S. Pain Treatments business, leading to a $189.2 million impairment charge and the Company's admission that its "internal controls related to the timely recognition of quarterly rebates were inadequate" and that its "disclosure controls and procedures were not effective." These disclosures materially impacted Bioventus's stock price. Moreover, Bioventus admitted that the $8.4 million decrease in revenue "related to the rebates accrual

adjustment for 2022 and cascading effect on future revenue projections materially impacted the Company's evaluation of its ability to meet debt covenants, resulting in liquidity and going concern disclosures in the" 3Q 2022 Form 10-Q.

155. Accordingly, for the reasons set forth above, the Registration Statement omitted the disclosures required under Item 303.

## VIII. CLASS ACTION ALLEGATIONS

156. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following proposed Class:

> As to claims under the Securities Act, all persons that purchased or otherwise acquired Bioventus's Class A common stock pursuant and/or traceable to the Registration Statement, and were damaged thereby; and

> As to claims under the Exchange Act, all persons and entities who purchased or otherwise acquired Bioventus's Class A common stock between February 11, 2021 and November 21, 2022, both inclusive, and were damaged thereby.

157. Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of Bioventus and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) Bioventus's employee retirement and benefit plan(s); and (vi) the legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories.

158. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of May 12, 2023, there were over 62.486 million shares of Bioventus Class A common stock outstanding, owned by at least thousands of investors.

159. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. The questions of law and fact common to the Class include, but are not limited to, the following:

    a. Whether the federal securities laws were violated by Defendants' conduct as alleged herein;

    b. Whether Defendants made any untrue statements of material fact or omitted to state any material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading;

    c. Whether the Registration Statement contained any untrue statements of material fact or omitted to state any material facts required to be stated therein or necessary to make the statements therein not misleading;

    d. Whether the Exchange Act Defendants acted with scienter as to Plaintiff's claim for relief under Section 10(b) of the Exchange Act;

    e. Whether the Officer Defendants were controlling persons as to Plaintiff's claim for relief under Section 20(a) of the Exchange Act;

    f. Whether the Individual Defendants were controlling persons as to Plaintiff's claim for relief under Section 15 of the Securities Act;

g. Whether any Defendants can sustain their burden of establishing an affirmative defense under applicable provisions of the Securities Act;

h. Whether and to what extent the prices of Bioventus Class A common stock were artificially inflated or maintained during the Class Period due to the misstatements and non-disclosures complained of herein;

i. Whether, with respect to Plaintiff's claims under the Exchange Act, reliance may be presumed under the fraud on the market doctrine;

j. Whether and to what extent Class members have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

160. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.

161. There will be no difficulty in the management of this action as a class action. Class members may be identified from records maintained by the Company or its transfer agent(s), or by other means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR

162. The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that existed or were purported to exist at the time the statements were made. Further, the PSLRA safe harbor expressly excludes

forward-looking statements "made in connection with an initial public offering," such as the IPO. 15 U.S.C. § 77z-2(b)(2)(D).

163. To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of Bioventus who knew that the statement was untrue or misleading when made.

## X. CLAIMS FOR RELIEF PURSUANT TO THE SECURITIES ACT

### COUNT I

**Section 11 of the Securities Act**
**In Connection with the Registration Statement**
**(Against Bioventus and the Individual Defendants)**

164. Plaintiff repeats, incorporates, and realleges each and every allegation above relating to the Securities Act claims as if fully set forth herein.

165. This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made. For purposes of asserting this and

57

their other claims under the Securities Act, Plaintiff does not allege that Defendants acted with intentional, reckless, or otherwise fraudulent intent.

166. The Registration Statement contained untrue statements of material fact, omissions of material fact required to be stated therein, and omissions of material fact necessary to make the statements therein not misleading.

167. Defendants were responsible for the content and dissemination of the Registration Statement. Each Individual Defendant signed the Registration Statement and Defendants Hawkins, Cowdy, Neels, Nohra, Parker, Stalnecker, and Sutter were Directors of the Company when the Registration Statement became effective.

168. As the issuer and registrant for the IPO, Bioventus is strictly liable for the material misstatements and omissions in the Registration Statement.

169. The Defendants acted negligently in that none of them conducted a reasonable investigation or possessed reasonable grounds to believe that the statements contained in the Registration Statement were true and not misleading, and that the Registration Statement did not omit any material facts required to be stated therein or necessary to make the statements made therein not misleading.

170. Plaintiff and the Class acquired Bioventus Class A common stock pursuant and/or traceable to the Registration Statement.

171. When they acquired Bioventus Class A common stock pursuant to and/or traceable to the Registration Statement, Plaintiff and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the untruths and omissions contained (and/or incorporated by reference) in the Registration Statement.

172.    Plaintiff and the Class have sustained damages.  The value of Bioventus Class A common stock has declined substantially subsequent to and due to Defendants' violations.

## COUNT II

### Section 15 of the Securities Act
### In Connection with the Registration Statement
### (Against the Individual Defendants)

173.    Plaintiff repeats, incorporates, and realleges each and every allegation above relating to the Securities Act claims as if fully set forth herein.

174.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made.  For purposes of asserting this and their other claims under the Securities Act, Plaintiff does not allege that Defendants acted with intentional, reckless, or otherwise fraudulent intent.

175.    At all relevant times, the Individual Defendants were officers and/or directors of the Company and were controlling persons of Bioventus within the meaning of Section 15 of the Securities Act.

176.    The Individual Defendants, by virtue of their positions of control and authority and their direct participation in and/or awareness of Bioventus's operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of Bioventus, its Board, and its employees, and cause Bioventus to issue, offer, and sell Bioventus Class A common stock pursuant to the defective Registration Statement.

177.    The Individual Defendants had the power to, and did, control the decision-making of Bioventus, including the content and issuance of the statements contained (and/or incorporated by reference) in the Registration Statement; they were provided with or had unlimited access to copies of the Registration Statement (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected; and they were directly involved in or responsible for providing false or misleading information contained in the Registration Statement (and/or documents incorporated by reference therein) and/or certifying and approving that information.  The Individual Defendants each signed the Registration Statement.

178.    The Individual Defendants acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the Registration Statement was true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

179.    Plaintiff and others similarly situated suffered damages in connection with the purchase or acquisition of Bioventus Class A common stock pursuant and/or traceable to the Registration Statement.

## XI.    EXCHANGE ACT ALLEGATIONS

180.    The statements made by the Exchange Act Defendants (Bioventus, Reali, Anglum, and Singleton) that are alleged to be false and misleading are identified in the

sections below.  For the avoidance of doubt, all of the statements and omissions that Plaintiff alleges to be actionable under the Exchange Act are included in this section.

181.    The false and misleading statements and omissions described below that were made in Bioventus's filings with the SEC are attributable to the Officer Defendants as follows:  Defendants Reali and Anglum signed the Registration Statement, 2020 10-K, 2021 10-K, 1Q22 10-Q and 2Q22 10-Q; and Defendants Reali and Singleton signed Bioventus's 1Q22 10-Q and 2Q22 10-Q.

### A.    Exchange Act Materially False and Misleading Statements and Omissions

182.    In the Registration Statement, the Exchange Act Defendants made the materially false and misleading statements and omissions set forth above with particularity in Section VII, which are actionable under both the Securities Act and the Exchange Act. Specifically, the Exchange Act Defendants:

> a.    Made material misstatements about Bioventus's revenue recognition and GAAP compliance (*see supra* Section VII.A); and
>
> b.    Violated Item 303 by omitting the known uncertainties created by Bioventus's material weaknesses in internal controls (*see supra* Section VII.B).

183.    During the Class Period, the Exchange Act Defendants made additional statements on these topics in Bioventus's SEC filings and during investor conference calls, as set forth below, and violated Item 303 by omitting the known uncertainties created by

Bioventus's material weaknesses in internal controls in Bioventus's 2020 and 2021 Forms 10-K. These statements and omissions are actionable for the reasons identified below.

184. In addition, the Exchange Act Defendants made materially false and misleading statements regarding:

    a. revenue, net sales, and EBITDA that Bioventus materially inflated in violation of GAAP;

    b. Bioventus's disclosure controls and internal controls over financial reporting, which were ineffective and suffered from material weaknesses throughout the Class Period that resulted in improper revenue recognition and inadequate rebate accruals in violation of GAAP; and

    c. The shift from WAC to ASP for Medicare reimbursements and whether Bioventus had offset that impact by reducing rebates in its contracts with private payers, when Bioventus had failed to perform any meaningful analysis of the shift, lacked the controls necessary to do so, and had failed to offset the lower pricing with lower rebates on contracts with private payers.

    **1.    False and Misleading Statements Regarding Bioventus's Revenue Recognition and GAAP Compliance**

185. Bioventus's 2020 and 2021 Forms 10-K stated:

We report sales net of contractual allowances, rebates and returns.

This statement was materially false when made because Bioventus did not "report sales net of contractual allowances, rebates and returns." In truth, Bioventus recognized revenue

without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP. This statement was also materially misleading when made because it gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was violating GAAP and suffered from a material weakness in internal controls and ineffective disclosure controls and procedures, as the Company later admitted.

186. Bioventus's 2020 10-K stated:

***Revenue recognition***

*Sale of products* . . . . [Emphases in original]

We recognize revenue at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude from revenues taxes collected from customers and remitted to governmental authorities.

Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements and certain distribution and administration fees offered in our customer contracts and other indirect customer contracts relating to the sale of our products. We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update

them at the end of each reporting period as needed. There were no adjustments arising from the change in estimates of variable consideration for the years ended December 31, 2020 and 2019.

The 2020 10-K repeated these statements in substantially identical form in the notes to the financial statements provided in the 2020 10-K. (2020 10-K at 121.)

The 1Q21 10-Q, 2Q21 10-Q, and 3Q21 10-Q stated:

**Revenue recognition** [Emphasis in original]

Our policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K.

These statements were materially false when made because Bioventus did not: (i) determine the "transaction price" as "the contracted price net of estimates of variable consideration"; (ii) "establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales"; (iii) have "estimates" that "t[ook] into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns"; (iv) include "[t]he amount of variable consideration . . . in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period"; or (v) "regularly review all reserves and update them at the end of each reporting period as needed." In truth, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration

and remove it from revenue, as required by GAAP. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was violating GAAP and suffered from a material weakness in internal controls and ineffective disclosure controls and procedures, as the Company later admitted.

187. Bioventus's 2020 10-K stated:

**Discounts and rebates** [Emphasis in original]

. . . We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases.

These statements were materially false when made because Bioventus did not "reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases." In truth, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was violating

GAAP and suffered from a material weakness in internal controls and ineffective disclosure controls and procedures, as the Company later admitted.

188. The notes to the financial statements provided in each of the 2020 10-K and 2021 10-K stated:

> *Discounts and gross-to-net deductions* [Emphasis in original]
>
> . . . The Company reduces revenue and records the reserve as a reduction to accounts receivable for the estimated discount and rebate at the expected amount the customer will earn, based on historical buying trends and forecasted purchases.

These statements were materially false when made because Bioventus did not "reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases." In truth, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was violating GAAP and suffered from a material weakness in internal controls and ineffective disclosure controls and procedures, as the Company later admitted.

189. Bioventus's 2021 10-K stated:

> **Revenue recognition**

*Sale of products* . . . . [Emphases in original]

We recognize revenue generally at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude taxes collected from customers and remitted to governmental authorities from revenues.

Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements, and certain distribution and administration fees offered in customer contracts and other indirect customer contracts relating to the sale of products. We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experiences, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed. There were no significant adjustments arising from the change in estimates of variable consideration for the years ended December 31, 2021 and 2020.

The 2021 10-K repeated these statements in substantially identical form in the notes to the financial statements provided in the 2021 10-K. (2021 10-K at 97.)

Bioventus's 1Q22 10-Q and 2Q22 10-Q stated:

**Revenue recognition** [Emphasis in original]

Our policies for recognizing sales have not changed from those described in the Company's 2021 Annual Report on Form 10-K.

These statements were materially false when made because Bioventus did not: (i) determine the "transaction price" as "the contracted price net of estimates of variable consideration"; (ii) "establish reserves for the estimated variable consideration based on

the amounts earned or eligible for claim on the related sales"; (iii) have "estimates" that "t[ook] into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns"; (iv) include "[t]he amount of variable consideration . . . in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period"; or (v) "regularly review all reserves and update them at the end of each reporting period as needed."   In truth, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP.  These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was violating GAAP and suffered from a material weakness in internal controls and ineffective disclosure controls and procedures, as the Company later admitted.

190.   Bioventus's 2021 10-K stated:

***Discounts and gross-to-net deductions*** [Emphasis in original]

. . . We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases. . . .

These statements were materially false when made because Bioventus did not "reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases."  In truth, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP.  These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was violating GAAP and suffered from a material weakness in internal controls and ineffective disclosure controls and procedures, as the Company later admitted.

> **2.    False and Misleading Statements Regarding
> Revenue, Net Sales, and EBITDA that Bioventus
> Materially Inflated in Violation of GAAP**

191.    On March 10, 2022, Bioventus filed a Form 8-K announcing its financial results for 4Q21 and FY 2021, and reported total revenue of $130.4 million and EBITDA of $28.5 million, and for its Pain Treatments vertical and U.S. geographic region, $115.2 million in net sales for the three months ended December 31, 2021.  On May 9, 2022, Bioventus filed a form 8-K announcing its financial results for 1Q22, and reported total revenue of $117.3 million and EBITDA of $7.1 million, and for its Pain Treatments vertical and U.S. geographic region, $104.1 million in net sales for the three months ended April 2, 2022.  On August 10, 2022, Bioventus filed a Form 8-K announcing its financial

results for 2Q22, and reported total revenue of $140.3 million and EBITDA of $22.9 million, and for its Pain Treatments vertical and U.S. geographic region, $126.3 million in net sales for the three months ended July 2, 2022. On November 8, 2022, Bioventus filed a Form 8-K announcing its financial results for 3Q22, and reported total revenue of $137.1 million and EBITDA of $22.7 million, and for its Pain Treatments vertical and U.S. geographic region, $55.419 million in net sales for the three months ended October 1, 2022. These statements were materially false when made because the reported revenue and EBITDA were materially overstated as a result of Bioventus's GAAP violations, material weaknesses in internal controls over financial reporting, and ineffective disclosure controls and procedures. On November 21, 2022, Bioventus revealed that rebate claims had resulted in an $8.4 million reduction in the revenue previously reported for 3Q22 and a $4.3 million reduction in EBITDA, a significant reversal the Company attributed to "open rebates and accruals." This reversal was the product of the Company's overstatement of revenue and EBITDA for at least a year, driven by its failure to account properly for rebates. On November 22, 2022, Craig-Hallum reported that the rebate was the result of the Company "receiving too high of HA payments from an insurer for at least a year . . . ." This meant the insurer would submit higher rebate requests in subsequent quarters such that, within any given year, the total rebate requests evened out to equal the contractual amount owed. (FE-1.)

### 3. False and Misleading Statements Regarding the Purported Effectiveness of Bioventus's Disclosure Controls and Internal Controls Over Financial Reporting

192.    The 2020 10-K contained signed certifications by Reali and Anglum, who each certified that: (i) the 2020 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; (ii) the financial information contained in the Form 10-K "fairly present in all material respects the financial condition, results of operations, and cash flows" of Bioventus; and (iii) the 2020 10-K disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting." The 1Q21 10-Q, 2Q21 10-Q, and 3Q21 10-Q also included substantively identical certifications signed by Defendants Reali and Anglum. These statements were materially false when made because: (i) the 2020 10-K, 1Q21 10-Q, 2Q21 10-Q, and 3Q21 10-Q each contained materially false and misleading statements as set forth herein; (ii) the financial information contained in these SEC filings violated GAAP and was the unreliable product of material weaknesses in controls; and (iii) Bioventus suffered from undisclosed, material weaknesses in internal controls and disclosure controls and procedures, as the Company later admitted. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that

Bioventus was violating GAAP and suffered from a material weakness in internal controls and ineffective disclosure controls and procedures, as the Company later admitted.

193. Bioventus's 2020 10-K stated:

**Evaluation of Disclosure Controls and Procedures** [Emphasis in original]

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2020. . . .

During 2020 we remediated a material weakness associated with the proper processing of Exogen reimbursement claims in accordance with regulations and contractual terms.

These statements were materially false when made because Bioventus's "disclosure controls and procedures were" not "effective at the reasonable assurance level as of December 31, 2020." In truth, Bioventus had an undisclosed material weakness in internal controls over financial reporting, and its disclosure controls were ineffective. These statements were also materially misleading when made because they gave reasonable investors the false impression that any GAAP violations or material controls weaknesses had been disclosed, while omitting the material facts that Bioventus was violating GAAP and suffered from ineffective disclosure controls and procedures and a material weakness in internal controls, as the Company later admitted.

194. Bioventus's 1Q21 10-Q stated:

***Evaluation of Disclosure Controls and Procedures*** [Emphasis in original]

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of April 3, 2021.

The 2Q21 10-Q and 3Q21 10-Q repeated this statement "as of July 3, 2021," and "as of October 2, 2021," respectively.

These statements were materially false when made because Bioventus's "disclosure controls and procedures were" not "effective at the reasonable assurance level as of" the date provided in each Form 10-Q. In truth, Bioventus had an undisclosed material weakness in internal controls over financial reporting, and its disclosure controls were ineffective. These statements were also materially misleading when made because they gave reasonable investors the false impression that any GAAP violations or material controls weaknesses had been disclosed, while omitting the material facts that Bioventus was violating GAAP and suffered from ineffective disclosure controls and procedures and a material weakness in internal controls, as the Company later admitted.

195. Bioventus's 2021 10-K stated:

***Evaluation of Disclosure Controls and Procedures*** [Emphasis in original]

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2021.

***Management's Report on Internal Control over Financial Reporting*** . . . .
[Emphasis in original]

> In connection with the preparation and filing of this Annual Report, the Company's management, including our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2021, based on the framework set forth in "Internal Control—Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Our assessment of, and conclusion on, the effectiveness of internal control over financial reporting did not include Misonix and Bioness, both acquired by the Company in 2021 and included in our 2021 consolidated financial statements. Misonix and Bioness are now wholly-owned subsidiaries of the Company and comprised approximately 51.2% and 6.4%, respectively, of total assets, and approximately 3.6% and 7.9%, respectively, of total net sales, of the Company's related consolidated financial statement amounts as of and for the year ended December 31, 2021. Based on its evaluation, the Company's management concluded that, as of December 31, 2021, the Company's internal control over financial reporting is effective.

These statements were materially false and misleading when made because: (i) Bioventus's "disclosure controls and procedures were" not "effective at the reasonable assurance level as of December 31, 2020"; and (ii) "the Company's internal control over financial reporting" was not "effective" as of December 31, 2021. In truth, Bioventus had an undisclosed material weakness in internal controls over financial reporting, and its disclosure controls were ineffective. These statements were also materially misleading when made because they gave reasonable investors the false impression that any GAAP violations or material controls weaknesses had been disclosed, while omitting the material facts that Bioventus was violating GAAP and suffered from ineffective disclosure controls and procedures and a material weakness in internal controls, as the Company later admitted.

196.   Bioventus's 1Q22 10-Q stated:

***Evaluation of Disclosure Controls and Procedures*** [Emphasis in original]

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of April 2, 2022.

The 2Q22 10-Q repeated this statement "as of July 2, 2022."

These statements were materially false and misleading when made because Bioventus's "disclosure controls and procedures were" not "effective at the reasonable assurance level as of" the date provided in each Form 10-Q.  In truth, Bioventus had an undisclosed material weakness in internal controls over financial reporting, and its disclosure controls were ineffective.  These statements were also materially misleading when made because they gave reasonable investors the false impression that any GAAP violations or material controls weaknesses had been disclosed, while omitting the material facts that Bioventus was violating GAAP and suffered from ineffective disclosure controls and procedures and a material weakness in internal controls, as the Company later admitted.

197.   The 2021 10-K contained signed certifications by Reali and Anglum, who each certified that:  (i) the 2021 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; (ii) the financial information contained in the Form 10-K "fairly present in all material respects the financial condition, results of operations, and

cash flows" of Bioventus; (iii) they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"; and (iv) the Exchange Act Defendants had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting." The 1Q22 10-Q and 2Q22 10-Q included substantively identical certifications by Defendants Reali and Singleton. These statements were materially false when made because: (i) the 2021 10-K, 1Q22 10-Q and 2Q22 10-Q each contained materially false and misleading statements as set forth herein; (ii) the financial information contained in these SEC filings violated GAAP and was the unreliable product of material weaknesses in controls; and (iii) Bioventus suffered from undisclosed, material weaknesses in internal controls and disclosure controls and procedures, as the Company later admitted. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was violating GAAP and suffered from a material weakness in internal controls and ineffective disclosure controls and procedures.

### 4. False and Misleading Statements Regarding the Purportedly "Net-Neutral" Shift from WAC to ASP Pricing

#### a. 4Q21 Earnings Call on March 10, 2022

198. During the 4Q21 Earnings Call, a Morgan Stanley analyst asked, "[Y]ou just mentioned the HA market remains very strong. Reimbursement is robust. It's -- heard some concerns from investors that Medicare might be potentially cutting prices in the not-too-distant future. But can you maybe spend a moment there, talk about how Bioventus might be better situated versus competitors? And any idea of precise timing for or implementation of the pricing cuts?" Defendant Reali responded:

> Yes. Thanks for the question, Drew, on that. We've looked at this very carefully, and this is not a Medicare cut per se, but it's focused on ASP reporting and ASP reimbursement, average selling price reimbursement. One of the things that we've historically done at Bioventus in our HA business is focused on market access. And what that means is having specific contracts with insurance carriers such as United Healthcare, the largest private carrier in the country today. And with those contracts, gives us unfettered access to accounts and the ability to cross sell to what we call non-contracted, non-United patients. But we also spend a lot of money relative to getting those contracts through rebates back to insurance companies where we have that unfettered access in that exclusive contract. So ***when we look at this analysis for us, and this is specific to Bioventus, I can't speak for other countries or other companies, rather, it's a net-neutral for Bioventus. While we may lose a little on the ASP reimbursement, we gain by paying less rebates because of that reimbursement change.***
>
> ***So for Bioventus, it provides us with basically a balanced footing on the HA reimbursement side.*** We may see some choppiness as we go through this, and we're projecting this would occur in the third quarter this year. But we feel that choppiness will be very short-lived as we work through the ASP reimbursement and, of course, the rebate change associated with that, that we pay back to insurance companies.

These statements were materially false when made because the shift from WAC to ASP was not "net-neutral for Bioventus," and Bioventus was not in a position to "gain by paying less rebates because of that reimbursement change," much less stand on "balanced footing on the HA reimbursement side." Instead, these statements had no factual basis because Bioventus: (i) suffered from grossly ineffective controls and inadequate systems that prevented any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and lacked the controls and systems necessary to do so.

### b.     1Q22 Earnings Call on May 10, 2022

199.    During the 1Q22 Earnings Call, an analyst from Goldman Sachs Group, Inc. asked, "[Y]ou touched on the potential pricing mechanism change here coming in the second half of the year. I think if you could maybe just provide a little bit more detail on sort of the mechanism of how that pricing change could affect your business. And any quantification you might be willing to sort of characterize over the next 12 months or as you annualize the potential pricing change." Defendant Reali answered:

Sure. So the way we look at this is we do expect the ASP reporting to happen. It's not 100%, but we think it's likely in the second half of the year. And that impacts Medicare pricing specifically to ASP reporting. But on the other side of the equation is our contracted business where we pay rebates. Very specifically, with contracts like United and Cigna, we pay rebates. Within our contracts with these payers, we have very specific clauses to reduce the rebates based on ASP reporting.

So **when we do our analysis of volume in our business, volume of syringes, the actual reduction in rebates offsets any reduction in reimbursement, specifically based on ASP reporting. We've run these calculations very carefully, and we feel strongly that not only will we be basically neutral through this process, but we can gain market share as we go forward in the medium term.**

These statements were materially false when made because the "actual reduction in rebates" did not "offset[] any reduction in reimbursement," and Bioventus had not "run these calculations very carefully" by analyzing "volume in our business, volume of syringes." Instead, these statements had no factual basis because Bioventus: (i) suffered from grossly ineffective controls and inadequate systems that prevented any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and lacked the controls and systems necessary to do so.

### c. 2Q22 Earnings Call on August 11, 2022

200. In his introductory remarks on the 2Q22 Earnings Call, Defendant Reali stated:

> As we highlighted on previous earnings calls, reimbursement for HA shifted from wholesale acquisition cost to average selling price at the end of June. Given the sales mix of our HA portfolio, this new pricing dynamic has not fundamentally impacted our overall growth opportunity. ***As expected, we have been able to lower our reimbursement rebate rates on all of our preferred contracts with private payers, which has offset lower pricing for other areas of our HA business.***
>
> ***The modifications to these agreements are consistent with our modeling exercises done over the past several months as we prepared for this new environment.***

These statements were materially false when made because Bioventus had not "been able to lower our reimbursement rebate rates on all of our preferred contracts with private payors" and had not "offset lower pricing for other areas of our HA business," nor were "[t]he modifications to these agreements . . . consistent with our modeling exercises done over the past several months as we prepare[d] for this new environment." Instead, these statements had no factual basis because Bioventus: (i) suffered from grossly ineffective controls and inadequate systems that prevented any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements, as the Company later admitted in its 2022 10-K. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful,

fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and lacked the controls and systems necessary to do so.

201. During the 2Q22 Earnings Call, an analyst from Craig-Hallum Capital Group LLC asked, "[J]ust on the HA pricing. What have you seen in July and August here with the changes around CMS? Are you seeing HA volumes and the price that you could charge the docs relatively consistent with the first half?" Defendant Reali answered:

> Well, we did see, based on ASP reporting a dip in our pricing for DUROLANE and GELSYN, in particular, [Supartz] was already ASP reported. But as we've talked about *that has been countered by our rebate adjustments that per our planning*, and we're very pleased with the results of this and it's a credit to our market access team. *We've been able to adjust all of our rebates on our contracted business, which is a significant portion to a lower amount that net effect, Alex, negates any impact on the ASPs because we're paying less rebates on our contracted business*.
>
> So *as we've modeled that over the past several months that turned out exactly the way we thought it would*. So the first phase of this has gone well.

These statements were materially false when made because the shift to ASP had not "turned out exactly the way we thought it would" based on "model[ing]" that over the past several months"; Bioventus had not "been able to adjust all of our rebates on our contracted business . . . to a lower amount" or to "negate[]" any impact on the ASPs"; and the "dip in our pricing for Durolane and Gelsyn" was not "countered by our rebate adjustments [] per our planning." Instead, these statements had no factual basis because Bioventus: (i) suffered from grossly ineffective controls and inadequate systems that prevented any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did

not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements, as the Company later admitted in its 2022 10-K. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and lacked the controls and systems necessary to do so.

202.    Later in the call, an analyst from Morgan Stanley asked, "[J]ust to go back to the HA component for a moment. I know we've kind of talked about this before. But I was hoping we could maybe get a better sense of what's embedded in guidance from a volume perspective. And if you are -- I think you mentioned maybe some volatility, but are you seeing any initial signs of like surgeon preference changes or anything within the portfolio or within the HA market?" Defendant Reali responded:

> So what's built into our forecast going forward is continued volume growth in our HA business as we've seen before because ***we've seen no indication of impact on the volume*** and that's certainly something we'll take advantage of. And as I talked about in the prior question on HA, a lot of our ASP impact, ***all of our ASP impact has been negated by our ability to renegotiate our rebates on a contracted business, which is a significant portion and that has been true to our model*** and it's something that we're excited about.

These statements were materially false when made because "all of our ASP impact" was not "negated by our ability to renegotiate our rebates on a contracted business," the results after the pricing shift were not "true to our model," and Bioventus had seen "indication of impact on the volume." Instead, these statements had no factual basis because Bioventus:

(i) suffered from grossly ineffective controls and inadequate systems that prevented any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements, as the Company later admitted in its 2022 10-K. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and lacked the controls and systems necessary to do so.

### d. September 14, 2022 Morgan Stanley Global Healthcare Conference

203. On September 14, 2022, Defendant Singleton participated in the Morgan Stanley Global Healthcare Conference. The Morgan Stanley analyst asked, "[E]arlier in the year, there was the big debate about what Medicare changes in pricing regime will kind of due to the HA market. And I think if I kind of go back and look at your updated guidance, I mean, it sounds like you're kind of baking in some potential disruptions in the marketplace. But for 2 months, roughly 2 months after the change, I mean, are you seeing anything from an underlying utilization perspective that's giving you concern that there is going to be disruption in the HA market as a result of the change?" Defendant Singleton responded:

Yes, obviously I'm new to the HA market, but I will tell you, I really have a lot of confidence in the team that we have navigating us through that. And so far, *for the first 2 months, it's progressing as we had it expected and have modeled into our numbers. And so that's kind of as expected.*

The Morgan Stanley analyst then asked, "[I]s there any disruption though that was kind of baked in there?" Singleton responded:

Yes. I guess I guess what adjective you want to put on it disrupted or choppiness, Yes, we expect a little bit of choppiness in the back half as we make the transition from WAC to ASP, but *it's kind of all built into our models*.

These statements were materially false when made because it was not true that the shift to ASP had "progress[ed] as we had expected and have modeled into our numbers" and ended up "kind of as expected," and it was not "all built into our models." Instead, these statements had no factual basis because Bioventus: (i) suffered from grossly ineffective controls and inadequate systems that prevented any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements, as the Company later admitted in its 2022 10-K. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and lacked the controls and systems necessary to do so.

204. The Morgan Stanley analyst also asked about Bioventus's contracts with insurers after the change in Medicare pricing: "[Y]ou have UnitedHealthcare and Cigna, just post kind of this regime change or Medicare pricing change? I mean, is there additional opportunity? Or are you even looking for more exclusive contracts with commercial insurers. Is that more important now than it was before kind of Medicare pricing changed?" Singleton stated in response:

> I think we're going to -- we feel really good. I mean, Cigna has just come on. I mean between Cigna and United that gives us really access to preferred lives and a lot of leverage in the market. We believe that's going to help us going through the WAC to ASP transition, **we have adjusted our contract with them from the standpoint of the rebates favorability that was associated with the WAC going to the ASP world.**

These statements were materially false when made because Bioventus had not "adjusted our contract with them from the standpoint of the rebates favorability that was associated with the WAC going to the ASP world." Instead, Bioventus had not secured reduced rebates to offset the impact of lower pricing and reimbursements, as the Company later admitted in its 2022 10-K, and in the fourth quarter of 2022 United submitted a $4 million rebate claim that drove a "double-digit price loss" on Durolane, and meant that "Durolane revenue declined high single digits for the quarter." These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and lacked the controls and systems necessary to do so.

### e. 3Q22 Earnings Call on November 8, 2022

205.     In his introductory remarks during the 3Q22 Earnings Call, Reali stated:

> While we expect to see continued pressure on GELSYN revenue through the first half of 2023, we believe that the mechanics of ASP reporting will resolve this issue as full ASP reporting takes effect and GELSYN pricing stabilizes to a more competitive position. As a reminder, ASP reporting is based on a 4-quarter look back. While both GELSYN and DUROLANE moved from WAC to ASP pricing, ***this dynamic did not impact DUROLANE, which maintained strong double-digit growth for the quarter***.

These statements were materially false when made because it was not true that "the mechanics of ASP reporting will resolve this issue as full ASP reporting takes effect and Gelsyn pricing stabilizes to a more competitive position," or that the reduced pricing "dynamic did not impact Durolane."  Instead, these statements had no factual basis because Bioventus:  (i) suffered from grossly ineffective controls and inadequate systems that prevented any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) due to its inability to analyze pricing and volume changes and account for rebates, Bioventus experienced "double-digit price loss" on Durolane, as the Company later admitted on March 31, 2023.  These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced pricing did not impact Durolane, while omitting the material facts that Bioventus had not performed such an analysis and lacked the controls and systems necessary to do so.

206.     Later in the call, a Morgan Stanley analyst asked Reali, "[A]s you're looking at these issues, and I get that some of these are transitory, what's giving you really the confidence on the visibility to maybe label some of these as transitory.  And maybe specifically with the HA side, you talked about being like kind of mid next year until these kind of resolved.  But again, kind of what gives you confidence –that level of confidence and that there's not broader implications for the other parts of the HA portfolio to come?" In response, Reali stated:

> So **we model this out, and we have a full understanding of where our pricing is going to go over the next year with all 3 HA products**, DUROLANE, GELSYN as well as SUPARTZ. So if you look at it that way, **we have a really good understanding of that as well as the market dynamics**.

These statements were materially false when made because Bioventus did not "have a full understanding of where our pricing is going to go next year," did not "have a really good understanding of" pricing or "market dynamics," did not "know the markets" or "where the pricing is going to be," and, with regard to Durolane, did not "know where the pricing is going relative to ASP."  Instead, these statements had no factual basis because Bioventus: (i) suffered from grossly ineffective controls and inadequate systems that prevented any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements, as the Company later admitted in its 2022 10-K.  These statements were also materially misleading when made because they gave reasonable investors the false

impression that Bioventus had performed a meaningful, fact-based analysis of the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and lacked the controls and systems necessary to do so.

### 5. The Exchange Act Defendants' Material Omissions Violated SEC Item 303

207. During the Class Period, Item 303 required that the Management Discussion and Analysis section of Bioventus's SEC filings describe "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii).

208. In violation of Item 303, the 2020 and 2021 Forms 10-K omitted the known, material uncertainties that, with material weaknesses in internal controls, Bioventus was violating GAAP and recognizing significant amounts of revenue that would later be reversed. This known, materially unfavorable uncertainty is described in detail in Section VII.B, *supra*, and the 2020 and 2021 Forms 10-K also violated Item 303 for the reasons described therein.

### B. Additional Allegations of Scienter

#### 1. Defendants Received Internal Reporting on the Company's Inability to Account for Rebates and Grossly Deficient Controls

209. Before the IPO and throughout the Class Period, the Officer Defendants regularly received internal reports showing the true facts that their public statements misstated and concealed.

210.    As an initial matter, senior leadership knew, or recklessly disregarded, that the Company's revenue recognition was contrary to the requirements of ASC 606 and the Exchange Act Defendants' representations to investors because the Company's revenue recognition was entirely directed and controlled by senior management.  Rather than carefully consider historical experience and contract requirements, and only recognize revenue only when there is a "high degree of confidence that revenue will not be reversed in a subsequent reporting period," the Company's senior leadership took it upon themselves to unilaterally issue "crazy" and inaccurate forecasts for revenue and rebates despite that Bioventus never had any system or process to track revenue or rebates, and lacked effective controls over these functions.  (FE-1, FE-2.)

211.    In fact, senior leadership knew that they were not recognizing revenue consistent with ASC 606 and their investor representations because the systems needed to do so did not exist at the Company.  That is, Bioventus never had any system or process to track revenue, rebates, and discounts for each insurer.  (FE-1.)  The financial team charged with tracking and forecasting rebates was clear that the Company had "no controls" on which customers were asking for rebates or how much they were asking for.  (FE-2.)

212.    Bioventus's Financial Planning and Analysis Manager was vocal about the Company's "poor systems" for managing its finances.  (FE-2.)  Specifically, Bioventus's financial management and forecasting systems were not set up correctly and lacked basic functionalities, which severely limited the Company's ability to track things and report things accurately:  it was "like they were in the stone age.  (FE-2.)  "I flagged it to them immediately" and "I kept bringing it up," FE-2 confirmed.  (FE-2.)  Among other things,

Bioventus's Financial Planning and Analysis Manager reported these concerns about the poor systems directly to Singleton, telling Singleton that the financial systems were a "mess." (FE-2.) These same concerns were reiterated to CFO Anglum (later CFO Singleton), VP of Finance Ben Fishburn, and Director of FP&A and Business Intelligence Diane Schabinger in Monthly Financial Close Meetings. (FE-2.)

213. Further, during Quarterly Finance Meetings held at Bioventus's headquarters, the sales team expressed concerns with inaccurate rebate forecasting and improperly recognizing revenue. (FE-1.) Given the poor systems and uncertainty over rebates, they urged that Bioventus should be more conservative to avoid reversing or lowering its revenue figures when the Company was later hit with rebate requests. (FE-1.)

### 2. Defendants' Statements Indicate Knowledge Regarding the WAC-to-ASP Shift

214. The Officer Defendants' public statements about the shift from WAC to ASP further corroborate their knowledge and access to the internal facts that their public statements concealed, supporting a strong inference of scienter.

215. For example, during the March 10, 2022 Q4 2021 Earnings Call, an analyst from Morgan Stanley asked about Medicare's "cutting prices in the not-too-distant future" and whether Bioventus could "talk about how Bioventus might be better situated versus competitors?" In response, CEO Reali explained that "We've looked at this very carefully" and that "when we look at this analysis for us . . . it's a net-neutral for Bioventus. While we may lose a little on the ASP reimbursement, we gain by paying less rebates because of that reimbursement change."

216.    Similarly, during the May 10, 2022 Q1 2022 Earnings Call, an analyst from Goldman Sachs asked if Bioventus could "provide a little bit more detail on sort of the mechanism of how that pricing change could affect your business."   CEO Reali replied that:

> When we do our analysis of volume in our business, volume of syringes, the actual reduction in rebates offsets any reduction in reimbursement, specifically based on ASP reporting. We've run these calculations very carefully, and we feel strongly that not only will we be basically neutral through this process, but we can gain market share as we go forward in the medium term.

CEO Reali further explained that this was the case because Bioventus's "contracts with these [private health insurers] have very specific clauses to reduce the rebates based on ASP reporting."

217.    Confirming that the Officer Defendants were closely monitoring the WAC to ASP pricing shift, during the August 11, 2022 Q2 2022 Earnings Call, CEO Reali responded to a question from a Craig-Hallum Capital analyst about what Bioventus has seen "in July and August here with the changes around CMS."  CEO Reali explained that:

> Well, we did see, based on ASP reporting a dip in our pricing for DUROLANE and GELSYN, in particular, subparts was already ASP reported. But as we've talked about that has been countered by our rebate adjustments that per our planning, and we're very pleased with the results of this and it's a credit to our market access team. We've been able to adjust all of our rebates on our contracted business, which is a significant portion to a lower amount that net effect, Alex, negates any impact on the ASPs because we're paying less rebates on our contracted business.
>
> So as we've modeled that over the past several months that turned out exactly the way we thought it would. So the first phase of this has gone well. I would say there could continue to be some volatility in the coming quarters as we continue to adjust to the ASP environment. But we're very pleased with what we're seeing and in fact, gaining some key competitive accounts as the

playing field has been leveled. Once again, we feel very confident in our ability to continue to grab market share in the HA area.

We have the largest sales force, we have the largest portfolio of products, and we think we have the market-leading product in DUROLANE, our single-injection product with the highest molecular weight. So from our perspective, Alex, first phase went really well and we're optimistic as this continues to unfold.

218.    The Officer Defendants spoke about the WAC to ASP pricing shift and its effects in detail because analysts were frequently concerned about this issue. For example, a March 31, 2022 Craig-Hallum Capital report stated that "physician reimbursement will change from WAC to ASP. Due to Bioventus' rebate structure this is expected to have minimal impact, however failure to maintain net pricing for its HA products would be a risk to Bioventus shares." A May 10, 2022 Craig-Hallum Capital report stated that "[t]he shift of HA from WAC to ASP is an item to watch, though contracts should cover most of the changes." A May 16, 2022 Craig-Hallum Capital report stated "BVS continues to be very optimistic in its ability to drive 20% organic growth from this business for the next 4-6 years. . . . BVS has demonstrated it has a superior product and proof point being its exclusive payor deals and pricing contracts. This also supports the segment during pricing changes, such as CMS' move from WAC to ASP which is anticipated to have minimal disruption on BVS' business and likely pushes more volume towards a product with known prices."

### 3.    HA Products Were Core Operations Central to Bioventus's Business

219.    As Bioventus's leading products and principal source of revenue and growth, HA products constituted core operations of the Company. Sales of HA products accounted

for over 50% of Bioventus's revenue from 2019 to 2021 (and 42% in 2022). Bioventus admitted in the Registration Statement that it was "highly dependent on a limited number of products"—its HA products—and that "our ability to execute our growth strategy and maintain profitability will depend upon the continued demand for these products."

220. Further, Reali explained in Bioventus's March 25, 2021 Q4 2020 earnings call that HA products were expected "to be the largest contributor to our organic growth on a total dollar basis in 2021, led by our Durolane single-injection product" and characterized Durolane as a "truly special product." Indeed, growth in Durolane alone constituted 22% of Bioventus's sales growth in Q1 2021, the first quarter of the Class Period.

221. Bioventus's sales of its HA products were thus crucial for the Company. Given these facts, it would be absurd to suggest that the Officer Defendants were without knowledge of the true facts concerning the HA products' rebates and pricing that existed at the time of their false and misleading statements.

### 4. The Officer Defendants Were Motivated to Conceal the Fraud to Complete a Series of Acquisitions

222. The Officer Defendants were motivated to make false statements to inflate the price of Bioventus stock in order to complete a series of acquisitions.

223. With the IPO proceeds, Defendants Reali and Anglum embarked on an acquisition spree in 2021, purchasing healthcare companies Bioness and Misonix and making a $50 million escrow deposit with the intent to acquire CartiHeal.

224.     Officer Defendant Reali told investors on March 25, 2021 during Bioventus's 4Q20 Earnings Call that Bioventus's "long-term growth profile" hinged on its acquisition strategy, which in turn depended on its "robust" and "best-in-class" "free cash flow generation." As Bioventus's leading products, its HA products played a central role.

225.     To reveal that Bioventus was misreporting revenue from these drugs in violation of GAAP, faced steeply declining pricing and sales, and had material controls weaknesses would immediately put an end to the Officer Defendants' acquisition strategy for two reasons. First, Bioventus used its stock as part of the consideration paid to acquire Misonix, meaning that a higher stock price provided more valuable currency, reducing the number of shares and the amount of cash the Company would have to pay to purchase Misonix. Second, the Bioness and CartiHeal deals required large future milestone payments, and the Misonix and CartiHeal deals required Bioventus to take on debt, both of which made Bioventus increasingly dependent on income from its core HA products.

226.     After the Bioness acquisition, analysts questioned whether Bioventus's M&A strategy was sustainable. Specifically, an analyst from JPMorgan asked during Bioventus's May 12, 2021 Q1 Earnings Call "about your M&A strategy going forward"; CEO Reali responded that Company sought "accretive growth over many years to come, getting to consistent double-digit growth," then described the Company's HA products as "the growth drivers for the company." Reali explained that he "want[ed] to make sure we highlighted that for" the analyst "because it is very compelling."

227.     After Defendants Reali's and Anglum's buying spree in 2021, Bioventus was left swimming in more than $360 million of debt, anticipating hundreds of millions of

dollars in future milestone payments, and expending tens of millions in cash to integrate the acquisitions and make them profitable. This provided powerful motive for the Officer Defendants to commit fraud and falsely downplay any threats to the HA products or problems with revenue recognition or internal controls. Indeed, Bioventus's National Account Director of Market Access confirmed that CEO Reali was adamantly focused on acquisitions and there was significant pressure on employees to keep Bioventus's stock price high in order to finance acquisitions and pay for them. (FE-1.)

228. The Officer Defendants' motive became particularly acute as Bioventus's financial strains increased immediately after its release of aggressive financial guidance in March 2022. On April 4, 2022, Bioventus exercised its option to complete the expensive purchase of CartiHeal, but on May 10, 2022, Bioventus reported that market conditions had forced it to abandon its prior funding plans. On June 17, 2022, Bioventus and CartiHeal agreed to allow Bioventus to pay the remaining $215 million for CartiHeal via deferred milestone payments post-closing (with costly 8% interest), which would begin coming due in 2023. Bioventus completed the deal on July 11, 2022, subject to its future milestone payment obligations to CartiHeal shareholders.

### 5. Reali's Termination Supports Scienter

229. Underscoring scienter, Reali was terminated by Bioventus's Board after presiding over a catastrophic decline in its share price since the IPO. In particular, Reali's termination followed two successive quarters that revealed, contrary to his prior statements, that the impact of Bioventus's deficient controls, inability to account for rebates, and the WAC-to-ASP shift was far from an isolated, short-term issue. For example, as detailed

above, on January 11, 2023, Reali claimed that the rebate problem was limited to "one specific payer" and that "we do feel that going forward we can be accurate," and that Bioventus was seeing "sustained double-digit volume growth" for Durolane that "counteracted any impact" from reduced pricing. Just two months later, however, on March 31, 2023, the Company revealed that another large rebate claim for $4 million had materially decreased revenue in the fourth quarter of 2022, driving a year-over-year decrease of 3.5%, and that "Durolane revenue declined high single digits for the quarter." Given Reali's false statements and the Company's stock price decline under his tenure, Bioventus's Board terminated Reali's employment just five days later.

### 6. Corporate Scienter

230. Bioventus possessed scienter for two independent reasons. First, the Officer Defendants, who acted with scienter as set forth above, had binding authority over the Company and acted within the scope of their apparent authority in making the misstatements and omissions at issue. The scienter of the Officer Defendants is imputed to the Company.

231. Second, certain allegations herein establish Bioventus's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature. It can be strongly inferred that senior executives at Bioventus possessed scienter such that their intent can be imputed to the Company. For instance, Bioventus's VP of Finance, Ben Fishburn, and Business

Intelligence Diane Schabinger, attended the Company's Monthly Financial Close Meetings, where the inaccurate rebate forecasting was raised. (FE-2).

232. Given the severity of Bioventus's internal controls failures, and the fact that Bioventus's executives were informed of the Company's inaccurate rebate forecasting, it can be strongly inferred that additional executives unknown at this time and sufficiently senior to impute their scienter to Bioventus (i) knew of the misstatements alleged herein, and (ii) approved the false statements despite knowing of their false and misleading nature.

## C. Loss Causation

233. As alleged herein, the Exchange Act Defendants' conduct, misstatements, and omissions of material facts directly and proximately caused Plaintiff and the Class to suffer substantial losses. Those losses were a result of Plaintiff's and the Class's purchases of Bioventus Class A common stock at artificially inflated prices during the Class Period.

234. The Exchange Act Defendants, through each category of false and misleading statements and omissions, concealed throughout the Class Period that: (i) Bioventus had material weaknesses in its internal controls and ineffective disclosure controls and procedures; (ii) these deficiencies allowed Bioventus to engage in improper revenue recognition in violation of GAAP, misrepresenting the Company's true financial performance; (iii) the shift from WAC to ASP pricing was decimating the sales of Bioventus's key HA products, and the Exchange Act Defendants' claims to the contrary lacked any reliable factual basis. The Exchange Act Defendants also concealed the foreseeable risks and uncertainties arising from these known facts, including, but not limited to, that:

a. Bioventus would fail to properly account for large rebate claims due to its material weaknesses in internal controls over financial reporting;

b. Bioventus would report inflated financial metrics to investors as a result of its deficient internal controls and ineffective disclosure controls and procedures, and later would be required to revise those reported results, causing a significant revenue reversal; and

c. Bioventus would be forced to take a large impairment charge when it belatedly recognized the impact of large rebate claims and reduced pricing and revenues on its HA products.

235. These concealed risks bear directly on Bioventus's true operational and financial condition and the value of its Class A common stock.

236. The concealed risks began to materialize through a series of negative events and disclosures that constructively revealed, on a piecemeal basis, the truths that the Exchange Act Defendants' Class Period false and misleading statements and omissions concealed. As these events and disclosures partially revealed the truth, the Exchange Act Defendants continued to make materially false and misleading statements and omissions that had the effect of, at least temporarily, concealing their fraud.

237. As the relevant truth leaked out into the market, Plaintiff and the Class suffered losses. The losses that Plaintiff and the Class suffered were foreseeable and caused by the materialization of the risks that the Exchange Act Defendants' fraudulent conduct concealed from investors.

238. The cascade of events and disclosures that were the materialization of the concealed risks and the revelation of the truth include the significant revenue reversal announced in November 2022, the disclosure of material weaknesses in internal controls over financial reporting and disclosure controls and procedures, the impact of the ASP reporting shift on HA products' pricing and revenue, and a $189.2 million impairment charge driven by the material weaknesses and deteriorating performance of the HA products. Together, these events and disclosures revealed the material weaknesses in Bioventus's controls, Bioventus's GAAP violations, and the reality that the ASP reporting shift decimated its business.

### 1. November 8, 2022

239. On November 8, 2022, Bioventus filed a Form 8-K announcing 3Q22 financial results. Bioventus reported total revenue of $137.1 million and EBITDA of $22.7 million—well below consensus estimates of $141.6 million and $25.3 million—and $55.419 million in net sales for its Pain Treatments vertical and U.S. geographic region, and that demand for the 3-injection Gelsyn treatment plummeted, causing revenue from the company's pain business to decline approximately 13% quarter over quarter. Given this material underperformance, Bioventus reduced guidance of net sales of $527 million to $532 million, a significant decline from the prior guidance of $547.5 million to $562.5 million.

240. The Exchange Act Defendants held the 3Q22 earnings call that same day. Reali admitted that the "revenue shortfall" was "primarily . . . attributed to transitory headwinds related to GELSYN," citing "two primary headwinds specific to Gelsyn":

(1) "higher than normal rebate claims due to unexpected prior period rebate charges from a private payer who found errors in their earlier claims reporting," and (2) "the recent change in pricing to average selling price, or ASP, from wholesale acquisition cost, or WAC."

241. Reali attempted to offset these negative facts by claiming that the pricing "dynamic did not impact Durolane," and that the rebate claim was an isolated incident as it had been submitted by "a private payer who found errors in their earlier claims reporting."

242. On this news, the share price of Bioventus Class A common stock declined $4.06, or 57.5%, from $7.06 at the close of trading on Monday, November 7, 2022, to $3.00 at the close of trading on Tuesday, November 8, 2022.

243. Analysts were surprised at the sudden negative announcement. A November 9, 2022 Craig-Hallum analyst report stated that the announcements were a "surprise after comments of relative calm," and "***the impact [due to the change in pricing] was much more than management previously stated***." A November 8, 2022 Canaccord Genuity analyst report called the poor results "thesis changing," stating that it was "clear the shift to ASP reporting from WACC has impacted the commercial stability here; this comes in sharp contrast to prior management commentary that called for ASP declines to be offset by reduced rebate levels." Canaccord Genuity downgraded the stock to a "Hold" rating and lowered their price target.

## 2. November 16, 2022

244. On November 16, 2022 after the close of trading, Bioventus filed a Form 8-K announcing that the Company would be unable to timely file its 3Q22 Form 10-Q. The Exchange Act Defendants also announced additional rebate claims from a large payer. The Exchange Act Defendants disclosed that the "recognition of additional rebates may impact Bioventus' recently announced revenue guidance." The Exchange Act Defendants also stated that Bioventus's "internal controls related to the timely recognition of quarterly rebates were inadequate specifically for the period ended October 1, 2022." The Exchange Act Defendants further disclosed that, as a result of the stock drop caused by the pricing decline and rebate errors disclosed on November 8, 2022, Bioventus expected to take an impairment charge in the range of $185 million to $205 million.

245. As these facts materialized, the price of Bioventus's stock declined $1.00 per share, or over 33%, from a close of $2.97 on Wednesday, November 16, 2022, to close at $1.97 per share on Thursday, November 17, 2022.

246. Morgan Stanley issued an analyst report on November 18, 2022, acknowledging that Bioventus had "received an invoice for rebate claims," which Morgan Stanley expected "will be a multiple of the ~$2m headwind stated on the 3Q22 call for '22 guidance." Morgan Stanley also removed its rating and price target.

## 3. November 21, 2022

247. On November 21, 2022 after the close of trading, Bioventus filed its 3Q22 Form 10-Q, disclosing that the recently received rebate claims had resulted in an $8.4 million reduction in the revenue previously reported for 3Q22 on November 8, 2022. This

resulted in the Company reporting a year-over-year decline of $8.953 million, or 16.0% for its U.S. Pain Treatments business, whereas the Company had previously reported a decline of only $544,000, or 1%. Bioventus reported that the change in U.S. Pain Treatments sales was "due to more treatments being sold under contracts with major issuers at lower prices and price competition within the osteoarthritic joint pain treatment market." Bioventus also disclosed that it had also incurred an impairment charge of $189.2 million due to the stock price decline following the November 8, 2022 disclosures and acknowledged that the unexpected rebates had a "cascading effect on future revenue projections [that] materially impacted the Company's evaluation of its ability to meet debt covenants, resulting in liquidity and going concern disclosures in the" Form 10-Q.

248.   In the Form 10-Q, the Company admitted that its "internal control over financial reporting was not performed at a sufficient level of precision to ensure that the third quarter 2022 rebates accrual was complete and accurate." The Company admitted that it had received the large invoice "subsequent to the initial calculation for the third quarter rebates accrual," but that "there were not processes in place to ensure it was reviewed timely in order to update the accrual" by the time the Company disclosed 3Q22 results. To remediate the weakness, the Company disclosed that it was: (i) "[r]eassessing open rebates accruals and changing the estimation method for calculating the rebate accruals"; (ii) "[i]mplementing enhanced controls and status tracking to ensure that rebates invoices . . . are received and reviewed timely;" and (iii) "[i]ncreasing rigor of documenting key conversations with payers." In addition, the Form 10-Q admitted that Bioventus's "disclosure controls and procedures were not effective as of October 1, 2022."

249. As these facts materialized, the price of Bioventus Class A common stock declined $0.07, or 3.7%, from $1.88 at the close of trading on Monday, November 21, 2022, to $1.81 at the close of trading on Tuesday, November 22, 2022.

250. A November 22, 2022 Craig-Hallum analyst report stated, "[W]e learn there are in-fact more errors in store and are moving to the sidelines until faith in financials/operating business can be restored and hard decisions around BVS' future are made," downgrading the stock to a "Hold" rating.

\* \* \*

251. In total, from November 7, 2022 (the last day of trading prior to the first partially corrective disclosure) to November 22, 2022, the price of Bioventus Class A common stock declined from $7.06 to $1.81, a decline of approximately 74.4%.

### D. Presumption of Reliance and Fraud-on-the-Market Doctrine

252. Plaintiff is entitled to a presumption of reliance on the Exchange Act Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market doctrine. At all relevant times, the market for Bioventus Class A common stock was an efficient market for the following reasons, among others:

    a. Bioventus Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    b. The average weekly trading volume of Bioventus Class A common stock was significant;

c.  As a regulated issuer, Bioventus filed periodic public reports with the SEC;

d.  Bioventus regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

e.  Bioventus was followed by many securities analysts employed by major brokerage firms who wrote reports that were published and distributed.

253.    As a result of the foregoing, the market for Bioventus Class A common stock promptly digested current information regarding Bioventus from all publicly available sources and reflected such information in the price of Bioventus Class A common stock. Under these circumstances, all purchasers of Bioventus Class A common stock during the Class Period suffered similar injury through their purchase of Bioventus Class A common stock at artificially inflated prices, and the presumption of reliance applies.

254.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on the Exchange Act Defendants' omissions of material fact.

## XII. CLAIMS FOR RELIEF PURSUANT TO THE EXCHANGE ACT

### COUNT III

#### Section 10(b) of the Exchange Act and Rule 10b-5
#### (Against the Exchange Act Defendants)

255.   Plaintiff repeats, incorporates, and re-alleges each and every allegation contained above as if fully set forth herein.

256.   During the Class Period, the Exchange Act Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

257.   The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:

  a.  Employed devices, schemes, and artifices to defraud;

  b.  Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

  c.  Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other similarly situated in connection with their purchases of Bioventus Class A common stock during the Class Period.

258. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Bioventus Class A common stock. Plaintiff and the Class would not have purchased Bioventus Class A common stock at market prices, or at all, if they had been aware that the market prices of Bioventus Class A common stock were artificially inflated and maintained by the Exchange Act Defendants' false and misleading statements and omissions.

259. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Bioventus Class A common stock. Plaintiff and the Class would not have purchased Bioventus Class A common stock at market prices, or at all, if they had been aware that the market prices of Bioventus Class A common stock were artificially inflated and maintained by the Exchange Act Defendants' false and misleading statements and omissions.

## COUNT IV

### Section 20(a) of the Exchange Act
### (Against the Officer Defendants)

260. Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

261. The Officer Defendants acted as controlling persons of Bioventus within the meaning of Section 20(a) of the Exchange Act. By virtue of their positions and their power to control Bioventus's public statements, the Officer Defendants had the power and ability to control the actions of Bioventus and its employees. By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## XIII. JURY DEMAND

262. Plaintiff, on behalf of itself and the Class, demands a jury trial.

## XIV. PRAYER FOR RELIEF

227. WHEREFORE, Plaintiff prays for judgment as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d) Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

DATED: June 12, 2023                    Respectfully Submitted,

*/s/ Javier Bleichmar*
Javier Bleichmar*
Joseph A. Fonti (appearance forthcoming)
**BLEICHMAR FONTI & AULD LLP**
7 Times Square, 27th Floor
New York, NY 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
jfonti@bfalaw.com

Nancy A. Kulesa*
75 Virginia Road
White Plains, NY 10603
Telephone: (914) 265-2991
Facsimile: (212) 205-3960
nkulesa@bfalaw.com

* reflects attorneys appearing pursuant to
LR 83.1(d)

*Counsel for Lead Plaintiff Wayne County*
*Employees' Retirement System and*
*Lead Counsel for the Proposed Class*

/s/ Gagan Gupta
Gagan Gupta (NCSB #: 53119)
**TIN FULTON WALKER**
**& OWEN PLLC**
115 East Main Street
Durham, NC 27701
Telephone: (919) 370-8807
ggupta@tinfulton.com

*Local Counsel for Lead Plaintiff Wayne*
*County Employees' Retirement System*