## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF NORTH CAROLINA

|  |  |
|---|---|
| ROBERT CIARCIELLO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>BIOVENTUS INC., KENNETH M. REALI, MARK L. SINGLETON, GREGORY O. ANGLUM, and SUSAN M. STALNECKER,<br><br>Defendants. | Case No. 1:23-cv-00032-CCE-JEP<br><br>**SECOND AMENDED COMPLAINT — CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**BLEICHMAR FONTI & AULD LLP**
Javier Bleichmar*
Joseph A. Fonti*
7 Times Square, 27th Floor
New York, NY 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
jfonti@bfalaw.com

* reflects attorneys appearing pursuant to
LR 83.1(d)

*Counsel for Lead Plaintiff Wayne County
Employees' Retirement System and
Lead Counsel for the Proposed Class*

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ................................................................... 1

II.     JURISDICTION AND VENUE ............................................................. 11

III.    PARTIES ........................................................................................ 12

        A. Lead Plaintiff ......................................................................... 12

        B. Defendants ............................................................................. 12

IV.     FACTUAL ALLEGATIONS ............................................................. 14

        A. The Accuracy of Bioventus's Financial Statements Hinged on
           Accurately Tracking Rebates on Its Key HA Products and
           Deducting Them from Revenue, as GAAP Requires ...................... 14

        B. Bioventus's Material Weaknesses in Controls Created a
           Materially Heightened Risk of False Financial Statements and
           Material Revenue Reversals from Rebate Claims ......................... 16

           1. Bioventus Was Required to Recognize Revenue in Accordance
              with ASC 606 and Deduct Rebates ..................................... 18

           2. Bioventus Violated GAAP and Its Internal Controls Suffered
              from Material Weaknesses ................................................. 23

           3. Despite Its Control Failures, Bioventus Falsely Claimed to
              Recognize Revenue in Accordance with ASC 606 and
              Defendants Completed the February 2021 IPO .................... 27

        C. In Summer 2021, Bioventus Failed an Internal Audit of Its
           Rebate Processes and Controls; Defendants Reali, Anglum, and Stalnecker
           Personally Received the "Red Report" Showing the Controls
           Were Ineffective and Failed to Fix Them ................................. 29

        D. Despite Their Knowledge of the Controls' Inadequacy, Defendants Reali,
           Anglum and Stalnecker Fraudulently Certified the Effectiveness
           of Bioventus's Controls and the Accuracy of Its Financial Reporting ............ 37

        E. From at Least Q4 2021 to Q4 2022, Based on Its Arbitrary and
           Inaccurate Rebate Accruals, Bioventus Reported Materially Overstated
           Financial Results in Violation of GAAP ................................... 39

i

F.  In 2022, Saddled with Debt and Struggling Acquisitions, Bioventus Touted Rapid HA Product Sales Growth and Reali Falsely Denied Any Impact from Imminent Medicare Price Reductions ..................... 43

    1.  New Medicare Regulations Threatened Bioventus's HA Product Pricing ..................................................................... 45

    2.  With No Factual Basis, Reali and Singleton Falsely Assured Investors that the Shift to ASP Was "Net-Neutral" for Bioventus ............. 48

G.  The Truth Emerged: Defendants Admitted Material Controls Weaknesses and Reversed Material Amounts of Revenue Based on Large Rebate Claims, and Reduced ASP Pricing Slashed Bioventus's Revenues and Profit .............. 55

    1.  November 8, 2022: Weak Earnings and a Purportedly Unexpected Rebate Claim ................................................................ 55

    2.  November 16, 2022: Defendants Admitted a Material Weakness in Internal Controls Driven by Rebates ........................................... 58

    3.  November 21, 2022: Bioventus Materially Reversed Revenue Due to the Rebate Claims, Admitted that Its Disclosure Controls and Procedures Were Not Effective, and Took a $189 Million Impairment Charge ............................................................ 60

    4.  January 11, 2023: Reali Continued to Claim that the Lower Pricing Dynamic Did Not Apply to Durolane and that Rebate Problems Were Resolved ................................................ 63

    5.  March 31, 2023: Defendants Admitted Another Large Rebate Claim from United and Acknowledged Durolane Impact from ASP Shift ........... 65

V.    FORMER EMPLOYEE ALLEGATIONS ............................................. 68

VI.   THE OFFICER DEFENDANTS AND DEFENDANT STALNECKER ARE SUBJECT TO CONTROL PERSON LIABILITY ................................ 83

VII.  SECURITIES ACT ALLEGATIONS ................................................. 85

A.  False and Misleading Statements Regarding Bioventus's Revenue Recognition and GAAP Compliance ................................ 85

VIII.  CLASS ACTION ALLEGATIONS ..................................................... 89

IX.   INAPPLICABILITY OF STATUTORY SAFE HARBOR ................................ 92

X.    CLAIMS FOR RELIEF PURSUANT TO THE SECURITIES ACT ................... 93

    COUNT I ............................................................................ 93

COUNT II ........................................................................................................ 94

XI.   EXCHANGE ACT ALLEGATIONS .................................................... 96

A. Exchange Act Materially False and Misleading Statements ............................ 97

1. False and Misleading Statements Regarding Bioventus's
Revenue Recognition and GAAP Compliance ........................................... 98

2. False and Misleading Statements Regarding Revenue, Net Sales, and
Adjusted EBITDA that Bioventus Materially Inflated
in Violation of GAAP ................................................................................ 106

3. False and Misleading Statements Regarding the Purported
Effectiveness of Bioventus's Disclosure Controls and
Internal Controls Over Financial Reporting .............................................. 109

4. False and Misleading Statements Regarding the Purportedly
"Net-Neutral" Shift from WAC to ASP Pricing ........................................ 117

B. Additional Allegations of Scienter ................................................................ 130

1. The Exchange Act Defendants Received Internal Reporting on the
Company's Grossly Deficient Controls and
Inability to Account for Rebates ............................................................... 130

2. The Exchange Act Defendants' Statements Indicate Knowledge of
the False and Misleading Nature of Their Statements .............................. 134

3. Stalnecker Was Chair of the Audit and Risk Committee Tasked with
Overseeing the Company's Controls, Yet Falsely Claimed the
Controls Were "Effective" After Being Told the Opposite ..................... 139

4. HA Products Were Core Operations Central to Bioventus's Business..... 141

5. The Magnitude and Duration of the Fraud ............................................... 142

6. The Officer Defendants and Defendant Stalnecker Were Motivated
to Conceal the Fraud to Complete a Series of Acquisitions..................... 144

7. Reali's Termination Supports Scienter .................................................... 148

8. Corporate Scienter ................................................................................... 149

C. Loss Causation .............................................................................................. 150

1. November 8, 2022 ................................................................................... 152

2. November 16, 2022 ................................................................................. 154

3. November 21, 2022 ................................................................................. 155

4.  March 31, 2023 ........................................................................... 157

    D.  Presumption of Reliance and Fraud-on-the-Market Doctrine ........................ 159

XII.    CLAIMS FOR RELIEF PURSUANT TO THE EXCHANGE ACT ................. 160

    COUNT III ............................................................................................. 160

    COUNT IV ............................................................................................. 162

XIII.  JURY DEMAND ................................................................................................. 162

XIV.  PRAYER FOR RELIEF .................................................................................... 162

Court-appointed Lead Plaintiff Wayne County Employees' Retirement System ("WCERS" or "Plaintiff") alleges: (i) strict liability and negligence claims under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), and (ii) fraud-based claims under Sections 10(b) and 20(a) of the Exchange Act of 1934 (the "Exchange Act") for a class period of February 11, 2021 to March 30, 2023, both inclusive (the "Class Period"), against Bioventus Inc. ("Bioventus" or the "Company"), Kenneth M. Reali, Mark L. Singleton, Gregory O. Anglum, and Susan M. Stalnecker.

Plaintiff, by and through its counsel, alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters based on, among other things, the independent investigation conducted by and through Lead Counsel. This investigation includes, but is not limited to, a review and analysis of public filings by Bioventus with the Securities and Exchange Commission ("SEC"); transcripts of Bioventus conferences with investors and analysts; press releases and media reports concerning the Company; analyst reports concerning Bioventus; other public information and data regarding the Company; and interviews with former employees of Bioventus conducted in Lead Counsel's investigation.[1]

## I. NATURE OF THE ACTION

1. This Securities Act and Exchange Act class action arises from Defendants' false and misleading statements about the internal controls and pricing on Bioventus's key

---

[1] Emphasis is added and citations are omitted unless otherwise noted.

products and its material overstatement of revenue and EBITDA in violation of U.S. Generally Accepted Accounting Principles ("GAAP").

2. Bioventus is a medical device and drug company. Its financial performance is heavily influenced by the pricing and sales of its key products, hyaluronic acid ("HA") injections to treat osteoarthritis, and by the amount of rebates on the HA products that Bioventus must pay to third-party payers like private insurers and Medicare. Federal law requires that Bioventus maintain effective internal controls to properly account for such rebates and ensure accurate financial statements prepared in accordance with GAAP.

3. Defendants—Bioventus, Kenneth M. Reali (former CEO), Mark L. Singleton (CFO), Gregory O. Anglum (former CFO), and Susan M. Stalnecker (Director and Audit Committee Chair)—made three categories of material misstatements: (1) false financial statements that violated GAAP by reporting $12.4 million in earnings that did not exist, (2) false and misleading statements that Bioventus's internal controls were "effective" when they were ineffective and grossly deficient, and (3) misstatements about pricing on Bioventus's key HA products.

4. <u>False Financial Statements in Violation of GAAP</u>: GAAP requires Bioventus to deduct—that is, *exclude*—rebates from its reported revenue. GAAP requires Bioventus to take a conservative approach to deducting rebates: Bioventus cannot report significant amounts of revenue that it will later have to reverse (*i.e.*, remove from its financial statements) when rebates are paid out.

5.     Defendants falsely assured investors that Bioventus complied with these requirements.  They claimed to "report sales *net* of contractual allowances, *rebates* and returns," and to determine rebate amounts based on "historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns."  Bioventus thus assured investors that it complied with GAAP and followed the mandated process with the required inputs.

6.     Instead, Bioventus violated GAAP by *including* rebates in its reported revenue.  This Second Amended Complaint pinpoints how this occurred:  As the Company's former Internal Audit Manager (FE-3) found, rather than rigorously tracking rebate data and historical trends to determine the amount of revenue that could be recognized, as the Company claimed to do, Bioventus lacked any documented or consistent process.  Instead, the rebates were the product of arbitrary percentages that changed from quarter to quarter without any data or legitimate reason.  (FE-3.)  Thus, Bioventus had no effective controls and processes for calculating rebates and deducting them from revenue, and instead was using an arbitrary, unreliable process to determine the rebate amounts.

7.     As a result, Bioventus issued false financial statements for over a year during the Class Period that materially overstated revenue and Adjusted EBITDA, in violation of GAAP, by including $12.4 million in rebates owed to a single insurance company, UnitedHealthcare ("United").  The $12.4 million should have been deducted, not included, in Bioventus's reported revenue:  it was money that Bioventus did not earn, could not keep, and ultimately had to pay to United.

3

8.     The GAAP violations materially distorted Bioventus's financial statements and caused it to beat analysts' consensus earnings estimates that it otherwise would have missed.  Investors and analysts had no way to know that Bioventus was materially overstating its revenue and Adjusted EBITDA because Bioventus publicly claimed that it complied with GAAP and had effective controls when it did not.

9.     <u>False Statements of "Effective" Controls</u>:  The Company's GAAP violations were the direct result of material weaknesses in Bioventus's internal controls with respect to rebates and the absence of effective disclosure controls to catch the errors.

10.    The federal securities laws require effective controls to ensure that public companies issue reliable, accurate financial statements and public disclosures.  In line with these requirements, Defendants falsely assured investors that Bioventus had "effective" internal controls and disclosure controls.

11.    The truth was the opposite:  the Company's controls were grossly ineffective and suffered material weaknesses as to rebates.  Without effective controls, Bioventus could not accurately calculate how much it owed in rebates at any given time or estimate what would be owed, as Bioventus's former Senior Manager of SOX & Internal Audit (FE-4) explained.  FE-5, a former Accounts Payable Specialist, confirmed that Bioventus "had big problems with the whole rebate calculation" and "[t]hey were always off."  The Company's rebate accruals were the unreliable product of a flawed and arbitrary process.

12.    The material weaknesses existed at the time of the IPO and were long known to Defendants.  CEO Reali personally signed off on multiple rebate payments of $1 million

4

or more (including single payments as large as $3.5 million) each quarter, demonstrating that he was well aware of the rebates' magnitude and their material impact. (FE-5.) Reali, CFO Anglum, and other senior leadership participated in Quarterly Finance Meetings at the "Board room" at Bioventus's headquarters where complaints about inaccurate rebate forecasts were raised. (FE-5.) In these meetings, Bioventus's Controller objected that the significantly higher rebate payments were "messing up our numbers." (FE-5.)

13. By September 2021, Defendants had direct personal knowledge that Bioventus's controls had material weaknesses. In summer 2021, Bioventus received a large rebate invoice from United for several million dollars. This prompted a confidential internal audit of its rebate processes and controls, which the Company quickly failed, resulting in a "red report" (named for the urgency of the issues that required immediate remediation). (FE-3, FE-4.)

14. Defendant CEO Reali personally received the "red report" in September 2021, as did Defendants Anglum (CFO) and Stalnecker (Audit Committee Chair); the former Internal Audit Manager (FE-3) sent it to them and the former Senior Manager of SOX & Internal Audit (FE-4) was copied on the email. The "red report" made clear that the Company's controls and processes were grossly deficient; that the Company instead was using an arbitrary, unreliable process to determine the rebate amounts; and that the "severe" issues needed to be remediated quickly.

15. Nonetheless, Defendants did nothing to remediate the known control failures. Meanwhile, Defendants Reali, Anglum, and Stalnecker repeatedly told investors—in SEC

filings and certifications that they personally signed—that the controls were "effective" and that the Company was calculating and deducting rebates in accordance with GAAP.

16.     By January 2022, the issues still had not been remediated, prompting FE-3 and FE-4 to resign on the same day.  Nonetheless, Defendants falsely claimed that "as of December 31, 2021, the Company's internal control over financial reporting is effective."

17.     These material weaknesses left investors exposed to a heightened risk of misstatements—like a ship with no navigation system drifting in the ocean, Bioventus was reporting financials with no reliable factual basis.  None of this was disclosed at the time, leaving investors in the dark about the true facts:  the Company (a) had ongoing material weaknesses that were reported directly to its CEO, CFO, and Audit Committee Chair by September 2021; (b) the material weaknesses had not been remediated; and (c) they were causing the Company to book millions of dollars in false revenue that would later have to be reversed, materially reducing the Company's financial performance and stock price.

18.     The other shoe dropped in November 2022, when the Company revealed that United had claimed over $8 million of rebates to which it was contractually entitled, and when United claimed another $4 million in rebates by December 2022.  These material rebate claims at the end of 2022—which related to five quarters (Q4 2021 through Q4 2022)—were not a surprise to Defendants because they knew United had done exactly the same thing in summer 2021, though Defendants had concealed it at the time.

19.     Finally, in November 2022 Bioventus belatedly admitted that it had "a material weakness" in internal control over financial reporting because "its internal

6

controls related to the timely recognition of quarterly rebates were inadequate," that its "internal control over financial reporting was not performed at a sufficient level of precision to ensure that the third quarter 2022 rebates accrual was complete and accurate," and that the Company's "disclosure controls and procedures were not effective as of October 1, 2022." While the Company tried to paint these material weaknesses as confined to the third quarter of 2022, they had existed since the IPO and were known to Reali, Anglum, and Stalnecker for over a year before the Company's belated disclosure.

20. <u>False Statements that the Medicare Pricing Shift Was "Net-Neutral"</u>: Defendants also falsely assured investors that Bioventus had successfully insulated itself from Medicare regulations that reduced pricing and reimbursement on the HA products. Although the Medicare regulations were new, Defendants consistently reassured investors that Bioventus was fully prepared for their implementation, and after the regulations were implemented, declared that they had not impacted the Company's bottom line. Specifically, Defendants Reali and Singleton falsely claimed that new Medicare regulations that would severely reduce prices on the Company's HA products starting in July 2022 were "net-neutral" for Bioventus. They made specific factual assertions that the Company had been able to "adjust *all* of our rebates on our contracted business" to "offset lower pricing" when, in reality, it had not done so. After the pricing shift, Reali claimed that it "***turned out exactly the way we thought it would***" and was "true to our model," such that "*all* of our ASP impact has been negated."

21.     These specific factual assurances—made both before and after the pricing shift—were false.  They had no factual basis because, without basic controls, Bioventus was unable to perform any meaningful analysis of pricing or volume changes and their impact on sales.  As Reali later admitted, "when we ship out our HA syringes, we have no insight into where they're going.  We don't know that they're going to a United patient or Cigna or Blue Cross, Blue Shield or Aetna, we don't get that information until quarters later, 2 quarters or even later sometimes depending on the lag of the rebate."

22.     Further, Reali's categorical factual statements that Bioventus had "offset lower pricing" by adjusting "all of our rebates on our contracted business" were false because Bioventus had not done so for many of its contracts.  Days before Reali's departure, the Company belatedly admitted that changes in ASP "may result in **larger** than expected rebates payments" under its "contracts with private payers."  Thus, lower pricing was **increasing** rebate amounts, not reducing it, directly contrary to Reali's prior statements.

23.     <u>The Truth Catches Up to Bioventus</u>:  The truth was revealed in a series of partially corrective disclosures.

24.     <u>First</u>, on November 8, 2022, the Company reported dismal earnings and slashed guidance because of the shift to ASP pricing and an $8.4 million rebate claim from United.  This was the partial materialization of what Defendants had long known:  United had submitted a similar multi-million-dollar claim over a year earlier, and Bioventus had failed the resulting internal audit in September 2021, as Defendants Reali, Anglum, and

8

Stalnecker knew at the time. And while Defendants have claimed that the dismal financial results were "disappointing but not surprising" (ECF 53 at 1), the market plainly disagreed. One analyst described these revelations as "***thesis changing***" and "in sharp contrast to prior management commentary that called for ASP declines to be offset by reduced rebate levels." While these thesis-changing results may not have been "surprising" to Defendants given what they already knew, they surely were to investors: Bioventus's share price immediately plunged ***57.5%*** (from $7.06 to $3.00 per share) in a ***single day***.

25. <u>Second</u>, on November 16, 2022, the Company revealed that it would be unable to timely file its 3Q22 Form 10-Q, that its "internal controls related to the timely recognition of quarterly rebates were inadequate," and that Bioventus expected to take an impairment charge in the range of $185 million to $205 million. The stock plummeted another 33%. The control weaknesses had existed since the IPO, and the November 9, 2022 stock drop that led to the impairment charge was itself caused by the partial correction of Defendants' prior misstatements.

26. <u>Third</u>, on November 21, 2022, the Company reversed $8.4 million in revenue based on the United rebate claim, which also drove a $4.3 million reduction in Adjusted EBITDA. Far from merely "adjust[ing] a small amount of revenue in 3Q22" (ECF 53 at 2), this was a ***reversal*** of revenue that the Company never should have recognized because it had owed the money to United for over a year. The $8.4 million reversal was highly material: for 3Q22, it amounted to over 6% of total revenue, 15% of net sales within the U.S. Pain Treatments vertical, and 7.5% of Adjusted EBITDA, for 3Q22. The Company

further revealed that the large rebate had a "cascading effect on future revenue projections [that] materially impacted the Company's evaluation of its ability to meet debt covenants, resulting in liquidity and going concern disclosures in the" Form 10-Q; admitted material weaknesses in internal controls over financial reporting and disclosure controls and procedures; and took a $189 million impairment charge. The stock dropped 3.7%.

27.    Finally, on March 31, 2023, Bioventus reported poor full-year 2022 financial results, with a 3.5% decline in sales "primarily driven by a decline in price resulting from higher than expected rebate claims"—that is, another $4 million rebate claim from United, which the Company called purportedly "[u]nanticipated rebate claims from one private payer"—as well as "lower than previously expected" ASP "for both Durolane and Gelsyn." The stock dropped another 11.6%. Five days later, Reali was terminated.

28.    As a result of Defendants' material misstatements, Bioventus's stock price declined catastrophically from $13.00 in its February 2021 IPO to just $1.07 on March 31, 2023, leaving investors with enormous losses. The striking decline in Bioventus's share price between June 2022 and Reali's April 5, 2023 termination is shown below:



## II.     JURISDICTION AND VENUE

29.     This Court has jurisdiction over the subject matter of this action pursuant to (i) Section 22 of the Securities Act of 1933 (15 U.S.C. § 77v); and, separately, (ii) Section 27 of the Exchange Act of 1934 (15 U.S.C. § 78aa).  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.

30.     Venue is proper in this District pursuant to: (i) Section 22(a) of the Securities Act (15 U.S.C. § 77v(a)); and, separately, (ii) Section 27 of the Exchange Act (15 U.S.C. § 78aa).  In addition, venue is proper pursuant to 28 U.S.C. § 1391(b) because the acts and transactions giving rise to the violations of law complained of occurred in part in this District, including the dissemination of false and misleading statements into this District.  Bioventus's Class A common stock trades on the NASDAQ.

31.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

### A.     Lead Plaintiff

32.     Lead Plaintiff Wayne County Employees' Retirement System is a public pension fund established in 1944 to administer retirement and related benefits to public employees of Wayne County, Michigan.   WCERS manages more than $1.2 billion on behalf of nearly 10,000 active and retired members.   As set forth in the certification attached hereto as Exhibit A, WCERS purchased Bioventus Class A common stock during the Class Period and traceable to the Registration Statement.

### B.     Defendants

33.     Defendant Bioventus is a Delaware corporation with principal executive offices located at 4721 Emperor Boulevard, Suite 100, Durham, North Carolina 27703. The Company's Class A common stock trades on NASDAQ under the ticker symbol "BVS."  Bioventus issued Class A common stock in the IPO.

34.     Defendant Kenneth M. Reali ("Reali") served as Bioventus Chief Executive Officer ("CEO") and a Director of the Company from April 2020 and September 2020, respectively, until he was terminated effective April 4, 2023.  Defendant Reali signed the

Registration Statement. He served as CEO of Clinical Innovations, LLC, a medical device company, from 2015 until its sale in February 2020.

35. Defendant Mark L. Singleton ("Singleton") has served as Bioventus's Senior Vice President ("SVP") and Chief Financial Officer ("CFO") since March 21, 2022. He was previously the Vice President Finance at Teleflex Incorporated, which he joined in 2014. Prior to that, he worked for nearly two decades at Lenovo/IBM.

36. Defendant Gregory O. Anglum ("Anglum") served as Bioventus's SVP and CFO from August 2017 until April 2022. Anglum signed the Registration Statement. Prior to joining Bioventus, Anglum held CFO positions at Overture, a technology company, and StrikeIron, a Software-as-a-Service Company. He also spent several years in public accounting roles with Arthur Anderson and Grant Thornton.

37. Defendant Susan M. Stalnecker ("Stalnecker") has been a member of Bioventus's Board since September 2020, and has served as Chair of the Board's Audit and Risk Committee since the close of the IPO in February 2021. Stalnecker signed the Registration Statement and Bioventus's 2020 and 2021 Forms 10-K. She has been a Senior Advisor at Boston Consulting Group, a global management consulting firm, since March 2016. Stalnecker served as VP of E.I. duPont de Nemours and Co. from December 1976 until she retired in 2016.

38. Defendants Reali, Singleton, and Anglum are collectively referred to herein as the "Officer Defendants." Bioventus, the Officer Defendants, and Defendant Stalnecker are collectively referred to herein as the "Exchange Act Defendants." Bioventus, Reali,

Anglum, and Stalnecker are collectively referred to herein as the "Securities Act Defendants."

## IV. FACTUAL ALLEGATIONS

### A. The Accuracy of Bioventus's Financial Statements Hinged on Accurately Tracking Rebates on Its Key HA Products and Deducting Them from Revenue, as GAAP Requires

39. Founded in 2012, Bioventus is a medical device company focused on joint health, bone graft substitutes, and fracture treatment. At the time of the IPO, Bioventus had three business segments that the Company referred to as "verticals": (i) osteoarthritis ("OA") joint pain treatment and joint preservation (sometimes called the "Pain Treatments" vertical); (ii) bone graft substitutes; and (iii) minimally invasive fracture treatment.

40. Bioventus's key revenue source was three HA products within the Pain Treatments vertical: (i) Durolane, a single injection therapy launched in 2018; (ii) Gelsyn-3 ("Gelsyn"), a three-injection therapy launched in 2016; and (iii) Supartz FX ("Supartz"), a five-injection therapy first launched in the U.S. in 2001. Bioventus was highly reliant on its sales of these three drugs, which together accounted for 53%, 54%, and 49% of its total revenue for the years ended December 31, 2020, 2019, and 2018, respectively.

41. As detailed below, investors relied on Bioventus to accurately track and report the revenue it generated from these drugs. A key component of accurately recognizing revenue is accounting for the impact of rebates: contractual arrangements where Bioventus agrees to pay third-party payers (such as insurance companies)

contractually specified rebate amounts for sales of its drugs. These rebates directly and materially reduced Bioventus's net revenue and impacted the Company's financial statements. As a simplified example, if Bioventus sold an HA product to a healthcare provider for $100, the patient's insurance company would subsequently request a $30 rebate from Bioventus, with the result that Bioventus only earned $70 in net revenue on that sale.

42. GAAP imposes two key requirements, detailed below, to ensure that companies accurately recognize revenue based on a reliable determination of rebate amounts. Compliance is not optional; these are hard and fast ***requirements*** that companies like Bioventus ***must*** adhere to.

43. First, under GAAP, Bioventus may not simply recognize the entire amount of gross sales as revenue. Instead, it may ***only*** recognize revenue from drug sales ***net*** of expected rebates. In the example above, Bioventus may only recognize the net revenue of $70, not the gross revenue of $100. In this example, recognizing any revenue above $70 would misstate Bioventus's financial performance because Bioventus ultimately would keep only $70 of revenue after paying rebates.

44. Second, in terms of calculating the correct net revenue to be reported, Accounting Standards Codification ("ASC") 606 of GAAP requires that Bioventus only recognize the amount of revenue for which it is "probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period." A "reversal" means that Bioventus must remove revenue already recognized in its financial

statements. To the extent there is any uncertainty about the amount of rebates, Bioventus is required to be conservative and to only recognize revenue that it will not need to pay back. To be clear, this is not a matter of subjective judgment where a company can pick and choose its path based on its own ideas or make up arbitrary numbers; rather, Bioventus *must have* a reasonable *factual* basis for these revenue recognition determinations.

45. As detailed below, Bioventus repeatedly violated these GAAP requirements and improperly recognized material amounts of revenue that, in reality, were subject to rebates, resulting in a significant revenue reversal. Bioventus's public statements about its revenue and Adjusted EBITDA were thus inaccurate and constitute false and misleading statements actionable under the securities laws.

### B. Bioventus's Material Weaknesses in Controls Created a Materially Heightened Risk of False Financial Statements and Material Revenue Reversals from Rebate Claims

46. Bioventus's reporting of inflated revenue and Adjusted EBITDA in violation of GAAP were the direct result of its failure to maintain effective internal controls over financial reporting and effective disclosure controls.

47. Since the Sarbanes-Oxley Act ("SOX") was passed in the wake of accounting scandals like Enron and WorldCom, federal law has required public companies to maintain effective internal controls over financial reporting and effective disclosure controls—and to have senior management certify their effectiveness.

48. Internal controls over financial reporting ("ICFR") ensure that public companies provide investors with complete and accurate information about financial

results in their public filings. According to the SEC, ICFR include "policies and procedures" that "(1) [p]ertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the registrant; [and] (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with [GAAP]." SEC Release No. 33-8238.

49. Disclosure controls and procedures are "controls and other procedures of an issuer that are designed to ensure that information required to be disclosed by the issuer in the reports that it files or submits under the [Exchange] Act . . . is recorded, processed, summarized and reported within the time period specified" by the SEC. 17 C.F.R. § 240.13a-15(e).

50. As detailed below, the Exchange Act Defendants knew that Bioventus's internal controls over financial reporting and disclosure controls were grossly ineffective. By early September 2021, Defendants Reali (CEO), Anglum (CFO), and Stalnecker (Audit Committee Chair) personally received an internal audit report flagging these failures (FE-3). The report concluded (among other things) that Bioventus:

- Had no effective controls over rebates, rebate payments, or rebate accruals (¶¶85, 89-92, 187(a)-(b), 188(b));

- Had never designed or implemented any documented or consistent process for estimating rebates (¶¶89-91, 187(b), 188(b));

- Had no internal documentation or explanation to justify the rebate accruals it used to report revenue on its financial statements (¶¶89-90, 187(b), 188(b)); and

- Was using arbitrary rebate accrual percentages that changed every quarter without any data or legitimate reason (¶¶90-91, 187(b)).

51. The audit report further cautioned that remediation was required for internal controls and compliance with SOX with respect to rebates (FE-3), yet this remediation had not occurred even by January 2022.

52. These known material control weaknesses enabled Bioventus to repeatedly overstate revenue in violation of GAAP. At the same time, in violation of the securities laws, Defendants made false and misleading public statements certifying that the materially deficient controls were "effective" while knowing that they were not.

### 1. Bioventus Was Required to Recognize Revenue in Accordance with ASC 606 and Deduct Rebates

53. ASC 606, issued by the Financial Accounting Standards Board ("FASB"), sets forth the core principle that an entity may only recognize net revenue in an amount that reflects the consideration to which the entity expects to be entitled in exchange for the goods. This required Bioventus to recognize revenue net of any "variable consideration" like discounts, rebates, or other chargebacks.

54. ASC 606-10-05-4 requires that a company can only recognize revenue after completing a five-step process: (i) identify the contract(s) with a customer (Step 1); (ii) identify the performance obligations in the contract (Step 2); (iii) determine the transaction price (Step 3); (iv) allocate the transaction price to the performance obligations in the contract (Step 4); and (v) recognize revenue when (or as) the entity satisfies a performance obligation (Step 5).

18

55. Bioventus's rebates affected Step 3—determining the amount of the transaction price. GAAP refers to these rebates as "variable consideration" that reduced the contracted price for HA products. Under ASC 606, the transaction price used as the basis to recognize revenue must reflect a deduction for the expected amount of variable consideration from the contracted price. (ASC 606-10-32-5.) With respect to the example above, this is shown as follows:



56. Under ASC 606, Bioventus was required to "estimate the amount of variable consideration," *i.e.*, rebates. (ASC 606-10-32-8.) ASC 606 sets forth two methodologies for this calculation, and Bioventus claimed to follow the "expected value" methodology, which "is the sum of probability-weighted amounts in a range of possible consideration amounts." (*Id.*) ASC 606 further required the Company to "consider all the information

19

(historical, current, and forecast) that is reasonably available to the [Company] and [to] identify a reasonable number of possible consideration amounts." (ASC 606-10-32-9.)

57. Bioventus was required to determine the expected rebate amounts based on its customer contracts, and this information was readily available to the Company, according to FE-1, Bioventus's former National Account Director of Market Access from November 2018 to January 2023. (FE-1.) The total amount of rebates was negotiated between Bioventus and each private payer insurer and was formally set in a contract. Further, under these contracts, the insurers had a year to submit their rebate requests. Thus, if a quarterly rebate request was lower than the contractually-mandated amount owed based on sales, the insurer would predictably submit higher rebate requests in the subsequent quarters such that, within any given year, the total rebate requests evened out to equal the contractual amount owed. (FE-1.) For example, if a payer consistently had $1,000 in claims per quarter, but then claimed rebates for just $700 in the next quarter, the Company should be ready for an additional $300 within the next year. (FE-1.)

58. Bioventus claimed in its SEC filings to determine the expected amount of variable consideration using factors such as "historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns." However, as shown below, Bioventus's accounting treatment of rebates was known to be arbitrary and unreliable and disregarded the facts, making these public statements false and misleading.

20

59. GAAP required Bioventus to deduct sufficient variable consideration from the transaction price so that it was probable that a significant reversal in the amount of cumulative revenue recognized would not occur when the uncertainty associated with the variable consideration was subsequently resolved, *i.e.*, when Bioventus was required to pay the rebate claim.[2]  (ASC 606-10-32-11.)

60. Put another way, companies may include variable consideration "in revenue ***only when there is a high degree of confidence that revenue will not be reversed in a subsequent reporting period***."  (FASB Accounting Standards Update No. 2014-09, at ¶BC204 (Basis for Conclusions).)  ASC 606 also required Bioventus to "assess[] whether it is probable that a significant reversal" in revenue will occur by considering "both the likelihood and the magnitude of the revenue reversal."  (ASC 606-10-32-12.)

61. That ASC 606 requires this assessment does not make revenue recognition a matter of opinion, and companies cannot simply include all variable consideration in revenue.  Rather, to the extent there is any uncertainty about the rebate amounts that are owed, the variable consideration must be excluded from revenue.  Guidance from leading accounting firms—including Grant Thornton, Bioventus's own auditor during the Class Period—makes clear that companies must be conservative in this regard:

---

[2] "Probable" has the same meaning as used in ASC 450-20:  "the future event or events are likely to occur."  Put differently, GAAP requires that it be ***unlikely*** that the amount of revenue that Bioventus recognized at the time of sale (contract price minus estimated variable consideration) will differ from the net revenue Bioventus ultimately receives from that sale (*e.g.*, once Bioventus has paid any rebate owed in the year following the sale).

- Grant Thornton has advised that under ASC 606, "[i]f an entity cannot reasonably estimate the total quantity of goods . . . that the customer will purchase, it should use the *minimum* price per unit to determine the transaction price" so as to avoid "a *significant revenue reversal* if the customer ultimately purchases sufficient volume to achieve the minimum price per unit."

- PricewaterhouseCoopers ("PwC"), Bioventus's auditor pre-Class Period, has advised that, "[w]hen management cannot reasonably estimate the amount of rebates that customers are expected to earn, it still needs to consider whether there is a minimum amount of variable consideration that should not be constrained." PwC further advised that, with regard to rebates, a company that "does not have the ability to estimate the total units expected to be sold," should include only "the *minimum* price per unit in the estimated transaction price" to "meet[] the objective" of ensuring "that a *significant reversal in the cumulative amount of revenue recognized will not occur*."

- Similarly, Ernst & Young has advised that if a company cannot arrive at a probable estimate, "the amount of variable consideration that must be included in the transaction price is *limited to the amount that will not result in a significant revenue reversal*." (Emphasis in original.)

62. These requirements require companies to carefully analyze rebates based on contractual requirements, historical experience, industry data, and other factors, and to be conservative in calculating and reporting recognized revenue: if they cannot reasonably determine the amount of rebates that are probable, they may only recognize the revenue that "will not result in a significant revenue reversal" even if the full rebate amount is ultimately claimed. This is for good reason, as a failure to be conservative can result in reporting materially inflated—and therefore false—revenue to investors.

63. As detailed below, that is exactly what happened.

### 2. Bioventus Violated GAAP and Its Internal Controls Suffered from Material Weaknesses

64. Reali became Bioventus's CEO in April 2020. Reali arrived at Bioventus with a checkered past: as CEO of a medical device company called TranS1, Reali was accused of securities fraud in a complaint sustained by the Fourth Circuit. *Singer v. Reali*, 883 F.3d 425 (4th Cir. 2018). Later, TranS1 merged with Baxano Surgical, Inc., and Reali—still its President and CEO—drove the company into bankruptcy in 2014.

65. At Bioventus, Reali presided over GAAP violations and material weaknesses in the Company's disclosure controls and internal controls over financial reporting. The Company admitted in November 2022 that "its internal controls related to the timely recognition of quarterly rebates were inadequate," its "internal control over financial reporting was not performed at a sufficient level of precision," and its "disclosure controls and procedures were not effective."

66. The same state of affairs existed before the February 2021 IPO and throughout the Class Period. In particular, as Bioventus's Senior Manager of SOX & Internal Audit from August 2020 to January 2022 (FE-4) explained, Bioventus used a crude approach to rebates that failed to account for the known fact that Bioventus was required to pay rebate requests that often came to Bioventus months after sales had occurred—including a large rebate invoice from United in summer 2021 (FE-4). Bioventus's ineffective controls and processes meant it did not know the actual amounts of rebates it owed and had no documentation to challenge or evaluate whatever rebate amounts insurers requested. (FE-3, FE-4.) According to Bioventus's former Internal Audit Manager from

April 2021 to January 2022, the Company's process for calculating variable consideration was grossly unreliable and effectively non-existent: instead of rigorously tracking rebate data and historical trends to determine the amount of revenue that was unlikely to be reversed, and thus could be recognized, Bioventus had no documented or consistent process for estimating rebates (FE-3). Instead, the rebate accruals were the product of arbitrary percentages that changed from quarter to quarter without any data or legitimate reason (FE-3). Ultimately, the Company's rebate accruals were not based on documentation and legitimate reasoning (FE-3), and they were materially inaccurate.

67. As a result, Bioventus did not properly calculate the amount of variable consideration from rebates or exclude it from the Company's reported revenue, but falsely told investors that it did so. Meanwhile, for over a year, the material weaknesses caused Bioventus to materially overstate revenue in violation of GAAP and created the risk of a significant revenue reversal.

68. The problems started at a basic level: Bioventus's antiquated systems required heavy use of time-intensive manual calculation for simple tasks. Bioventus never correctly set up SAP and Oracle PBCS software that could have assisted with financial monitoring, tracking, and forecasting, and thus lacked the automation and functionalities that would have allowed the Company to quickly access accurate data. (FE-2.) As a result, the Company's ability to track, report, measure, and monitor things was severely limited. (FE-2.) For example, employees had to devote weeks every year to helping the Company try to manually track salary and payroll expenses (a major expense at the Company).

(FE-2.)  This practice was "insane" because, at a good company, these functions can be performed in an hour, or a few minutes each.  (FE-2.)

69.    With these antiquated systems, Bioventus also lacked the ability to reliably determine the payments it was making and whether those amounts were correct.  As FE-6, a Bioventus Payment Specialist from August 2021 to August 2022, relayed, the Company's accounting processes were so bad that "We didn't even know which bills had been paid or not paid," the Company had "no supporting documents" for its bills and, "[w]e were blindly paying stuff."  (FE-6.)

70.    With respect to rebates, Bioventus had no system or process to track revenue, rebates, and discounts for each insurer.  (FE-1, FE-3, FE-4.)  As Bioventus's Financial Planning and Analysis Manager from October 2021 to June 2022 explained, the financial team charged with tracking and estimating rebates was clear that the Company had no controls as to which customers were asking for rebates or how much they were asking for.  (FE-2.)  Instead, there were thousands of lines, and they were trying to do it in an Excel file, without any kind of system in place.  (FE-2.)  It was "a real mess."  (FE-2.)  FE-5, a former Accounts Payable Specialist at Bioventus, reiterated that Bioventus "had big problems with the whole rebate calculation" and "[t]hey were always off."  (FE-5.)

71.    The significant problems with inaccurate rebate estimates were well known to senior leadership, including the Officer Defendants.  (FE-5.)  Every quarter, CEO Reali, CFO Anglum, VP of Finance Ben Fishburn, the Company's financial team, and others heard complaints about inaccurate rebate estimates at Quarterly Finance Meetings held at

"the Board Room" at Bioventus's headquarters, which FE-5 attended. In these meetings, Bioventus's Controller objected that the significantly higher rebate payments than Bioventus had estimated were "messing up our numbers" (FE-5) and the sales team expressed concerns with inaccurate rebate forecasting and improperly recognizing revenue (FE-1). Given the poor systems and uncertainty over rebates, they urged that Bioventus should be more conservative to avoid reversing or lowering its revenue figures when the Company was later hit with rebate requests. (FE-1.)

72. Similarly, every month, at Monthly Financial Close Meetings, CFO Anglum (later CFO Singleton), VP of Finance Ben Fishburn, Director of FP&A and Business Intelligence Diane Schabinger, the FP&A group, and others heard about problems with the Company's rebate estimates and that the Company's systems were a mess. (FE-2.)

73. The fact that the Company regularly received large rebate requests was also known to Bioventus's most senior executives. CEO Reali and CFO Anglum also personally approved large rebate payments every quarter, with CEO Reali personally signing off on two or three rebate payments of $1 million or more every quarter and signed off on a $3.5 million rebate payment during FE-3's tenure. (FE-5.)

74. Even though the pervasive control failures were raised directly with Bioventus's senior leadership—including Defendants Reali and Anglum—and materially impacted Bioventus's financial statements, they were never fixed. To the contrary, the deficiencies actually grew worse during the Class Period, as set forth in detail below.

3. **Despite Its Control Failures, Bioventus Falsely Claimed to Recognize Revenue in Accordance with ASC 606 and Defendants Completed the February 2021 IPO**

75.     Despite the existing, known ineffective accounting systems, control failures and inaccurate calculations, Defendants pushed forward with the IPO to raise cash by taking Bioventus public and, in doing so, falsely claimed that Bioventus recognized revenue and accounted for rebates in compliance with GAAP.

76.     On January 20, 2021, Bioventus filed a registration statement on Form S-1 that, after several amendments, was declared effective by the SEC on February 10, 2021 (together, the "Registration Statement"). On February 12, 2021, Bioventus filed a prospectus on Form 424B4 with the SEC, which incorporated and formed part of the Registration Statement (the "Prospectus").

77.     On February 11, 2021, Bioventus commenced the IPO and its stock began to trade on NASDAQ. In the IPO, Bioventus issued 9.2 million shares of Class A common stock at the IPO price of $13.00 per share, including 1.2 million shares that were issued as a result of the underwriters exercising their option to purchase additional shares. The Company received gross proceeds of $119.6 million.

78.     The Registration Statement falsely claimed that Bioventus's revenue recognition policy was only to record revenues that were "net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, [and] contractual allowances." The Company further claimed that "these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as

our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns." For rebates in particular, the Company claimed: "We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases."

79. Moreover, Bioventus claimed that its revenue recognition practices complied with ASC 606, stating that "[t]he amount of variable consideration is included in the transaction price," and thus recorded as revenue, "only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period." Bioventus also claimed to "regularly review all reserves and update them at the end of each reporting period as needed."

80. These statements—which told investors that Bioventus was following GAAP and its stated accounting policies in calculating rebates and recognizing revenue—were false and misleading when made. As detailed herein, with grossly defective controls and accounting systems, Bioventus had no factual basis to determine the amount of rebates or the variable consideration to be deducted from revenue, as GAAP requires, and was not doing so. Instead, Bioventus's reported revenue on HA products was the product of ineffective controls that were not compliant with SOX; "crazy" and inaccurate estimates; rebates and discounts that were not subject to any controls; masses of data that were crudely combined into Excel files; and highly inaccurate rebate estimating. Moreover, concerned

employees communicated these problems to the Officer Defendants at regular internal meetings and through direct objections. In short, the Company's rebate accruals were the unreliable product of a process that was known to be flawed and arbitrary, in violation of GAAP.

81. Bioventus's material weaknesses in controls violated GAAP, left the Company subject to a materially heightened risk of large revenue reversals, and led to material overstatements of revenue and Adjusted EBITDA for over a year.

### C. In Summer 2021, Bioventus Failed an Internal Audit of Its Rebate Processes and Controls; Defendants Reali, Anglum, and Stalnecker Personally Received the "Red Report" Showing the Controls Were Ineffective and Failed to Fix Them

82. As Bioventus's Senior Manager of SOX & Internal Audit from August 2020 to January 2022 (FE-4) explained, in early 2021, the Company's Audit Committee set an agenda for an internal audit of the Company's processes and controls for rebate requests from insurers, but the Company initially did not take steps to perform this audit.

83. <u>A Multi-Million-Dollar Rebate Request Forced the Company to Start the Internal Audit in Summer 2021</u>: Months later, Bioventus received an extremely large rebate invoice from United for millions of dollars. (FE-4.) Bioventus then "scrambled" to evaluate the multi-million-dollar rebate and to start its internal audit of the rebate process. (FE-4.) As detailed below, the results of this audit—reported directly to Defendants Reali, Anglum, and Stalnecker—were disastrous.

84. Beginning in May or June 2021, Bioventus's Internal Audit Manager from April 2021 to January 2022 (FE-3) conducted an audit of the entire rebates process at Bioventus. FE-3 was responsible for planning, field work, testing, and preparing the audit report, which took three to four months to complete. The audit reviewed Bioventus's previous 12 months of rebates and tested all controls with respect to rebates, including SOX controls over the rebate process and rebate accruals and the Company's internal controls over financial reporting with respect to rebates. (FE-3.) FE-4 confirmed that FE-3 conducted the internal audit, with assistance from Jessica Dill Gidney, Director of Internal Audit and Risk Management, and that the audit reviewed every step of the process, from Bioventus's management of the contracts with insurance companies that set the rebate amounts to Bioventus actually making the rebate payments.

85. <u>Bioventus Failed the Internal Audit, Resulting in a "Red Report"</u>: The audit report rated approximately twelve action items as "red," meaning there were severe issues in multiple areas of processes and controls that needed to be remediated quickly. (FE-3, FE-4.) This "red report" was the worst possible audit result, as a yellow report means there are some issues to look into, and a green audit report means all processes and controls are effective. (FE-4.) Among other things, the audit concluded that the Company did not have effective controls over rebates, rebate payments, or rebate accruals. (FE-3.) The Company failed both the operational and SOX testing of the rebate process, had not designed adequate controls, and failed to execute on the controls that were supposed to be in place. (FE-3.) The Company's lack of processes and controls with respect to rebates meant that

it could not effectively determine what the Company currently owed in rebates, much less what it would owe in subsequent periods. (FE-3, FE-4.) The controls deficiencies identified by the internal audit related to controls that affected the Company's financial statements. (FE-3, FE-4.)

86. The internal audit's specific findings and action items were as follows:

87. <u>Flawed and Arbitrary Rebate Accruals</u>: The Company failed audit testing as to its rebate accruals. (FE-3.) The rebate accrual process was supposed to identify the amount of rebates that Bioventus owed each insurance company at the close of each month and/or quarter. (FE-3.) As FE-3 explained, every quarter, the Company set a rebate "accrual" for each payer (insurance company) that estimated what rebates Bioventus owed to those payers. The rebate accrual was often presented as a percentage. (FE-3.) For example, a 10% rebate accrual meant the Company estimated that for each $100 it had received in sales, it owed that payer 10% (that is, $10) in rebate payments. (FE-3.)

88. Rebate estimating was important because higher accruals meant the Company reported lower revenue for that period, while smaller accruals raised revenue. In the above example, moving from a 10% to a 5% accrual meant that the Company would increase reported revenue from $90 to $95.

89. But the Company had no effective controls over the financial reporting and the accrual process for rebates. (FE-3.) Indeed, the audit revealed that the Company had never designed or implemented any documented or consistent process for estimating

rebates. (FE-3.) That is, Bioventus lacked any internal documentation or explanation to justify the rebate accruals it used to report revenue on its financial statements. (FE-3.)

90. To make matters worse, the Company was changing its rebate accrual percentage every quarter without any data or legitimate reason that could justify the changes. (FE-3.) The Company had no explanation for how the rebate accruals were calculated or why the Company changed its accrual process each quarter and changed the accrual percentages it assigned to payers. (FE-3.) There was no documentation or explanation supporting the percentages the Company used. (FE-3.) For example, as part of the audit, FE-3 asked the rebate department, "Why are you using five percent versus 10 percent?" but they had no answer or reasoning. "They didn't know." (FE-3.)

91. Thus, the audit report advised that the Company's rebate accruals needed to be based on documentation and legitimate reasoning to determine an accurate estimate of what rebates the Company owes. (FE-3.) The internal audit also included an action item that called for the Company to design and implement a clear and defensible process for calculating its rebate accruals, and consistently apply this methodology each quarter. (FE-3.) FE-3 told the rebate team that "you can't arbitrarily pick a number" to modify rebate reserves for a particular insurance company and/or time period. FE-3 confirmed that the Company's deficient approach to rebate accruals could lead to underestimating or overestimating the amount of rebates owed.

92. FE-4 corroborated that the audit revealed that the Company failed to effectively account for rebates that it owed to insurance companies and could not

effectively calculate how much it owed in rebates at any given time or effectively estimate what would be owed. By contrast, proper controls would have allowed Bioventus to accurately estimate the rebate amounts owed to each insurance company and how much to accrue for future rebate invoices, even if an insurance company failed to submit a rebate claim for multiple months.

93. As such, FE-3 and FE-4 confirmed that, contrary to the Company's representations to investors, (i) Bioventus was not using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration, and (ii) Bioventus had not reduced revenue and recorded the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases. Instead, its rebate accruals—and the resulting public financial statements—were based on a flawed process with materially deficient controls that was known to produce unreliable results.

94. <u>Bioventus Lacked Documentation to Analyze Insurers' Rebate Requests:</u> With respect to rebate invoices, because Bioventus lacked both effective controls and documentation of how much it owed under contracts with each insurer, Bioventus was simply paying whatever invoices were submitted by insurance companies as they came in. (FE-3, FE-4.) In other words, Bioventus was "blindly" paying rebate invoices with no documentation to know whether they were correct. (FE-6; *see also* FE-3, FE-4.)

95.     By September 2021, Bioventus's "Red Report" Was Sent Directly to Defendants Reali, Anglum, and Stalnecker:  After completion of audit testing and before issuance of the final report, FE-3 participated in an exit meeting with CFO Anglum and other senior leadership.  During the exit meeting, FE-3 walked everyone through the audit results and each action item.  This included the lack of effective controls over rebates, rebate payments, and rebate accruals; that remediation was required for internal controls and compliance with SOX; and the problems with the Company's operational practices.  During the exit meeting, Anglum did not seem surprised by the results, and acknowledged and agreed that the audit's findings were accurate.  (FE-3.)  "I think he [Anglum] knew they weren't doing their job," FE-3 said, referring to the employees responsible for overseeing rebate processes.  (FE-3.)  For senior leadership, and employees responsible for rebate payment and accrual, none of the problems identified by the audit "was a surprise."  (FE-3.)  "They knew it was broken."  (FE-3.)

96.     After the exit meeting, FE-3 finalized the audit report.  In late August 2021 or early September 2021, FE-3 emailed the final report to Defendant CEO Reali; Defendant CFO Anglum; and the Chair of the Audit Committee, Defendant Stalnecker, among others.  (FE-3.)  FE-4 was also copied on the transmittal email.  (FE-4.)  In addition, the audit report was placed on the agenda for the Audit Committee of the Board of Directors, distributed to the Audit Committee members, and discussed by the entire Audit Committee at the quarterly Board meeting.  (FE-3, FE-4.)

97.     Tellingly, Defendants never disclosed to investors that (a) Bioventus received the large rebate claim from United in summer 2021, (b) the Company had not accrued for it in advance (and lacked the processes and controls to do so), or that (c) Bioventus failed the resulting internal audit by early September 2021.  And not only did Defendants conceal these facts, but Defendants Reali and Anglum fraudulently certified in the Q1, Q2, and Q3 2021 Forms 10-Q that they had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

98.     <u>Despite the "Red Report," Bioventus Failed to Remediate the Known Issues</u>: The action items in the internal audit report had due dates, which were typically about three months from late August or early September 2021.  (FE-3.)  Among the action items were that the Company needed to design a system for rebate management to effectively (i) calculate what the Company owed in rebates currently and (ii) estimate what it would owe in subsequent periods.  (FE-4.)  This had been done effectively at other companies, but not at Bioventus.  (FE-4.)

99.     However, Bioventus failed to implement the action items.  In fall 2021, the Department Heads of finance, accounting, internal audit, and other departments all submitted written analyses to CFO Anglum reporting that they lacked the staffing capabilities to complete the tasks that needed to be done.  (FE-4.)  In summary, FE-4 said, Bioventus "was a shitshow."  In particular, FE-4 pointed to the fact that Reali was focused on acquiring companies; he and other leaders failed to ensure that Bioventus had the staff

to handle the additional work resulting from his acquisitions. The Company also suffered from many incompetent employees who were holdovers from when the Company was private and lacked the necessary skillset for financial roles at a public company. (FE-4.)

100. Even by January 2022, the action items still were not implemented. FE-3 and FE-4 resigned on the same day in January 2022 because the Company did not take the internal audit function or internal controls seriously and did not prioritize SOX compliance. (FE-3, FE-4.) As of their resignation in January 2022, the Company had not completed the required action items set out in the audit report, including implementing a legitimate and defensible process for rebate accrual and estimating. (FE-3, FE-4.)

101. Given these failures, FE-4 did not feel comfortable being a part of the issuance of the Company's 2021 annual report, and left prior to its issuance. FE-4 knew the recommendations from the audit report had not been implemented by January 2022 because, if they had, FE-4 would have had to test them, and the controls' descriptions would have been updated in the Company's records, which FE-4 accessed. Likewise, FE-3 confirmed that, in January 2022, the Company had not completed the required action items set out in the audit report, and (among other things) still had not implemented a compliant process for rebate accrual and estimating that was based on documentation and legitimate reasoning to determine an accurate estimate of what rebates the Company owed.

**D.** **Despite Their Knowledge of the Controls' Inadequacy, Defendants Reali, Anglum and Stalnecker Fraudulently Certified the Effectiveness of Bioventus's Controls and the Accuracy of Its Financial Reporting**

102.   As detailed above, by September 2021, Defendants Reali, Anglum, and Stalnecker had direct personal knowledge that the Company's controls and processes were inadequate to properly accrue for rebates.  With that knowledge, they falsely assured investors that they had evaluated those controls and certified their effectiveness.

103.   Bioventus's 2021 Form 10-K filed on March 11, 2022, stated that Defendants Reali and Anglum had "conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2021" and "concluded that, as of December 31, 2021, the Company's internal control over financial reporting is effective."  The 2021 Form 10-K also stated that Defendants Reali and Anglum had "conducted an evaluation of the effectiveness of our disclosure controls and procedures as of" December 31, 2021 and "concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2021."  Defendants Reali, Anglum, and Stalnecker signed the 2021 Form 10-K.

104.   Further, the 2021 Form 10-K and Bioventus's 1Q22, 2Q22, and 3Q 2022 Forms 10-Q each contained signed certifications by Reali and Anglum or Singleton (during their respective tenures), who each certified that:  (i) the financial statements therein "fairly present in all material respects the financial condition, results of operations and cash flows" of Bioventus; (ii) they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision,

to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"; and (iii) the Officer Defendants had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting."

105. These statements were materially false and misleading and directly contradicted what Defendants Reali, Anglum, and Stalnecker knew at the time. By September 2021, these Defendants had personally received the internal audit "red report" stating that the Company had never designed or implemented any documented or consistent process for estimating rebates. (FE-3.) Thus, these Defendants knew that Bioventus's internal controls for its rebate accruals were grossly deficient and, as a result, that the financial information presented in the reports for Q4 2021 through Q3 2022 did not fairly present Bioventus's financial condition, results of operations, and cash flows. And contrary to their public statement that, "as of December 31, 2021, the Company's internal control over financial reporting is effective," in reality, as of December 31, 2021, Bioventus had not remediated the ineffective rebate-related controls identified in the internal audit "red report." (FE-3, FE-4.)

106. Given these facts, after resigning in January 2022, FE-4 was very surprised to see that, in March 2022, the Company filed its 2021 annual report with a "clean" statement that Bioventus had effective controls. Indeed, FE-3 and F-4 resigned on the same

day due to the Company's failures to take Bioventus's control problems seriously and bring the controls into regulatory compliance. (FE-3, FE-4.)

### E. From at Least Q4 2021 to Q4 2022, Based on Its Arbitrary and Inaccurate Rebate Accruals, Bioventus Reported Materially Overstated Financial Results in Violation of GAAP

107. Driven by the Company's arbitrary and inaccurate rebate accruals stemming from its flawed process with materially deficient controls that were known to produce unreliable results, starting in the fourth quarter of 2021, Bioventus materially overstated its revenues and Adjusted EBITDA in violation of GAAP.

108. These material overstatements—which were included in the Company's SEC filings for over a year—were the direct result of the grossly ineffective rebate controls that were reported in writing to Defendants Reali, Anglum and Stalnecker by early September 2021, as detailed above. With knowledge of these ineffective controls and that the Company routinely received large rebate claims of millions of dollars, these Defendants knew that Bioventus was like a ship with no navigation system or rudder in the midst of a field of icebergs. The absence of effective controls left Bioventus with no factual basis for any rebate calculation and led directly to its issuance of false financial statements, in violation of GAAP, for over a year.

109. Nonetheless, these same Defendants signed the false SEC filings and falsely told investors that Bioventus's financial statements were accurate and that the Company had effective internal controls over financial reporting and effective disclosure controls and

procedures, while knowing that the Company's controls and procedures were grossly ineffective and practically non-existent. This was fraud.

110. Specifically, from Q4 2021 through Q4 2022, the Company improperly recognized revenues of approximately $12.4 million, with a cascading effect on the Company's other reported financial metrics. The material overstatements violated GAAP (ASC 606) and the Company's stated accounting policies. They were: (1) driven by Bioventus's HA products; (2) involved United, one of Bioventus's largest customers; (3) spanned each quarter from at least Q4 2021 through Q4 2022; and (4) were quantitatively and qualitatively material, inflating revenues in the Pain Treatment vertical (the Company's largest) by as much as 5.7%, and inflating the Company's overall Adjusted EBITDA by up to 61.4%, reflecting widespread and significant inflation.[3] Further, the

---

[3] In November 2022, Bioventus revealed that it had received a large rebate claim that reduced the Company's previously reported revenue by $8.4 million. This rebate claim related to prior periods, spanning at least Q4 2021 through Q3 2022. In a November 9, 2022 analyst report, Craig-Hallum wrote that the rebate request was "from a private payer who found some error in prior quarters' rebate claims . . . . 2021 revenues were likely over-inflated too," and that the payer at issue was "likely Cigna or UNH," *i.e.* United; a November 22, 2022 Craig-Hallum analyst report stated that the rebate was the result of Bioventus "receiving too high of HA payments from an insurer for at least a year." Because Bioventus did not make contracted sales to Cigna until July 2022, United necessarily was responsible for this rebate claim.

On March 31, 2023, the Company admitted that it had received additional rebate claims "from one private payer of $4 million." During the earnings call that same day, Defendant Reali admitted that these claims were made by United and attributed them to United discovering "through their internal audit . . . . which revealed that they had underbilled us" in prior periods. These claims related to at least Q1 2022 through Q4 2022, given that private payers had a year to submit rebate requests (FE-1) and, as Defendant Reali admitted on January 11, 2023, Bioventus "get[s] these rebate invoices [with] about 2 quarters lag time . . . 2 quarters or even later sometimes depending on the lag of the rebate."

Company's GAAP violations allowed it to beat analysts' consensus for net sales in Q4 2021 and Q2 2022 and Adjusted EBITDA in Q1 2022 and Q2 2022.

111.    The table below shows the Company's reported revenues from its Pain Treatments vertical and the corrected revenue figures after removing the overstatements:[4]

### Pain Treatments Revenues

| $ in millions | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 |
|---|---|---|---|---|---|
| Reported Pain Treatments Revenues | $62.7 | $52.1 | $63.9 | $60.5 | $48.0 |
| Overstatement Amount | $2.2 | $2.8 | $3.4 | $3.2 | $0.9 |
| Overstatement % | 3.6% | 5.7% | 5.6% | 5.6% | 1.9% |
| Corrected Pain Treatments Revenues | $60.5 | $49.3 | $60.5 | $57.3 | $47.1 |

112.    The overstated revenues in Pain Treatments were also material to Bioventus's total revenues (referred to as "net sales" by Bioventus) and allowed Bioventus to beat analysts' consensus in Q4 2021 and Q2 2022.   The table below shows the Company's reported net sales each quarter, analysts' consensus, whether Bioventus purportedly beat analysts' consensus, the corrected net sales after removing the overstatements, and any resulting earnings miss:

---

[4]  The calculations presented to correct the overstated revenue, net sales, and Adjusted EBITDA apportion the total $12.4 million in rebate claims in each quarter from Q4 2021 through Q4 2022 based on Bioventus's reported revenue for its Pain Treatments vertical, which included sales of HA products.  The reported metrics for Q3 2022 are those initially reported by the Company on November 8, 2022, which were revised on November 21, 2022 to reflect the impact of the $8.4 million in rebate claims.

**Net Sales**

| $ in millions | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 |
|---|---|---|---|---|---|
| Reported Net Sales | $130.4 | $117.3 | $140.3 | $137.1 | $125.8 |
| Consensus Net Sales | $130.3 | $117.7 | $138.3 | $141.6 | $132.7 |
| Performance vs. Consensus | *Beat* | *Miss* | *Beat* | *Miss* | *Miss* |
| Overstatement Amount | **$2.2** | **$2.8** | **$3.4** | **$3.2** | **$0.8** |
| Overstatement % | **1.7%** | **2.4%** | **2.5%** | **2.4%** | **0.6%** |
| Corrected Net Sales | **$128.2** | **$114.5** | **$136.9** | **$133.9** | **$125.0** |
| Corrected Net Sales vs. Consensus | ***Miss*** | *Miss* | ***Miss*** | *Miss* | *Miss* |

113.    Bioventus's overstatements in revenue also resulted in overstated Adjusted EBITDA figures and allowed Bioventus to beat analysts' consensus in Q1 and Q2 2022. The table below shows the Company's reported Adjusted EBITDA, analysts' consensus, whether Bioventus purportedly beat analysts' consensus, the corrected Adjusted EBITDA after removing the overstatements, and any resulting earnings miss:

**Adjusted EBITDA**

| $ in millions | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 |
|---|---|---|---|---|---|
| Reported Adjusted EBITDA | $28.5 | $7.1 | $22.9 | $22.7 | $15.2 |
| Consensus Adjusted EBITDA | $22.4 | $6.9 | $22.5 | $25.3 | $23.5 |
| Performance vs. Consensus | *Beat* | *Beat* | *Beat* | *Miss* | *Miss* |
| Overstatement Amount | **$2.2** | **$2.7** | **$3.4** | **$3.2** | **$0.8** |
| Overstatement % | **8.4%** | **61.4%** | **17.4%** | **16.4%** | **5.6%** |
| Corrected Adjusted EBITDA | **$26.3** | **$4.4** | **$19.5** | **$19.5** | **$14.4** |
| Corrected Adjusted EBITDA vs. Consensus | *Beat* | ***Miss*** | ***Miss*** | *Miss* | *Miss* |

114. The falsely reported financial metrics above were quantitatively material, boosting reported Pain Treatments revenues by over 5% from Q1 to Q3 2022, consistently inflating net sales, and boosting Adjusted EBITDA by double-digit percentages in three quarters, including a 61.4% overstatement in Q1 2022.

115. The overstatements were also qualitatively material: they persisted for over a year; related to Bioventus's core HA products—which accounted for most of the Company's revenue and organic growth; and repeatedly drove Bioventus to beat consensus estimates that it would otherwise have missed. Specifically, Bioventus reported net sales that beat consensus estimates in Q4 2021 and Q2 2022, and Adjusted EBITDA that beat consensus estimates in Q1 and Q2 2022, as a result of its GAAP violations and inflated financial metrics.

**F.  In 2022, Saddled with Debt and Struggling Acquisitions, Bioventus Touted Rapid HA Product Sales Growth and Reali Falsely Denied Any Impact from Imminent Medicare Price Reductions**

116. By early 2022, as the Company's ineffective controls and GAAP violations persisted, Defendants' efforts to acquire three additional healthcare companies had left Bioventus swimming in more than $360 million in debt, anticipating hundreds of millions of dollars in future milestone payments, and burning tens of millions of dollars in cash to try to integrate the acquired companies. To keep Bioventus afloat, the Company needed to convince investors that sales of its HA products would remain strong enough to pay for the acquisitions and maintain the Company's bottom line until the newly acquired businesses could provide value.

43

117. On March 10, 2022, the Company issued guidance that projected large growth, particularly from sales of HA products. During the earnings call the same day, Reali touted Bioventus's "HA business where we continue to gain market share with Durolane, our single injection, and Gelsyn, [] our 3 injection, and we see that continuing. The HA market is very strong." The Company projected that in 2022, revenues would grow approximately 26% to 31% year-over-year, reaching a range of $545 million to $565 million. FE-1 described this revenue forecast as "crazy," and said CEO Reali should never have said that. At that time, sales of the HA products, which made up 60 percent of the company's revenue, were not growing (FE-1).

118. Not only was HA growth stalling, but Bioventus faced existential risk from new federal regulations that would reduce pricing and reimbursements from Medicare for Bioventus's two main HA products, Durolane and Gelsyn, and thereby slash Bioventus's revenues and profits—including on the private, non-Medicare side of the business, which was heavily influenced by Medicare pricing.

119. Despite this reality, Defendants Reali and Singleton repeatedly told investors that the new federal regulations (which required a shift from WAC to ASP pricing) would have no impact on Bioventus, claiming that the impact was "net-neutral" because the Company had "offset lower pricing" by lowering "all of our rebates on our contracted business," and declaring that the Company had "looked at this very carefully," including by analyzing the "volume in our business." After the shift, they claimed that it "turned out

exactly the way we thought it would" and was "true to our model," such that "all of our ASP impact has been negated." These statements were outright false.

### 1. New Medicare Regulations Threatened Bioventus's HA Product Pricing

120. Bioventus's contracts for HA products generally used two types of pricing for reporting purposes: Wholesale Acquisition Cost (WAC), which is list pricing that does not reflect rebates and discounts, and Average Sales Price (ASP), which is net pricing that does reflect rebates and discounts.[5]

121. Historically, Bioventus had used a regulatory loophole that permitted it to report only WAC prices on Gelsyn and Durolane to the federal government's Centers for Medicare & Medicaid Services ("CMS").[6] Because Bioventus's WAC pricing was significantly higher than ASP for its HA products, reporting only WAC pricing resulted in Medicare and Medicaid paying higher reimbursement prices for these drugs. This reporting loophole thus inured to Bioventus's benefit.

122. To close the loophole, Congress passed a new law as part of The Consolidated Appropriations Act, 2021, that required manufacturers without a Medicaid

---

[5] Wholesale Acquisition Cost is defined by federal regulation as "the manufacturer's list price for [a] drug or biological to wholesalers or direct purchasers in the United States, not including prompt pay or other discounts, rebates or reductions in price." 42 U.S.C. § 1395w-3a(c)(6). Average Sale Price, in contrast, is a manufacturer's average sale price to all purchasers, net of discounts, rebates, chargebacks, and any other variable consideration.

[6] Specifically, because Bioventus did not have a Medicaid drug rebate agreement with the government, it was not required to report ASP to CMS. Without that data, CMS calculated its Medicare reimbursement for Bioventus based on higher WAC prices.

drug rebate agreement, like Bioventus, to report ASP information to CMS for each calendar quarter starting on January 1, 2022. The intended effect of this law was to reduce the amount of money the government would pay manufacturers like Bioventus. CMS issued its final rule implementing the new law on November 19, 2021.

123. As a result, starting on January 1, 2022, Bioventus was required to start reporting ASP for Gelsyn and Durolane to CMS. With ASP data in hand, beginning in July 2022, CMS would be able to utilize the new pricing data to reduce its payments for Durolane and Gelsyn. This would result in Medicare paying Bioventus significantly lower prices for these key drugs.

124. This government shift from WAC-based pricing to ASP-based pricing was highly material because (i) Bioventus's WAC pricing for Durolane and Gelsyn was significantly higher than ASP, and (ii) Bioventus was heavily reliant on payments from Medicare.

125. First, the gap between Bioventus's WAC and ASP pricing for Durolane and Gelsyn was significant. The ASP of Bioventus's Gelsyn dropped 8% in the first quarter after its ASP price was included on the CMS price list (*i.e.*, the period from July 31, 2022 to October 31, 2022), and declined 22% further in its second quarter on the list (*i.e.*, from October 31, 2022 to January 31, 2023). Bioventus's reported ASP for Durolane dropped 11% and a further 20% over those same periods. This price performance is an outlier: A total of 64 products have been added to CMS's Medicare Part B price list, which is based on manufacturers' reported ASPs, since January 31, 2021. The median change in reported

46

ASP in the quarter after a drug is added to the list for these 64 drugs is only -0.1%, and is only 0.0% after the drug has been on the list for two quarters. In other words, while most products had no change in pricing as a result of the shift to ASP pricing, Bioventus saw its key HA products' price plunge by approximately 28%. In short, Bioventus was highly vulnerable to the ASP reporting shift.

126. Second, reduced revenues from Medicare significantly impacted Bioventus's HA business. In a March 8, 2021 report, analysts from J.P. Morgan wrote that Bioventus's HA business was split between "~40% Medicare and ~60% commercial payors." For Q1 2021, Bioventus reported approximately $41.53 million in revenues from its Pain Treatments vertical, indicating that about 40% of this revenue, or $16.6 million, was from Medicare. A 28% decrease in the ASPs for Durolane and Gelsyn would significantly reduce Bioventus's revenues from Medicare. Durolane and Gelsyn were two of Bioventus's three largest HA products, and assuming they comprised approximately two-thirds of the $16.6 million in Medicare revenue, then Medicare revenues from those two drugs were approximately $11 million for Q1 2021. Thus, a 28% price decrease on these two drugs alone would result in a $3.08 million quarterly reduction in Medicare revenue. This was 18.6% of Bioventus's Medicare revenue in the Pain Treatments vertical (and 7.4% of the $41.53 million in total Pain Treatment revenues for Q1 2021).

127. Further, Medicare pricing heavily influenced private payers like insurance companies, who looked to lower Medicare pricing to negotiate lower prices under their own contracts with Bioventus: as Bioventus's Registration Statement explained, "Private

47

payers may adopt coverage decisions and payment amounts determined by CMS as guidelines in setting their coverage and reimbursement policies." Making up for lost Medicare revenues each quarter would require Bioventus to extract millions of dollars more from private payers—$3.08 million per quarter in the above analysis. Although Defendants claimed Bioventus would accomplish this by negotiating lower rebates with private payers, there was no reason for those payers to continue buying Bioventus's overpriced HA products. Thus, reduced Medicare pricing on Gelsyn and Durolane—its most lucrative drugs in its largest business line—was an existential threat for Bioventus, akin to an iceberg directly in the path of the Titanic.

### 2. With No Factual Basis, Reali and Singleton Falsely Assured Investors that the Shift to ASP Was "Net-Neutral" for Bioventus

128. By early 2022, the market was keenly focused on the shift to ASP. The issue was top of mind for investors and analysts because it threatened to reduce pricing on Bioventus's key HA products, and thus have a significant impact on the Company's revenues and profits. Defendants could have simply remained silent. Instead, however, they claimed to have performed detailed analysis of the new regulations' impact on Bioventus's HA pricing, then went further—repeatedly and consistently reassuring investors that, based on the Company's careful analysis, the impact would be "net-neutral," meaning that the new pricing regime would not affect the Company's bottom line.

129. To reassure investors, Bioventus claimed that it had been working to address the WAC-to-ASP shift well before the shift went into practice. Indeed, Defendants Reali

and Singleton claimed that Bioventus had conducted a detailed analysis and "run these calculations very carefully" showing that the shift was "net-neutral" because Bioventus had secured lower rebates with "all" private payers that offset any reduced pricing: Bioventus purportedly had "been able to adjust *all* of our rebates . . . to a lower amount" that "negate[d] any impact on the ASPs." These statements were not forward-looking: they described purported analysis Bioventus had already done and purported contractual changes it had already secured. And after the shift, they claimed things had "turned out exactly the way we thought it would" and the result was "true to our model." Again, these were statements of present and historical fact.

130. These false and misleading statements had no factual basis when made. Due to the known failures in Bioventus's grossly deficient rebate-related processes and controls, Bioventus lacked even basic capabilities to determine the pricing and rebates on its HA products. Bioventus was also incapable of tracking where its HA products were going, much less reliably modeling the impact of reduced pricing, purportedly lower rebates, and changes in volume. As Reali later admitted (on January 21, 2023), "*when we ship out our HA syringes, we have no insight into where they're going.* We don't know that they're going to a United patient or Cigna or Blue Cross, Blue Shield or Aetna, we don't get that information until quarters later, 2 quarters or even later sometimes depending on the lag of the rebate."

131. In other words, Bioventus admittedly was not capable of timely determining where its HA products were being sent or the volume of product being shipped to each

payer. This left Bioventus with no reliable basis to determine how shifts in pricing and volume would impact its bottom line. Any purported "analysis" was no better than a guess.

132. Defendants' abstract warnings about potential "choppiness" in results do not negate falsity: they did not reveal that the Company's purported analysis was baseless and wrong, much less that its pricing and sales began to deteriorate rapidly starting immediately after the shift. Indeed, Defendants consistently downplayed any long-lasting negative impact. For example, on March 10, 2022, Reali insisted that any potential future "choppiness" would be "very short-lived" and continued to reassure investors that Bioventus had analyzed the pricing shift "very carefully" to determine that its impact was "net-neutral." After the shift, on September 14, 2022, Defendant Singleton assured investors that there might be a "little bit of choppiness in the back half [of 2022] as we make the transition from WAC to ASP, but it's kind of all built into our models." In the same statement, Singleton declared that results to date were "as expected" and as the Company had "modeled into our numbers."

133. Ultimately, the reality was that private payers were unwilling to pay more than Medicare for Bioventus's HA products. Far from Bioventus having offset the impact of the shift to ASP pricing with lower rebates on "all" private contracts, certain private contracts had **higher** rebates, and certain private payers responded to the shift by moving their business *en masse* to other manufacturers. This resulted in a devastating impact on Bioventus's HA business, as the Company began to reveal in November 2022.

### a. March 10, 2022 Earnings Call

134. On March 10, 2022, during Bioventus's Q4 and FY 2021 earnings call, a Morgan Stanley analyst noted "concerns from investors that Medicare might be potentially cutting prices in the not-too-distant future," and asked "how Bioventus might be better situated versus competitors?" In response, Reali assured the analyst that Bioventus had "very carefully" modeled the impact of the shift and that it would have a "net-neutral" impact on the Company because Bioventus would make up for the lost CMS pricing "by paying less rebates" to its private payer customers.

135. Analysts believed Reali. A March 11, 2022 Morgan Stanley report stated, "Bioventus anticipates potential reimbursement changes would be a net neutral," because it would pay "less rebates to payers resulting in a neutral topline and margin impact for the company." Investment firm Craig-Hallum Capital Group LLC issued a report on March 31, 2022 that the shift would "have minimal impact" on Bioventus.

### b. May 9, 2022 Earnings Call

136. On May 9, 2022, Bioventus announced that it was maintaining its aggressive guidance for 2022. On May 10, 2022, Reali repeated his assurances regarding the WAC to ASP pricing shift during the 1Q22 earnings call. A Goldman Sachs analyst again asked "how that pricing change could affect your business." Rather than admit the truth—that the impact was disastrous, and Bioventus had not secured lower rebates or performed any reliable modeling (and could not do so)—Reali claimed:

We've run these calculations very carefully, and we feel strongly that ***not only will we be basically neutral through this process, but we can gain market share as we go forward in the medium term***. . . .

137.    Analysts continued to believe Reali.  In a May 10, 2022 report, J.P. Morgan analysts wrote that "any reduction in reimbursement" due to the shift to ASP reporting "should be offset by lower rebates within the [C]ompany's contracted business."

### c.    August 11, 2022 Earnings Call

138.    After the ASP shift went into effect on July 1, 2022, Reali falsely claimed that it had turned out "exactly the way we thought it would."  Prior to Bioventus's 2Q22 earnings call, Defendants had issued a Form 8-K in which they maintained the Company's prior, aggressive 2022 guidance, merely narrowing the range of expected revenue growth to 27% to 31%, compared to the prior range of 26% to 32%.

139.    In his introductory remarks on the 2Q22 earnings call on August 11, 2022, Reali acknowledged that the shift had occurred and stated, "As expected, we have been able to ***lower our reimbursement rebate rates on all of our preferred contracts with private payers, which has offset lower pricing*** for other areas of our HA business."  He further claimed that the modification to the rebates were "consistent with our modeling exercises," and even claimed that the shift had created "potential opportunities to increase our market share" because competitors could no longer offer lower pricing than Bioventus.

140.    During the call, an analyst from Craig-Hallum Capital asked if Bioventus "HA volumes and the price that you could charge the doc[tor]s [were] relatively consistent with the first half?"  Reali stated that, "per our planning," Bioventus had "***been able to***

52

*adjust all of our rebates . . . to a lower amount*" that "negate[d] any impact on the ASPs because we're paying less rebates." He emphasized that this was what Bioventus had "modeled [] over the past several months that *turned out exactly the way we thought it would*."

141. The truth was far different: Bioventus had not been able to "adjust all" of the rebates. The Company later admitted in its 2022 Form 10-K that "due to the manner in which rebates are calculated and paid under certain of our contracts with private payers, *changes in the ASP for our HA viscosupplements may result in larger than expected rebates payments* for the sale of these products." In other words, far from Bioventus *reducing* its rebates across the board, the shift to ASP meant rebates would *increase*, further reducing the Company's revenue and profit.

142. Unaware of the truth, an analyst from Morgan Stanley again asked about the impact of the WAC to ASP shift, the extent to which Bioventus's guidance relied on HA product volumes, and whether Bioventus saw "any initial signs" of "preference changes" to competitor HA products as a result. Reali claimed that Bioventus had "seen *no indication of impact on the volume*" of HA products sold, and reiterated that "*all of our ASP impact has been negated by our ability to renegotiate our rebates*." He touted that this purported result was "*true to our model*."

143. Again, analysts believed Reali's false statements. In an August 11, 2022 report, Canaccord Genuity affirmed, "While HA reimbursement shifted to reported ASPs vs WAC at the end of June, *BVS offset this development via lower reimbursement rebate*

53

*rates on its preferred HA contracts with private payers (which was as expected)*."
J.P. Morgan issued an analyst report that same day, which stated, "Reimbursement for HA
has shifted from wholesale acquisition cost to average selling price, though this has not
fundamentally impacted the growth opportunity as **management has been able to offset
lower pricing with lowered rebates on its contracted business**." In an August 12, 2022
report, Morgan Stanley analysts wrote, "Investor focus centered on Medicare
reimbursement pricing implications on HA products, however, the company expects a
neutral impact . . . . **[M]anagement has not seen an impact on underlying HA
utilization trends.**"

### d. September 14, 2022 Morgan Stanley Global Healthcare Conference

144. On September 14, 2022, Defendant Singleton participated in the Morgan
Stanley Global Healthcare Conference. The Morgan Stanley analyst asked if Singleton
had any concerns "that there is going to be disruption in the HA market as a result of the
change," *i.e.*, the shift to ASP reporting. Singleton reiterated Reali's prior assurances about
Bioventus's model, stating, "[I]t's progressing as we had it expected and have modeled
into our numbers. And so that's kind of as expected."

145. The Morgan Stanley analyst also asked specifically about Bioventus's
contracts with two of its largest private payer customers, United and Cigna, and the impact
of the shift. Rather than acknowledge that the Company lacked a reliable basis to determine
there would be no impact—and that the shift to lower ASP was increasing, not decreasing,
rebates—Singleton claimed with regard to Cigna that Bioventus had "adjusted our contract

with them from the standpoint of the rebates favorability that was associated with the WAC going to the ASP world."

G. **The Truth Emerged: Defendants Admitted Material Controls Weaknesses and Reversed Material Amounts of Revenue Based on Large Rebate Claims, and Reduced ASP Pricing Slashed Bioventus's Revenues and Profit**

146. Starting on November 8, 2022, the truth emerged in piecemeal fashion as Bioventus revealed a material reversal of revenue and poor earnings, and admitted material weaknesses in both the Company's disclosure controls and its internal controls over financial reporting related to rebate accruals, all of which were the product of the grossly deficient controls reported to Reali, Anglum, and Stalnecker by September 2021 and the Company's GAAP violations that had existed for well over a year. Further, Bioventus had failed to conduct any reliable modeling of the impact of the ASP shift, directly contrary to Reali's prior assurances, and this failure materialized when the financial performance of HA products steeply declined in the wake of the shift. As the truth emerged—that Bioventus had misstated the effectiveness of its controls and falsely overstated the financial performance of its key products—Bioventus's stock price declined precipitously.

1. **November 8, 2022: Weak Earnings and a Purportedly Unexpected Rebate Claim**

147. On November 8, 2022, Bioventus filed a Form 8-K announcing dismal 3Q22 financial results. Specifically, Bioventus reported total revenue of $137.1 million and EBITDA of $22.7 million—well below consensus estimates of $141.6 million and $25.3 million—and $55.419 million in net sales for its Pain Treatments vertical and U.S.

geographic region. Bioventus also disclosed that demand for the 3-injection Gelsyn treatment plummeted, causing revenue from the company's pain business to decline approximately 13% quarter over quarter. Given this material underperformance, Defendants slashed guidance to net sales of $527 million to $532 million, well below the prior range of $547.5 million to $562.5 million.

148. During that day's earnings call, Reali admitted that the "revenue shortfall" was "primarily . . . attributed to transitory headwinds related to GELSYN," calling out (1) "higher than normal rebate claims due to unexpected prior period rebate charges from a private payer who found errors in their earlier claims reporting," and (2) "the recent change in pricing to average selling price, or ASP, from wholesale acquisition cost, or WAC."

149. The large rebate claim was from United. A November 9, 2022 analyst report from Craig-Hallum stated that the payer that submitted the rebate claim was "likely Cigna or UNH," *i.e.*, United. United necessarily was responsible for this rebate claim, as a November 22, 2022, Craig-Hallum report stated that the rebate related to overpayments by the payer "for at least a year," and Bioventus did not make contracted sales to Cigna until July 2022. Unknown to investors, United was the same payer that had submitted a large rebate claim for several million dollars in summer 2021, which had prompted an internal audit of the rebate process and the "red report" sent to Defendants Reali, Anglum, and Stalnecker by September 2021.

150. Given that United had submitted a similar multi-million dollar rebate claim over a year earlier—and Reali and other senior executives had direct knowledge of that event and the Company's grossly deficient controls regarding rebates and rebate accruals—they could hardly claim surprise that the same issue surfaced again in 2022 and impacted the Company's financials. Indeed, FE-1 confirmed that the Company's claim that it was hit by an unexpected, large rebate request in November 2022 was incorrect, and used as a scapegoat for the Company's inability to meet CEO Reali's exaggerated revenue forecast. Likewise, based on FE-5's experience managing rebate requests, it was not plausible that the Company could have received a rebate request of this magnitude without knowing in advance that it would be coming in and that at least a significant portion of the amount was owed.

151. Nonetheless, Reali tried to cabin the issues, claiming during the November 8, 2022 earnings call that the rebate claim was due to a single "private payer who found errors in their earlier claims reporting." But Bioventus, not United, was responsible for properly determining the amount of rebates and deducting them from revenue for its financial statements, as GAAP required. It was Bioventus, not United, that lacked effective controls to ensure this happened. And Reali's statements obscured the facts that United had submitted a similar large claim in summer 2021, and that for over a year, Bioventus had been persistently failing to accrue the full rebate amounts for United, resulting in material overstatements of revenue in violation of GAAP. Reali also claimed the negative pricing "dynamic did not impact Durolane," which was not true (as detailed further below).

152.    Reali also continued to claim that Bioventus had a "full understanding" of pricing on its key HA products:  "So we model this out, and we have a full understanding of where our pricing is going to go over the next year . . . .  We certainly know the competition.  We know the markets and we know where the pricing is going to be."

153.    On this news, the share price of Bioventus Class A common stock declined 57.5% in a single day, from $7.06 to $3.00 at the close of trading on November 8, 2022.

154.    Analysts were shocked at the announcement.   A November 8, 2022 Canaccord Genuity analyst report said the results were "***thesis changing***," and that it was "clear the shift to ASP reporting from WAC[] has impacted the commercial stability here; this comes in ***sharp contrast to prior management commentary that called for ASP declines to be offset by reduced rebate levels***."

**2.      November 16, 2022:  Defendants Admitted a Material Weakness in Internal Controls Driven by Rebates**

155.    On November 16, 2022, Bioventus announced that it would be unable to timely file its 3Q22 Form 10-Q and that it may be forced to take "an impairment charge in the range of $185 million to $205 million."  According to the Company, this was because of "the recent decline in the Company's market capitalization subsequent to its previously announced financial results for the third quarter of 2022."  As detailed above, that decline was driven in substantial part by the Company's grossly inadequate controls and resulting failure to accrue properly for rebates for over a year, as well as Defendants' misstatements about the impact of the ASP shift.

156.    Bioventus also revealed that it was "seeking resolution" of the validity of a "revised invoice" for "rebate claims from a large private payer in relation to our Pain Treatments vertical," and that the "recognition of additional rebates may impact Bioventus's recently announced revenue guidance."

157.    While Bioventus did not quantify the impact of the rebate claims, it admitted that Bioventus's "internal controls related to the timely recognition of quarterly rebates were inadequate specifically for the period ended October 1, 2022."  Contrary to the Company's effort to cabin the admitted weakness in controls to the third quarter of 2022, these same, inadequate controls had been in place since the IPO.  Indeed, Defendants repeatedly told investors that between the IPO and Q2 2022, the Company had not implemented any "changes to our internal control over financial reporting."  Further, the Company revealed that it was "evaluating whether [it] will be able to meet all of its financial obligations as they come due within one year . . . ."

158.    On this news, the price of Bioventus's stock declined over 33%, or $1.00 per share, to close at $1.97 per share on November 17, 2022.

159.    A November 18, 2022 Morgan Stanley analyst report noted that Bioventus had "received an invoice for rebate claims" which Morgan Stanley expected "will be a multiple of the ~$2m headwind stated on the 3Q22 call for '22 guidance."  Morgan Stanley also removed its rating and price target for Bioventus Class A common stock due to the "potential risk of going concern," writing that Bioventus was then "very much a 'show me' story in need of a restructuring/turnaround to restore investor confidence."

3. **November 21, 2022: Bioventus Materially Reversed Revenue Due to the Rebate Claims, Admitted that Its Disclosure Controls and Procedures Were Not Effective, and Took a $189 Million Impairment Charge**

160. On November 21, 2022, Bioventus filed its 3Q22 Form 10-Q and revealed that the rebate claims had resulted in an $8.4 million reduction in the revenue previously reported for 3Q22, which also drove a $4.3 million reduction in Adjusted EBITDA. The $8.4 million revenue reversal—attributed to "open rebates and accruals"—drove a 16% year-over-year revenue decline ($8.953 million) in U.S. Pain Treatments revenues. The Company also disclosed that the material decline in U.S. Pain Treatments revenues was "due to more treatments being sold under contracts with major issuers at lower prices and price competition within the osteoarthritic joint pain treatment market." This attribution of the decline further revealed that "lower prices" and "price competition" were damaging Bioventus's HA business, contrary to Reali and Singleton's prior claims that the ASP pricing shift was "net-neutral," "all of our ASP impact has been negated," and the Company had "seen no indication of impact on the volume" after the shift.

161. Bioventus also announced a $189.2 million "non-cash impairment charge required by U.S. generally accepted accounting principles [GAAP]" "due to the recent decline in our market capitalization," an admission that Bioventus's business was worth materially less as a result of the reduced ASP pricing and material controls weaknesses.

162. Bioventus also elaborated on its previously disclosed material weakness in internal controls, stating that the "Company's management, including our Chief Executive

Officer and Chief Financial Officer, identified a material weakness related to the Company's internal control over financial reporting. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected and corrected on a timely basis."

163. Specifically, the Company admitted that its "internal control over financial reporting was not performed at a sufficient level of precision to ensure that the third quarter 2022 rebates accrual was complete and accurate." The Company admitted that when it received the large invoice, "there were not processes in place to ensure it was reviewed timely in order to update the [third quarter rebates] accrual." This disclosure confirms that the Company in fact received the invoice before October 1, 2022, but did not appropriately account for its impact before releasing inflated revenue and Adjusted EBITDA numbers on November 8, 2022, over a month later.

164. The material weakness was not new: the Company had repeatedly told investors that between the IPO and Q2 2022, the Company had not implemented any "changes to our internal control over financial reporting," effectively admitting that the material weakness identified for "the third quarter 2022" had also existed since the start of the Class Period. Underscoring the point, Bioventus stated on November 21, 2022 that "the process undertaken to estimate the expected reduction in revenue from rebates was consistent with the Company's historical practice," indicating that the material weaknesses

in that "process" that led to the material overstatements of revenue and Adjusted EBITDA were also "consistent with the Company's historical practice."

165. Further, because of the material weakness in internal control over financial reporting, the Company admitted that "our disclosure controls and procedures were not effective as of October 1, 2022." Again, this was not a new development.

166. Bioventus also detailed purported remediation efforts that further demonstrated the scope of the material weaknesses. The Company admitted it was: (i) "[r]eassessing open rebates accruals and changing the estimation method for calculating the rebate accruals"; (ii) "[i]mplementing enhanced controls and status tracking to ensure that rebates invoices . . . are received and reviewed timely;" and (iii) "[i]ncreasing rigor of documenting key conversations with payers." Bioventus admitted that these new and purportedly enhanced controls "have not operated for a sufficient amount of time to conclude that the material weakness has been remediated," indicating that the Company did not even know if the material weakness had been fully addressed.

167. Crucially, the Company further revealed that the $8.4 million decrease in revenue "related to the rebates accrual adjustment for 2022 and [sic] cascading effect on future revenue projections materially impacted the Company's evaluation of its ability to meet debt covenants, resulting in liquidity and going concern disclosures in the" Form 10-Q. Bioventus revealed that recent "conditions and events raise substantial doubt about the Company's ability to continue as a going concern," meaning the Company would run out of money and face liquidation.

168. On this news, the price of Bioventus Class A common stock declined $0.07, or 3.7%, to $1.81 at the close of trading on November 22, 2022.

169. In a November 22, 2022 report, analysts from Craig-Hallum wrote, "*[W]e learn there are in-fact more errors in store and are moving to the sidelines* until faith in financials/operating business can be restored and hard decisions around BVS' future are made," downgrading the stock to a "Hold" rating. The report noted that one of the main dynamics causing the "*restatements*" was "the rebate snafu that appeared in Q3 where *BVS was receiving too high of HA payments from an insurer for at least a year – this amount was incorrect*." Bioventus's inability to detect overpayments by its customers was an obvious indication of its deficient internal controls. The report also stated, "The rebate question above does *add questions to the financial infrastructure backbone at BVS and if more 'rebate adjustments' are necessary elsewhere.*"

> **4. January 11, 2023: Reali Continued to Claim that the Lower Pricing Dynamic Did Not Apply to Durolane and that Rebate Problems Were Resolved**

170. On January 11, 2023, Reali participated in the JPMorgan Healthcare Conference and continued to falsely assure investors that Durolane did not experience any impact from the ASP shift and that the rebate problems were limited to what the Company had previously disclosed. Defendant Reali stated that, with regard to Durolane, Bioventus had "seen sustained double-digit volume growth and that has counteracted any impact on reduction of transfer price" and that Bioventus expected to "continue to gain volume

growth from Durolane." Reali's statements concealed that Durolane pricing was similarly suffering from the ASP shift, and that Bioventus's revenues were declining as a result.

171. During the same conference, Reali admitted that Bioventus generally received rebate invoices after "2 quarters lag time," *i.e.*, after the product was sold, and the Company had "no insight into where they're going," *i.e.*, the Company had no meaningful way of tracking volumes and related pricing.

172. However, Reali further claimed that Bioventus had improved its rebate analysis. The J.P. Morgan analyst asked, "Also in the HA market, there was an issue a couple of months ago where there was a rebate that you weren't quite expecting or it was a larger rebate than you were expecting. Any update on how that's progressing? And how long that will also take to resolve back to normal?" In response, Reali stated:

> Yes. That was disappointing for us, and this was one specific payer where we did see a specific spike just with this payer in our contracted business in Q2. . . . .
>
> We've dug into this with this particular payer. They actually gave us NPI data so we could go back and look physician by physician. So we were able to isolate it and get comfortable with how we're accruing for rebates going forward. So we do feel that going forward we can be accurate.

173. On January 11, 2023, J.P. Morgan issued a report that bought into Reali's claims, stating that the Company saw "a light at the end of the tunnel over the next several quarters, with [management] also investing in better analytical capabilities to mitigate any future rebate issues."

### 5. March 31, 2023: Defendants Admitted Another Large Rebate Claim from United and Acknowledged Durolane Impact from ASP Shift

174. In reporting Bioventus's 4Q and FY 2022 results, Defendants revealed another $4 million in rebate claims from United, one of Bioventus's largest private payer customers, and that Durolane pricing (and revenues) had in fact been impacted by the ASP shift. It was no coincidence that in two consecutive quarters, Bioventus twice had to reverse revenue from United—the same payer that had claimed a multi-million rebate in summer 2021, prompting the disastrous internal audit—as pricing plunged on two of its largest HA products. This was the direct result of the deficient controls that existed and had persisted since the IPO, as well as Bioventus's resulting GAAP violations that started by the fourth quarter of 2021.

175. On March 31, 2023, Bioventus announced its 4Q and FY22 financial results. In the press release, Reali was quoted as stating, "Our results reflect additional pressure in our Pain Treatments vertical, primarily due to additional rebate claims previously not billed to us from a private payer, which offset the double-digit growth we are seeing in the Surgical Solutions vertical." The press release reported Bioventus's Q422 net sales: "Total net sales were $125.8 million compared to $130.4 million for the fourth quarter of 2021, a decrease of $4.6 million, or 3.5%, year-over-year, due to a decline in the Pain Treatments vertical, primarily driven by a decline in price resulting from higher than expected rebate claims."

176.    In his introductory remarks on that day's earnings call, Reali stated that Bioventus's financial performance "fell below our expectations" due to "continued pressure across our HA franchise" and supposedly "[u]nanticipated rebate claims from one private payer," *i.e.*, United, "along with lower volume growth and decreased selling price across our HA business."  Reali admitted that Bioventus had received "rebate claims of approximately $4 million" from United, "which represent claims previously not billed to us.  United Optum recently notified us that they had found these unbilled claims in their system through their internal audit of their rebate process in the fourth quarter, which revealed that they had underbilled us."  Reali also noted that, as a result of the rebate claims, Bioventus's "average selling price, or ASP, for both Durolane and Gelsyn is now lower than previously expected," that Bioventus experienced "double-digit price loss" on Durolane, and that "Durolane revenue declined high single digits for the quarter."

177.    Reali further explained that the impact of larger rebates "not only weighs on higher rebate payments, . . . but also weighs on your ASP because that becomes part of the calculation on the quarter that the rebates paid," *i.e.*, larger rebates are not only costly in their own right, but also reduce ASP because ASP is a net price that excludes rebates. Because Bioventus had not properly accrued for rebates on its HA products, the large rebate requests from United in two back-to-back quarters further reduced ASP.

178.    Because of Bioventus's weakened financial state, Reali acknowledged that Bioventus had renegotiated one of its acquisitions (the CartiHeal deal) to release Bioventus

from the milestone payment obligations and return the acquired company to its prior owners in exchange for a payment of $10 million to that company's shareholders.

179. Also on March 31, 2023, Defendants filed Bioventus's 2022 Form 10-K, reporting U.S. Pain Treatments net sales had declined to $194.830 million in 2022 compared to $201.068 million in 2021, a decline of 3.1%. The 2022 Form 10-K stated that the decline was "due to more treatments being sold under contracts with major insurers resulting from higher than expected rebate claims and price competition within osteoarthritic joint pain treatment market, partially offset with an increase in sales volume." The 2022 Form 10-K further stated that "due to the manner in which rebates are calculated and paid under certain of our contracts with private payers, changes in the ASP for our HA viscosupplements may result in larger than expected rebates payments for the sale of these products."

180. On news of these events, the price of Bioventus Class A common stock declined $0.14, or 11.6%, to $1.07 per share at the close of trading on March 31, 2023.

181. Analysts were disappointed and attributed the stock decline to the additional rebates and declines in Durolane pricing and revenues. For example, on April 3, 2023, Craig-Hallum analysts wrote in a report that the "unexpected rebate claims from UnitedHealth in combination with a higher mix in contracted Pain revenues and transition to ASP from WAC drove a 20%+y/y decline in revenue." Analysts from Canaccord Genuity wrote in a report issued the same day, "BVS saw weakness in Pain Treatments as it continued to experience headwinds in its HA business. HA-specific issues include

1) another swath of unexpected rebate charges from a private payor and 2) reduced ASP given higher rebate claims from a higher volume or private payer contracts."

182. Just five days after disclosing these disappointing financial results, on April 5, 2023, the Company announced that the Board of Directors had informed Reali on April 3, 2023 "that he would transition from his role as" CEO (*i.e.*, be fired) and as a result that Reali resigned as an officer and director the next day, April 4, 2023.

183. Following Reali's departure, Anthony P. Bihl III, Bioventus's former CEO from 2013 until his retirement in 2020, was named as interim CEO. Under Mr. Bihl's leadership, the Company has divested various businesses acquired under Reali's tenure to raise cash and keep the Company afloat, and is evaluating additional divestitures.

## V. FORMER EMPLOYEE ALLEGATIONS

184. Together with the allegations attributed to the FEs herein, this section provides an overview of the basis for the FEs' personal knowledge and the basis for the allegations herein.

185. **FE-1** served as National Account Director of Market Access at Bioventus from November 2018 to January 2023. In this capacity, FE-1 had responsibility for negotiating contracts between Bioventus and insurance companies, and primarily Bioventus's contracts for its HA products (Durolane, Gelsyn, and Supartz). According to FE-1, based on personal knowledge:

> (a) <u>CEO Ken Reali was "incompetent" and his revenue forecast for 2022 was "crazy"</u>: CEO Reali was "incompetent" and made a lot of bad mistakes. Reali was adamantly focused on acquisitions and there was significant pressure on employees to keep Bioventus's stock price

high in order to finance acquisitions and pay for them. In early 2022, FE-1 was surprised when CEO Reali announced the Company was raising its revenue forecast for the year. The revenue forecast was "crazy," FE-1 said, and CEO Reali should never have said that. At that time, sales of the HA products, which made up 60 percent of the Company's revenue, were not growing; Exogen had been performing poorly for years; and none of the newly acquired products performed well. In sum, the Company was not growing. The Company's claim in November 2022 that it was hit by an unexpected, large rebate request was incorrect, and used as a scapegoat for the Company's inability to meet CEO Reali's exaggerated revenue forecast.

(b) <u>Rebate requests were predictable based on information available to the Company</u>: Customers had a year to submit their rebate requests, and over the course of a year, the rebate requests evened out to equal the contractual amount owed for payments made. So if a quarterly rebate request was lower than the contractually-mandated amount owed based on sales, the customer will predictably submit higher rebate requests in the subsequent quarters such that, within any given year, the total rebate requests evened out to equal the contractual amount owed. For example, if a payer consistently had $1,000 in claims per quarter, but a particular quarter claimed rebates for just $700, the Company should be ready for an additional $300 within the next year. FE-1 was skeptical of the suggestion that Bioventus could not have anticipated the large rebate request that came in after the books closed in Q3 2022. The Company should have expected the rebate because the Company could have determined the amount of rebates Bioventus would need to pay each customer based on contractual agreements.

(c) <u>Bioventus had no system or process to track revenue, rebates, and discounts for each insurer</u>: FE-1 was not aware of Bioventus ever having any system or process to track revenue, rebates, and discounts for each insurer.

(d) <u>Bioventus held Quarterly Finance Meetings where the sales team expressed concerns with inaccurate rebate estimating and improper revenue recognition</u>: At Quarterly Finance Meetings held at Bioventus's headquarters, the sales team expressed concerns with inaccurate rebate estimating and improperly recognizing revenue. Given the poor systems and uncertainty over rebates, they urged that Bioventus should be more conservative to avoid reversing or lowering

69

its revenue figures when the Company was later hit with rebate requests.

186.    **FE-2** was a Financial Planning and Analysis Manager at Bioventus from October 2021 to June 2022.  Prior to that, FE-2 worked at Misonix from January 2021 until it was acquired by Bioventus in October 2021.   According to FE-2, based on personal knowledge:

   (a) <u>Bioventus had poor financial monitoring, tracking, and forecasting systems</u>:  When Misonix was acquired, FE-2 was surprised by the lack of sophistication in Bioventus's financial management and forecasting systems.  The ability to track things and report things accurately, and to measure and monitor things, was severely limited due to how poor the Company's system was.  It was "like they were in the stone age."

      a. Bioventus used an SAP system for accounting.  From previous experience with SAP accounting systems at other companies, FE-2 was aware of how sophisticated and automated that accounting software can be when done right.  But Bioventus's SAP system had none of that sophistication and automation.  Bioventus's SAP system could not do a number of actions that are routine at other companies, such as allocations and reverse entries.  By failing to implement proper accounting software, Bioventus lacked use of any of the true functionalities, which would have given the Company much more accurate data, and more quickly.

      b. Bioventus used another software system, Oracle PBCS, for forecasting.  FE-2 also had experience with Oracle PBCS software at a previous job, and was familiar with its capabilities.  But at Bioventus, the forecasting system was not set up right.  The Company was barely using any functionality and "I was kind of mind blown," FE-2 explained.  To make matters worse, the Company's IT department wanted nothing to do with Oracle and was not improving functionality, which was "scary" because the

Company relied on the Oracle system in order to populate its financial statements.

(b) <u>Bioventus lacked any system to track headcount and payroll expenses, and instead calculated Company expenses by forcing employees to spend a few weeks each year to try to gather this information</u>: FE-2 worked on a special project to get a better handle on the Company's headcount and payroll costs, but the Company put that project on pause. Salary and payroll was a major expense at Bioventus, yet the Company lacked a system that could quickly and accurately report how many employees worked at the Company and how much the Company was spending on payroll. Instead, Bioventus was trying to manage this data on an Excel spreadsheet, and Bioventus employees were forced to spend a few weeks every year trying to gather the right information and data to identify the company's headcount and calculate its payroll costs. This practice was "insane" because, at a good company, these functions can be performed in an hour, or a few minutes each.

(c) <u>Bioventus's rebate tracking and estimating system was "a real mess"</u>: The financial team charged with tracking and estimating rebates reported to FE-2 and others that the Company had no controls on which customers were asking for rebates or how much they were asking for. Instead, there were thousands of lines, and they were trying to do it in an Excel file, without any kind of system in place. It was "a real mess."

(d) <u>FE-2 told CFO Singleton and Other Executives that the Company's financial systems were in dire need of improvement</u>: FE-2 was vocal regarding FE-2's concerns about the Company's poor systems for managing its finances. "I flagged it to them immediately" and "I kept bringing it up," FE-2 said. Bioventus also did not have the systems and processes in place to take on two major acquisitions. Among other things, FE-2 reported these concerns about the poor systems directly to Diane Schabinger, Director of FP&A and Business Intelligence, and also to CFO Mark Singleton. In fact, FE-2 told Singleton that the financial systems were a "mess."

(e) <u>Bioventus's CFO was kept informed of these deficiencies at Monthly Financial Close Meetings</u>: FE-2 attended Monthly Financial Close Meetings to review the Company's financial performance, budget, and forecasting on a monthly basis, including forward-looking

metrics. Attendees also included CFO Anglum (later CFO Singleton), VP of Finance Ben Fishburn, Director of FP&A and Business Intelligence Diane Schabinger, and the FP&A group, among others. This monthly meeting kept the CFO informed on key issues, including the transition from WAC to ASP pricing for HA products and problems with the Company's rebate estimates. When Mark Singleton came in as CFO, he "walked into a shitshow." The Company's systems were a mess, but there was no clear discussion or resolution to improve or correct them. For each Monthly Financial Close Meeting, FE-2 worked with others to prepare a PowerPoint that was circulated to attendees and presented at the meeting.

187. **FE-3** was Internal Audit Manager at Bioventus from April 2021 to January 2022. FE-3 reported to Jessica Dill Gidney, Director of Internal Audit and Risk Management, who, in turn reported to the Audit Committee of Bioventus's Board of Directors. FE-3 is a certified public accountant. According to FE-3, based on personal knowledge:

(a) <u>Bioventus failed its internal audit of its processes and controls for managing and estimating rebate claims during the summer of 2021</u>: FE-3 conducted an internal audit on the processes and controls for managing and estimating rebates. This was an audit of the entire rebates process at Bioventus. FE-3 began the audit in May or June 2021, and it took three to four months to complete. The audit reviewed Bioventus's previous 12 months of rebates. FE-3 was responsible for planning, field work, testing, and preparing the audit report. The internal audit tested all controls with respect to rebates, including SOX controls over the rebate process and rebate accruals and the Company's internal controls over financial reporting with respect to rebates. By virtue of its scope, the audit involved many personnel and parts of the Company's business.

    a. Bioventus failed the audit. The audit report rated many action items as "red," meaning there were severe issues in multiple areas of processes and controls that needed to be remediated quickly.

b. The audit concluded that the Company did not have effective controls over rebates, rebate payments, or rebate accruals; that remediation was required for internal controls and compliance with SOX with respect to rebates; and that there were problems with its operational practices with respect to rebates.

(b) <u>The internal audit revealed that Bioventus had never designed or implemented a process for estimating rebates, and that the Company was taking arbitrary rebate accruals without any methodology or explanation that could justify the changes:</u>

a. The audit report set out numerous action items that Bioventus needed to complete. For example, the Company failed both the operational and SOX testing of the rebate process, had not designed adequate controls, and failed to execute on the controls that were supposed to be in place. There were approximately twelve action items that needed to be implemented right away.

b. The rebate accrual process was supposed to identify the amount of rebates that Bioventus owed each insurance company at the close of each month and/or quarter. But the Company lacked effective SOX controls over the financial reporting and the accrual process for rebates. Those processes are used to determine the Company's financial status, which is then publicly reported. The 2021 audit report set forth action items to address these problems and implement proper controls.

c. Among other things, the Company failed audit testing as to its rebate accruals. The Company lacked effective processes to estimate what rebates were owed to insurance companies, or challenge the accuracy of the rebate amounts requested by insurers. This meant that Bioventus could not effectively calculate how much it owed in rebates at any given time and could not effectively estimate what would be owed.

d. Every quarter, the Company set a rebate "accrual" for each payer (insurance company) that estimated what rebates Bioventus owed to those payers. The rebate accrual was often presented as a percentage. For example, a 10% rebate

accrual meant the Company estimated that for each $100 it had received in sales, it owed that payer 10% (that is, $10) in rebate payments. The rebate estimating was important because higher accruals meant the Company reported lower revenue for that period, while smaller accruals raised revenue. In the above example, moving from a 10% to a 5% accrual meant that the Company would increase reported revenue from $90 to $95.

e. The internal audit revealed that the Company had never designed or implemented any documented or consistent process for estimating rebates. Bioventus lacked any internal documentation or explanation to justify the rebate accruals it used to report revenue on its financial statements. Moreover, the Company was changing its rebate accrual percentage every quarter without any data or legitimate reason that could justify the changes. The Company used a spreadsheet to set and track the official rebate accruals for each quarter, but there was no documentation or explanation for how the Company arrived at the rebate accrual percentages it used. The Company had no explanation for how the rebate accruals were calculated or why the Company changed its accrual process each quarter and changed the accrual percentages it assigned to payers. Moreover, the audit found no documentation to support that the contracts had been reviewed by legal.

f. As part of the audit, FE-3 asked the rebate department, "Why are you using five percent versus 10 percent?" but they had no answer or reasoning. "They didn't know." Among other things, the action items that the internal audit recommended to bring the Company into compliance were that the Company must design and implement a clear and defensible process for calculating its rebate accruals, and consistently apply this methodology each quarter. FE-3 told the rebate team that "you can't arbitrarily pick a number" to modify rebate reserves for a particular insurance company and/or time period. The audit report advised that the Company's rebate accruals needed to be based on documentation and legitimate reasoning to determine an accurate estimate of what rebates the

Company owed. The deficient approach used by the Company could lead to underestimating or overestimating the amount of rebates owed.

g. Based on the findings of the internal audit, FE-3 stated that it would not be accurate for the Company to say that it had reduced revenue and recorded the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases.

(c) <u>After the audit testing was completed, FE-3 met with CFO Anglum and other senior leaders to walk through the details of the audit results, the controls failures and other deficiencies at the Company, and CFO Anglum acknowledged and agreed that the audit's findings were accurate</u>: FE-3 met with senior management a number of times during the rebates audit process in 2021. This included CFO Anglum; Jessica Dill Gidney, Director of Internal Audit; Barry Cooper, VP of Finance; Julia Tauras, Commercial Controller who was responsible for rebates; Tauras's direct report Brendan Byrnside, who was Finance Manager and oversaw rebates; and senior managers who were responsible for areas with targeted action items identified by the audit; among others. At the outset of the audit, they met in a "kick-off meeting" of "all the key players who would be a part of the audit." FE-3 also met with them in status meetings throughout the audit process. After audit testing was completed, but before the issuance of the final report, FE-3 also conducted an exit meeting with CFO Anglum and the senior leadership, where Anglum acknowledged and agreed that the audit's findings were accurate.

a. During the exit meeting, FE-3 walked everyone through the audit results and each action item. This included the lack of effective controls over rebates, rebate payments, and rebate accruals; that remediation was required for internal controls and compliance with SOX; and the problems with the Company's operational practices. FE-3 discussed the findings and action items with each of these senior leaders, which allowed those responsible for the areas with identified problems to respond to the findings, discuss the recommended action items, or suggest other solutions. CFO Anglum did not seem surprised by the results of the audit, and during this exit meeting acknowledged and

75

agreed that the audit's findings were accurate. "I think he [Anglum] knew they weren't doing their job," FE-3 said, referring to the employees responsible for overseeing rebate processes. Gidney, Cooper, Tauras, and Byrnside agreed with the accuracy of the audit findings and the action items as well. In fact, FE-3 observed, "everybody" at the Company was aware that the rebates process was not working even before the audit. None of the problems identified by the audit "was a surprise," FE-3 said. "They knew it was broken."

(d) FE-3 emailed the final audit report to CEO Reali, CFO Anglum, and the chair of the Audit Committee in late August 2021 or early September 2021: After the exit meeting, FE-3 finalized the audit report. FE-3 emailed the final report to CEO Reali; CFO Anglum; and the Chair of the Audit Committee, Susan Stalnecker, in late August 2021 or early September 2021. FE-3 was able to pinpoint that date because FE-3 started another project in September 2021.

   a. As part of the standard process for an internal audit report, FE-3 also sent the final report to all participants in the audit and those responsible for implementing action items identified in the audit report, including Jessica Dill Gidney, Director of Internal Audit; Barry Cooper, VP of Finance; Julia Tauras, Commercial Controller; Brendan Byrnside, Finance Manager; and others.

   b. The audit report was also placed on the Board's agenda so that it was reviewed at the upcoming quarterly meeting of the Board of Directors.

(e) Bioventus had still not completed the audit report's recommended action items when FE-3 resigned from the Company in January 2022: FE-3 resigned from Bioventus because the Company "didn't take controls seriously, which they should because they are a public company," FE-3 said. FE-3 was often frustrated by the lack of cooperation from Company employees when FE-3 requested information for internal auditing. And top leadership did not provide the support necessary for internal audits.

   a. The action items in the audit had due dates, which were typically about three months from the time the audit was released, which was late August or early September 2021.

76

However, by the time FE-3 left the Company more than four months later in January 2022, the Company had not completed the required action items set out in the audit report. Among other things, as of January 2022, the Company still had not implemented a compliant process for rebate accrual and estimating that was based on documentation and legitimate reasoning to determine an accurate estimate of what rebates the Company owed. FE-3 resigned the same day as FE-4.

188. **FE-4** was Senior Manager of SOX & Internal Audit at Bioventus from August 2020 to January 2022. FE-4 reported to Jessica Dill Gidney, Director of Internal Audit and Risk Management. Gidney reported to the Audit Committee and also had "dotted line" reporting to CFO Greg Anglum and, at times, to CEO Ken Reali. FE-4 is a certified public accountant and was hired to lead the SOX compliance effort in preparation for the IPO and to assist with internal audits to ensure Bioventus would meet public company SEC regulations. FE-4 is experienced with SOX compliance and internal auditing of public companies, and had worked at a "Big Four" accounting firm prior to joining Bioventus. Ultimately, FE-4 resigned from the Company because of its lack of controls, incompetent employees, and poor management. According to FE-4, based on personal knowledge:

    (a) In summer 2021, a multi-million-dollar rebate request from United prompted the Company to perform an internal audit of its rebate process: In early 2021, the Company's Audit Committee had set an agenda of internal audits to be conducted, including an audit of the Company's processes and controls for rebate requests from insurers, but the Company initially did not take steps to perform this audit. Months later, Bioventus received an extremely large rebate invoice from United for millions of dollars. Bioventus "scrambled" to try to determine why it owed this money, and the large rebate claim prompted the Company to start its internal audit of the rebate process.

77

(b) Bioventus failed its 2021 internal audit of its processes and controls for managing and estimating rebate claims, resulting in a "red report" identifying "severe" issues that needed immediate remediation: Bioventus conducted an internal audit on the processes and controls for Company revenue and "the entire rebates process" at Bioventus. The audit reviewed every step of the process, from Bioventus's management of the contracts with insurance companies that set the rebate amounts to Bioventus actually making the rebate payments. The audit was conducted by FE-3, Manager of Internal Audit, with assistance and oversight by Jessica Gidney.

    a. Bioventus failed the audit, resulting in a "red report." A red report means there are "severe" issues that need to be remediated quickly. By contrast, a green audit report means all processes and controls are effective, and a yellow report means there are some issues to look into.

    b. Specifically, the audit revealed that the Company failed to effectively account for rebates that it owed to insurance companies. Further, the Company lacked effective processes to estimate what rebates were owed to insurance companies. This meant that Bioventus could not effectively calculate how much it owed in rebates at any given time and could not effectively estimate what would be owed. The controls deficiencies identified by the internal audit related to controls that affected the Company's financial statements.

    c. Instead, FE-4 stated that Bioventus was not using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration.

    d. Proper controls would have instructed Bioventus on how much to accrue for future rebate invoices, even if an insurance company failed to submit a rebate claim for multiple months. Those proper controls would have provided Bioventus the ability to both accurately estimate the rebate amounts owed to each insurance company as well as challenge rebate invoices from insurers that were beyond the amount required under the terms of the

contracts. That way, if an insurer submitted an inaccurate invoice, Bioventus would know and have the documentation to support a challenge.

e. However, because Bioventus lacked effective controls, and lacked documentation of what it owed under contracts with each insurer and what rebate amounts would be requested by those insurers, Bioventus was simply paying whatever invoices were submitted by insurance companies as they came in. "They were just going off of the invoices that came in," FE-4 confirmed. The Company tried to compare rebate invoices to internal financial records to determine if the invoice amount was correct, "but they never actually matched" to internal documents. Despite the mismatch and lack of supporting documentation for the amount of rebates requested by insurers, the Company would pay them anyway.

(c) <u>Bioventus's "red" audit report was sent to the Audit Committee of the Board of Directors, CEO Reali, and CFO Anglum</u>: Once the audit was complete in 2021, the audit report identifying the Company's ineffective process to estimate rebates was sent to the Board's Audit Committee, CEO Reali and CFO Anglum, as well as senior management in finance and rebates. FE-4 was one of the recipients on an email sending the "red" audit report directly to the Chair of the Audit Committee, Defendant Stalnecker, and Defendant CEO Reali. Further, the report was placed on the agenda for the Audit Committee of the Board of Directors and distributed to and discussed by the entire Audit Committee at that meeting of the Company's Board of Directors.

(d) <u>Bioventus Failed to Remediate Its Ineffective Rebate Controls by the Time FE-4 Resigned in January 2022</u>:

a. The Company's management was required to provide responses to the internal audit that found failed controls for the Company's rebate process, and the audit report included recommendations of changes that needed to be implemented to fix the deficient rebate process.

b. Among these were that the Company needed to design a system for rebate management to effectively (i) calculate what the Company owed in rebates currently and

(ii) estimate what it would owe in subsequent periods. This had been done effectively at other companies, but not Bioventus.

c. However, as of the day FE-4 resigned in January 2022 (discussed below), no one had tested or updated the controls. FE-4 knows this because if the recommendations from the audit report had been implemented, FE-4 would have had to test them, and the controls descriptions would have been updated in the Company's records, which FE-4 accessed as part of FE-4's job responsibilities as Senior Manager.

(e) FE-4 resigned from the Company because of its ineffective internal controls, incompetent employees, and poor management:

a. Bioventus "was a shitshow," FE-4 summarized. Not only did the Company lack proper internal controls, it also had poor management. CEO Reali was focused on acquiring companies; he and other leaders failed to ensure that Bioventus had the staff to handle the additional work resulting from his acquisitions. The same was true when Bioventus issued its IPO; Reali and his leadership team did not ensure that Bioventus had sufficient or proper staff to transition Bioventus's financial operations to a public company.

b. In January 2022, FE-4 resigned because FE-4 did not feel supported by leadership to do FE-4's job, which was to bring the Company into compliance with SOX regulations. FE-4 felt that SOX was not something senior leadership cared about. Senior leadership did not emphasize or focus on the importance of bringing the Company into SOX compliance. FE-4 got the impression that CEO Reali cared more about acquiring companies and paid little attention to the risks involved with failing to build a strong SOX program for Bioventus as a newly public company. FE-4 did not feel comfortable being a part of the issuance of the Company's 2021 annual report, and left prior to its issuance. After resigning in January 2022, FE-4 was very surprised to see that in March 2022 the Company filed its

2021 annual report with a "clean" statement that Bioventus had effective controls.

c. Throughout FE-4's tenure prior to the announcement of CFO Anglum's departure on November 11, 2021, the Department Heads of finance, accounting, internal audit, and other departments all submitted written analyses to CFO Anglum reporting that they lacked the staffing capabilities to complete the tasks that needed to be done. The Company also suffered from many incompetent employees who were holdovers from when the Company was private and lacked the necessary skillset for financial roles at a public company. But the Company's management did not do what was necessary to properly staff and train these departments, despite a broad awareness of the need to do so. CFO Anglum lacked the power to implement the changes alone.

189. **FE-5** was an Accounts Payable (AP) Specialist at Bioventus from February 2018 to January 2020, and a Senior AP Specialist from January 2020 to November 2021. In this capacity, FE-5 received and processed requests for payment from the Company, which included the requests for rebates to private insurance payers. FE-5 worked directly with the Company's rebate manager to ensure each one was properly approved before FE-5 issued the rebate payments. Jane Williams was the rebate manager until February 2021, when she was replaced by Brendan Byrnside. FE-5 was stationed outside the rebate manager's office, so FE-5 often heard the rebate manager's conversations about rebates and rebate estimating. According to FE-5, based on personal knowledge:

(a) Bioventus had "big problems" with inaccurate rebate estimating, and executives objected that rebate payments were significantly higher than Bioventus had estimated: Bioventus "had big problems with the whole rebate calculation," FE-5 said. "They were always off." Inaccurate rebate calculations and rebate estimating was a major problem at Bioventus. For example, Bioventus's Controller objected

about that rebate payments were significantly higher than Bioventus had estimated and that it was "messing up our numbers." Bioventus had "a lot of issues" with rebate and rebate estimating and "[i]t was pretty inaccurate."

(b) <u>CEO Ken Reali and CFO Greg Anglum heard complaints about inaccurate rebate estimates at Quarterly Finance Meetings</u>: Bioventus's Financial Team held quarterly meetings to go over the rebate numbers and how they related to the Company's estimate, including discussing the Company's problems with inaccurate rebate estimating. The quarterly finance meetings were held at the Company headquarters in a large room, referred to as "the Board Room," and attended by CEO Ken Reali, CFO Greg Anglum, VP of Finance Ben Fishburn, and the Company's financial team (including FE-5), among others. At these meetings, the attendees discussed the Company's inaccurate rebate estimating. FE-5 also specifically recalled the Bioventus Controller, referenced above, discussing the inaccurate rebate estimating at this quarterly finance meeting. FE-5 confirmed that, as attendees, Reali and Anglum would have heard the complaints about the poor rebate estimating at these quarterly meetings.

(c) <u>CEO Reali and CFO Anglum provided personal approval for large rebate payments every quarter and it was not plausible the Company was unaware of the $8.4 million rebate it owed</u>: Large payments required CFO Anglum's approval, and very large payments required CEO Reali's approval. FE-5 recalled that these two thresholds were approximately $250,000 and $1 million, respectively. FE-5 confirmed that CEO Reali signed off on two or three rebate payments of $1 million or more each quarter. During FE-5's tenure, FE-5 recalled CEO Ken Reali once signed off on a $3.5 million rebate payment. Based on FE-5's experience managing these rebate requests, it was not plausible that the Company could have received an $8.4 million rebate request without knowing that at least a significant portion of that was owed and that this enormous rebate request would be coming in.

190. **FE-6** was a Payment Specialist at Bioventus from August 2021 to August 2022. According to FE-6, based on personal knowledge:

(a) <u>The Company's accounting processes were "a mess" and the Company was unable to effectively pay rebates and other bills</u>: The Company's accounting processes were "a mess," and FE-6 resigned after the acquisition of Misonix because the situation was getting worse. "We didn't even know which bills had been paid or not paid," FE-6 said. "There were no supporting documents. We were blindly paying stuff." The rebate invoices were a big part of the payments FE-6 made for Bioventus. Out of the $3 million to $6 million in payments made per week, a big chunk of that was for rebates, FE-6 confirmed. The Company's system for paying these bills was "a hot nightmare." It required trying to reconcile everything on a single Excel spreadsheet, and this was further complicated by payments that were "blocked" for a variety of reasons, including because sometimes payment for an invoice accidentally blocked all payments to a specific vendor. Further, the Company's purchase order system was not connected to its SAP accounting system—which itself was too complicated and difficult to use—all of which further impeded the Company's ability to track its financials.

(b) <u>Senior leadership was aware of the Company's accounting problems</u>: Senior leadership were aware of these issues. "Everybody knew it," FE-6 confirmed. For example, FE-6 had a number of conversations about the company's accounting difficulties and problems with Corrie Rittenhouse, Accounting Manager of Accounts Payable and T&E, who reported to the CFO.

## VI. THE OFFICER DEFENDANTS AND DEFENDANT STALNECKER ARE SUBJECT TO CONTROL PERSON LIABILITY

191. Plaintiff incorporates and realleges the allegations set forth above. In addition, the following allegations demonstrate the Officer Defendants' and Defendant Stalnecker's control over Bioventus at the time of the IPO and throughout the Class Period.

192. The Officer Defendants had control of Bioventus due to their executive positions and their roles in management, their preparation and signing of Bioventus's SEC filings, and their direct involvement in its day-to-day operations.

193.    The Officer Defendants held the top management positions within Bioventus and thereby controlled the Company.  Specifically: (i) Reali was Bioventus's CEO and a member of its Board throughout the Class Period; (ii) Singleton has served as Bioventus's SVP and CFO since March 21, 2022; and (iii) Anglum served as Bioventus's SVP and CFO from August 2017 until April 2022.

194.    The Officer Defendants prepared and signed Bioventus's SEC filings throughout the Class Period.  Specifically, Defendants Reali and Anglum signed the Registration Statement, 2020 Form 10-K, 2021 Form 10-K, 1Q22 Form 10-Q, and 2Q22 Form 10-Q; and Defendants Reali and Singleton signed Bioventus's 1Q22 Form 10-Q and 2Q22 Form 10-Q.

195.    The Officer Defendants also spoke on behalf of the Company during conference calls with investors during the Class Period.  Defendant Reali presented Bioventus's financial results and answered analyst questions during the earnings calls on March 10, 2022, and Defendants Reali and Singleton presented Bioventus's financial results and answered analyst questions during the earnings calls on May 10, 2022, August 11, 2022, and November 8, 2022.  Defendant Singleton also participated and presented in the September 14, 2022 Morgan Stanley Global Healthcare Conference, and Defendant Reali participated and presented in the January 11, 2023 J.P. Morgan Healthcare Conference.

196.    Defendant Stalnecker had control of Bioventus by virtue of her position as a director of the Company.  As a director, Defendant Stalnecker was responsible for

monitoring the operations of the Company on a regular basis and for authorizing the Company to take important actions, such as conducting the IPO.

197. Defendant Stalnecker authorized the content of and signed the Registration Statement and the 2020 and 2021 Forms 10-K.

## VII. SECURITIES ACT ALLEGATIONS

198. In this section of the Complaint, Plaintiff asserts strict liability and negligence claims based on Sections 11 and 15 of the Securities Act of 1933 on behalf of all persons and entities who purchased or otherwise acquired Bioventus's Class A common stock pursuant and/or traceable to the Registration Statement. Plaintiff expressly disclaims any allegations of fraud or intentional misconduct in connection with these non-fraud claims, which are pleaded separately from Plaintiff's Exchange Act claims.

199. All of the statements and omissions in the Registration Statement that Plaintiff alleges to be actionable are included in this section.

200. The Registration Statement violated the Securities Act because it contained materially false and misleading statements regarding Bioventus's revenue recognition and GAAP compliance.

### A. False and Misleading Statements Regarding Bioventus's Revenue Recognition and GAAP Compliance

201. The Prospectus incorporated into the Registration Statement stated:

We report sales net of contractual allowances, rebates and returns.

This statement was materially false when made because Bioventus did not "report sales net of contractual allowances, rebates and returns." In truth, Bioventus's rebate accruals—and

the resulting public financial statements—were based on a flawed process with materially deficient controls that were known to produce unreliable results in violation of GAAP. This statement was also materially misleading when made because it gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures.

202.     The Prospectus incorporated into the Registration Statement stated:

***Revenue recognition***

*Sale of products* . . . . [Emphases in original.]

We recognize revenue at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude from revenues taxes collected from customers and remitted to governmental authorities.

Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements and certain distribution and administration fees offered in our customer contracts and other indirect customer contracts relating to the sale of our products. We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will

not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed. Adjustments arising from the change in estimates of variable consideration were not significant for the years ended December 31, 2019 and 2018.

The Prospectus repeated these statements in substantially identical form in the notes to the financial statements provided therein (at F-13).

These statements were materially false when made because Bioventus did not: (i) determine the "transaction price" as "the contracted price net of estimates of variable consideration"; (ii) "establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales"; (iii) have "estimates" that "t[ook] into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns"; (iv) include "[t]he amount of variable consideration . . . in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period"; or (v) "regularly review all reserves and update them at the end of each reporting period as needed." In truth, Bioventus's rebate accruals—and the resulting public financial statements—were based on a flawed process with materially deficient controls that were known to produce unreliable results in violation of GAAP. Using an arbitrary process, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it

from revenue, as required by GAAP. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures.

203. The Prospectus incorporated into the Registration Statement stated:

**Discounts and rebates** [Emphasis in original.]

. . . We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases.

The Prospectus repeated these statements in substantially identical form in the notes to the financial statements provided therein (at F-14).

These statements were materially false when made because Bioventus did not "reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases." In truth, Bioventus's rebate accruals—and the resulting public financial statements—were based on a flawed process with materially deficient controls that were known to produce unreliable results in violation of GAAP. Using an arbitrary process, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable

consideration and remove it from revenue, as required by GAAP. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures.

## VIII. CLASS ACTION ALLEGATIONS

204. Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the following proposed Class:

> As to claims under the Securities Act, all persons that purchased or otherwise acquired Bioventus's Class A common stock pursuant and/or traceable to the Registration Statement, and were damaged thereby; and

> As to claims under the Exchange Act, all persons and entities who purchased or otherwise acquired Bioventus's Class A common stock between February 11, 2021 and March 30, 2023, both inclusive, and were damaged thereby.

205. Excluded from the Class are: (i) Defendants and any affiliates or subsidiaries thereof; (ii) present and former officers and directors of Bioventus and their immediate family members (as defined in Item 404 of SEC Regulation S-K, 17 C.F.R. § 229.404, Instructions (1)(a)(iii) & (1)(b)(ii)); (iii) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; (iv) any entity in which any Defendant had or has had a controlling interest; (v) Bioventus's employee retirement and benefit plan(s); and (vi) the

legal representatives, heirs, estates, agents, successors, or assigns of any person or entity described in the preceding five categories.

206. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of May 12, 2023, there were over 62.486 million shares of Bioventus Class A common stock outstanding, owned by at least thousands of investors.

207. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. The questions of law and fact common to the Class include, but are not limited to, the following:

    a. Whether the federal securities laws were violated by Defendants' conduct as alleged herein;

    b. Whether Defendants made any untrue statements of material fact or omitted to state any material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading;

    c. Whether the Registration Statement contained any untrue statements of material fact or omitted to state any material facts required to be stated therein or necessary to make the statements therein not misleading;

    d. Whether the Exchange Act Defendants acted with scienter as to Plaintiff's claim for relief under Section 10(b) of the Exchange Act;

e.   Whether the Officer Defendants and Defendant Stalnecker were controlling persons as to Plaintiff's claim for relief under Section 20(a) of the Exchange Act;

f.   Whether Defendants Reali, Anglum, and Stalnecker were controlling persons as to Plaintiff's claim for relief under Section 15 of the Securities Act;

g.   Whether any Defendants can sustain their burden of establishing an affirmative defense under applicable provisions of the Securities Act;

h.   Whether and to what extent the prices of Bioventus Class A common stock were artificially inflated or maintained during the Class Period due to the misstatements and non-disclosures complained of herein;

i.   Whether, with respect to Plaintiff's claims under the Exchange Act, reliance may be presumed under the fraud on the market doctrine;

j.   Whether and to what extent Class members have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of damages.

208.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all Class members is impracticable.

209.   There will be no difficulty in the management of this action as a class action. Class members may be identified from records maintained by the Company or its transfer

agent(s), or by other means, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

## IX. INAPPLICABILITY OF STATUTORY SAFE HARBOR

210. The statutory safe harbor and bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the untrue or misleading statements alleged herein. The statements complained of herein concerned then-present or historical facts or conditions that existed or were purported to exist at the time the statements were made. Further, the PSLRA safe harbor expressly excludes forward-looking statements "made in connection with an initial public offering," such as the IPO. 15 U.S.C. § 77z-2(b)(2)(D).

211. To the extent any of the false or misleading statements alleged herein can be construed as forward-looking, (a) they were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements, and the generalized risk disclosures made were not sufficient to shield Defendants from liability, and (b) the person who made each such statement knew that the statement was untrue or misleading when made, or each such statement was approved by an executive officer of Bioventus who knew that the statement was untrue or misleading when made.

## X. CLAIMS FOR RELIEF PURSUANT TO THE SECURITIES ACT

### COUNT I

**Section 11 of the Securities Act
In Connection with the Registration Statement
(Against the Securities Act Defendants)**

212.    Plaintiff repeats, incorporates, and realleges each and every allegation above relating to the Securities Act claims as if fully set forth herein.

213.    This Count does not sound in fraud.  Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made.  For purposes of asserting this and their other claims under the Securities Act, Plaintiff does not allege that the Securities Act Defendants acted with intentional, reckless, or otherwise fraudulent intent.

214.    The Registration Statement contained untrue statements of material fact and omissions of material fact necessary to make the statements therein not misleading.

215.    The Securities Act Defendants were responsible for the content and dissemination of the Registration Statement.  Defendants Reali, Anglum, and Stalnecker signed the Registration Statement.

216.    As the issuer and registrant for the IPO, Bioventus is strictly liable for the material misstatements and omissions in the Registration Statement.

217.    The Securities Act Defendants acted negligently in that none of them conducted a reasonable investigation or possessed reasonable grounds to believe that the

statements contained in the Registration Statement were true and not misleading, and that the Registration Statement did not omit any material facts required to be stated therein or necessary to make the statements made therein not misleading.

218. Plaintiff and the Class acquired Bioventus Class A common stock pursuant and/or traceable to the Registration Statement.

219. When they acquired Bioventus Class A common stock pursuant to and/or traceable to the Registration Statement, Plaintiff and others similarly situated did not know, nor in the exercise of reasonable care could they have known, of the untruths and omissions contained (and/or incorporated by reference) in the Registration Statement.

220. Plaintiff and the Class have sustained damages. The value of Bioventus Class A common stock has declined substantially subsequent to and due to the Securities Act Defendants' violations.

**COUNT II**

**Section 15 of the Securities Act**
**In Connection with the Registration Statement**
**(Against Defendants Reali, Anglum, and Stalnecker)**

221. Plaintiff repeats, incorporates, and realleges each and every allegation above relating to the Securities Act claims as if fully set forth herein.

222. This Count does not sound in fraud. Any allegations of fraud or fraudulent conduct and/or motive are specifically excluded, except that any challenged statements of opinion or belief made in the Registration Statement are alleged to have been materially misstated statements of opinion or belief when made. For purposes of asserting this and

94

their other claims under the Securities Act, Plaintiff does not allege that Defendants acted with intentional, reckless, or otherwise fraudulent intent.

223. At all relevant times, Defendants Reali, Anglum, and Stalnecker were officers and/or directors of the Company and were controlling persons of Bioventus within the meaning of Section 15 of the Securities Act.

224. Defendants Reali, Anglum, and Stalnecker, by virtue of their positions of control and authority and their direct participation in and/or awareness of Bioventus's operations and finances, possessed the power to, and did, direct or cause the direction of the management and policies of Bioventus, its Board, and its employees, and cause Bioventus to issue, offer, and sell Bioventus Class A common stock pursuant to the defective Registration Statement.

225. Defendants Reali, Anglum, and Stalnecker had the power to, and did, control the decision-making of Bioventus, including the content and issuance of the statements contained (and/or incorporated by reference) in the Registration Statement; they were provided with or had unlimited access to copies of the Registration Statement (and/or documents incorporated by reference) alleged herein to contain actionable statements or omissions prior to and/or shortly after such statements were issued, and had the power to prevent the issuance of the statements or omissions or to cause them to be corrected; and they were directly involved in or responsible for providing false or misleading information contained in the Registration Statement (and/or documents incorporated by reference

therein) and/or certifying and approving that information. Defendants Reali, Anglum, and Stalnecker each signed the Registration Statement.

226. Defendants Reali, Anglum, and Stalnecker acted negligently in that none of them exercised reasonable care to ensure, or had reasonable grounds to believe, that the Registration Statement was true and not misleading as to all material facts and did not omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading.

227. Plaintiff and others similarly situated suffered damages in connection with the purchase or acquisition of Bioventus Class A common stock pursuant and/or traceable to the Registration Statement.

## XI. EXCHANGE ACT ALLEGATIONS

228. The statements made by the Exchange Act Defendants (Bioventus, Reali, Anglum, Singleton, and Stalnecker) that are alleged to be false and misleading are identified in the sections below. For the avoidance of doubt, all of the statements that Plaintiff alleges to be actionable under the Exchange Act are included in this section.

229. The false and misleading statements described below that were made in Bioventus's filings with the SEC are attributable to the Officer Defendants as follows: Defendants Reali, Anglum, and Stalnecker signed the Registration Statement, 2020 Form 10-K, and 2021 Form 10-K; and Defendants Reali and Singleton signed Bioventus's 1Q22 Form 10-Q, 2Q22 Form 10-Q, and 3Q22 Form 10-Q.

### A. Exchange Act Materially False and Misleading Statements

230. In the Registration Statement, the Exchange Act Defendants made the materially false and misleading statements about Bioventus's revenue recognition and GAAP compliance set forth above with particularity in Section VII.A, which are actionable under both the Securities Act and the Exchange Act.

231. During the Class Period, the Exchange Act Defendants made additional statements on these topics in Bioventus's SEC filings and during investor conference calls, as set forth below. These statements are actionable for the reasons identified below.

232. In addition, the Exchange Act Defendants made materially false and misleading statements regarding:

    a. Revenue, net sales, and Adjusted EBITDA that Bioventus materially inflated in violation of GAAP;

    b. Bioventus's disclosure controls and internal controls over financial reporting, which were ineffective and suffered from material weaknesses throughout the Class Period that resulted in improper revenue recognition and inadequate rebate accruals in violation of GAAP; and

    c. The shift from WAC to ASP for Medicare reimbursements and whether Bioventus had offset that impact when Bioventus had failed to offset the impact of the shift, failed to perform any meaningful analysis of the shift, and lacked the controls necessary to do so, leaving the Exchange Act Defendants' statements with no factual basis.

97

1. **False and Misleading Statements Regarding Bioventus's Revenue Recognition and GAAP Compliance**

233. Bioventus's 2020 and 2021 Forms 10-K stated:

We report sales net of contractual allowances, rebates and returns.

This statement was materially false when made because Bioventus did not "report sales net of contractual allowances, rebates and returns." In truth, Bioventus's rebate accruals—and the resulting public financial statements—were based on a flawed process with materially deficient controls that were known to produce unreliable results in violation of GAAP. This statement was also materially misleading when made because it gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures.

234. Bioventus's 2020 Form 10-K stated:

*Revenue recognition*

*Sale of products* . . . . [Emphases in original]

We recognize revenue at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude from revenues taxes collected from customers and remitted to governmental authorities.

Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from

discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements and certain distribution and administration fees offered in our customer contracts and other indirect customer contracts relating to the sale of our products. We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed. There were no adjustments arising from the change in estimates of variable consideration for the years ended December 31, 2020 and 2019.

The 2020 10-K repeated these statements in substantially identical form in the notes to the financial statements provided in the 2020 10-K. (2020 Form 10-K at 121.)

The 1Q21 Form 10-Q, 2Q21 Form 10-Q, and 3Q21 Form 10-Q stated:

**Revenue recognition** [Emphasis in original]

Our policies for recognizing sales have not changed from those described in the Company's 2020 Annual Report on Form 10-K.

These statements were materially false when made because Bioventus did not: (i) determine the "transaction price" as "the contracted price net of estimates of variable consideration"; (ii) "establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales"; (iii) have "estimates" that "t[ook] into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying

and payment patterns"; (iv) include "[t]he amount of variable consideration . . . in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period"; or (v) "regularly review all reserves and update them at the end of each reporting period as needed." In truth, Bioventus's rebate accruals—and the resulting public financial statements—were based on a flawed process with materially deficient controls that were known to produce unreliable results in violation of GAAP. Using an arbitrary process, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP. Indeed, by September 2021—months before the 3Q21 Form 10-Q was filed—Defendants Reali, Anglum and Stalnecker knew that a multi-million-dollar rebate claim from United had caught the Company by surprise because its existing rebate accruals were inadequate, and had received the internal audit "red report" that explicitly told them that Bioventus lacked effective controls concerning rebates and related financial reporting. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures.

235.   Bioventus's 2020 Form 10-K stated:

**Discounts and rebates** [Emphasis in original]

. . . We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases.

These statements were materially false when made because Bioventus did not "reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases."  In truth, Bioventus's rebate accruals—and the resulting public financial statements—were based on a flawed process with materially deficient controls that were known to produce unreliable results in violation of GAAP. Using an arbitrary process, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP.  These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures.

236. The notes to the financial statements provided in each of the 2020 and 2021

Forms 10-K stated:

*Discounts and gross-to-net deductions* [Emphasis in original]

. . . The Company reduces revenue and records the reserve as a reduction to accounts receivable for the estimated discount and rebate at the expected amount the customer will earn, based on historical buying trends and forecasted purchases.

These statements were materially false when made because Bioventus did not "reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases." In truth, Bioventus's rebate accruals—and the resulting public financial statements—were based on a flawed process with materially deficient controls that were known to produce unreliable results in violation of GAAP. Using an arbitrary process, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP. Indeed, by September 2021—months before the 2021 Form 10-K was filed—Defendants Reali, Anglum and Stalnecker knew that a multi-million-dollar rebate claim from United had caught the Company by surprise because its existing rebate accruals were inadequate, and had received the internal audit "red report" that explicitly told them that Bioventus lacked effective controls concerning rebates and related financial reporting. These statements were also materially misleading when made because they gave reasonable investors the

false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures.

237.    Bioventus's 2021 Form 10-K stated:

***Revenue recognition***

*Sale of products* . . . . [Emphases in original]

We recognize revenue generally at a point in time upon transfer of control of the promised product to customers in an amount that reflects the consideration we expect to receive in exchange for those products. We exclude taxes collected from customers and remitted to governmental authorities from revenues.

Revenues are recorded at the transaction price, which is determined as the contracted price net of estimates of variable consideration resulting from discounts, rebates, returns, chargebacks, contractual allowances, estimated third-party payer settlements, and certain distribution and administration fees offered in customer contracts and other indirect customer contracts relating to the sale of products. We establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales. Where appropriate, these estimates take into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experiences, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns. The amount of variable consideration is included in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period. We regularly review all reserves and update them at the end of each reporting period as needed. There were no significant adjustments arising from the change in estimates of variable consideration for the years ended December 31, 2021 and 2020.

The 2021 Form 10-K repeated these statements in substantially identical form in the notes to the financial statements provided in the 2021 10-K. (2021 Form 10-K at 97.)

Bioventus's 1Q22 Form 10-Q, 2Q22 Form 10-Q, and 3Q22 Form 10-Q stated:

> **Revenue recognition** [Emphasis in original]
>
> Our policies for recognizing sales have not changed from those described in the Company's 2021 Annual Report on Form 10-K.

These statements were materially false when made because Bioventus did not: (i) determine the "transaction price" as "the contracted price net of estimates of variable consideration"; (ii) "establish reserves for the estimated variable consideration based on the amounts earned or eligible for claim on the related sales"; (iii) have "estimates" that "t[ook] into consideration a range of possible outcomes, which are probability-weighted for relevant factors such as our historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns"; (iv) include "[t]he amount of variable consideration . . . in the transaction price only to the extent that it is probable that a significant reversal in the amount of the cumulative revenue recognized will not occur in a future period"; or (v) "regularly review all reserves and update them at the end of each reporting period as needed." In truth, Bioventus's rebate accruals—and the resulting public financial statements—were based on a flawed process with materially deficient controls that were known to produce unreliable results in violation of GAAP. Using an arbitrary process, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted

customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP. Indeed, by September 2021—months before these statements—Defendants Reali, Anglum and Stalnecker knew that a multi-million-dollar rebate claim from United had caught the Company by surprise because its existing rebate accruals were inadequate, and had received the internal audit "red report" that explicitly told them that Bioventus lacked effective controls concerning rebates and related financial reporting. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures.

238.    Bioventus's 2021 Form 10-K stated:

***Discounts and gross-to-net deductions*** [Emphasis in original]

. . . We reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases. . . .

These statements were materially false when made because Bioventus did not "reduce revenue and record the reserve as a reduction to accounts receivable for the estimated discount and rebate at the most likely amount the customer will earn, based on historical buying trends and forecasted purchases." In truth, Bioventus's rebate accruals—and the resulting public financial statements—were based on a flawed process with materially

deficient controls that were known to produce unreliable results in violation of GAAP. Using an arbitrary process, Bioventus recognized revenue without using historical experience, current contractual requirements, specific known market events and trends, industry data and forecasted customer buying and payment patterns to estimate variable consideration and remove it from revenue, as required by GAAP. Indeed, by September 2021—months before the 2021 Form 10-K was filed—Defendants Reali, Anglum and Stalnecker knew that a multi-million-dollar rebate claim from United had caught the Company by surprise because its existing rebate accruals were inadequate, and had received the internal audit "red report" that explicitly told them that Bioventus lacked effective controls concerning rebates and related financial reporting. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures.

### 2. False and Misleading Statements Regarding Revenue, Net Sales, and Adjusted EBITDA that Bioventus Materially Inflated in Violation of GAAP

239. On March 10, 2022, Bioventus filed a Form 8-K announcing its financial results for 4Q21 and FY 2021, and reported revenues of $62.7 million from its Pain Treatments vertical, total net sales of $130.4 million, a net loss of $1.9 million, and

Adjusted EBITDA of $28.5 million. These statements were materially false when made because, in violation of GAAP, Bioventus's 4Q21 revenue from its Pain Treatments vertical and its total net sales were materially overstated by $2.2 million, net loss was materially understated by $2.2 million, and Adjusted EBITDA was materially overstated by $2.2 million. The Company's improper recognition of millions of dollars of revenue and Adjusted EBITDA in violation of GAAP was the direct result of material weaknesses in its internal controls concerning rebates and related financial reporting, and ineffective disclosure controls and procedures, which were expressly reported to Defendants Reali and Stalnecker (among others) in the internal audit "red report" in September 2021, and the improper inclusion in the Company's revenue of millions of dollars of rebates owed to United, the same large payer that had claimed millions of dollars in rebates in summer 2021.

240. On May 9, 2022, Bioventus filed a Form 8-K announcing its financial results for 1Q22, and reported revenues of $52.1 million from its Pain Treatments vertical, total net sales of $117.3 million, a net loss of $14.8 million, and Adjusted EBITDA of $7.1 million. These statements were materially false when made because, in violation of GAAP, Bioventus's 1Q22 revenue from its Pain Treatments vertical and its total net sales were materially overstated by $2.8 million, net loss was materially understated by $2.8 million, and Adjusted EBITDA was materially overstated by $2.7 million. The Company's improper recognition of millions of dollars of revenue and Adjusted EBITDA in violation of GAAP was the direct result of material weaknesses in its internal controls concerning

rebates and related financial reporting and ineffective disclosure controls and procedures, which were expressly reported to Defendants Reali and Stalnecker (among others) in the internal audit "red report" in September 2021, and the improper inclusion in the Company's revenue of millions of dollars of rebates owed to United, the same large payer that had claimed millions of dollars in rebates in summer 2021.

241. On August 10, 2022, Bioventus filed a Form 8-K announcing its financial results for 2Q22, and reported revenues of $63.9 million from its Pain Treatments vertical, total net sales of $140.3 million, a net loss of $8.0 million, and Adjusted EBITDA of $22.9 million. These statements were materially false when made because, in violation of GAAP, Bioventus's 2Q22 revenue from its Pain Treatments vertical and its total net sales were materially overstated by $3.4 million, net loss was materially understated by $3.4 million, and Adjusted EBITDA was materially overstated by $3.4 million. The Company's improper recognition of millions of dollars of revenue and Adjusted EBITDA in violation of GAAP was the direct result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures, which were expressly reported to Defendants Reali and Stalnecker (among others) in the internal audit "red report" in September 2021, and the improper inclusion in the Company's revenue of millions of dollars of rebates owed to United, the same large payer that had claimed millions of dollars in rebates in summer 2021.

242. On November 8, 2022, Bioventus filed a Form 8-K announcing its financial results for 3Q22, and reported revenues of $60.5 million from its Pain Treatments vertical,

total net sales of $137.1 million, and Adjusted EBITDA of $22.7 million. These statements were materially false when made because, in violation of GAAP, Bioventus's 3Q22 revenue from its Pain Treatments vertical, total net sales, and Adjusted EBITDA were materially overstated by $3.2 million. The Company's improper recognition of millions of dollars of revenue and Adjusted EBITDA in violation of GAAP was the direct result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures, which were expressly reported to Defendants Reali and Stalnecker (among others) in the internal audit "red report" in September 2021, and the improper inclusion in the Company's revenue of millions of dollars of rebates owed to United, the same large payer that had claimed millions of dollars in rebates in summer 2021.

      **3.**    **False and Misleading Statements Regarding the Purported Effectiveness of Bioventus's Disclosure Controls and Internal Controls Over Financial Reporting**

243. The 2020 Form 10-K contained signed certifications by Reali and Anglum, who each certified that: (i) the 2020 Form 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; (ii) the financial information contained in the Form 10-K "fairly present in all material respects the financial condition, results of operations, and cash flows" of Bioventus; and (iii) the 2020 Form 10-K disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal

control over financial reporting." The 1Q21 Form 10-Q, 2Q21 Form 10-Q, and 3Q21 Form 10-Q also included substantively identical certifications signed by Defendants Reali and Anglum. These statements were materially false when made because: (i) the 2020 Form 10-K, 1Q21 Form 10-Q, 2Q21 Form 10-Q, and 3Q21 Form 10-Q each contained materially false and misleading statements as set forth herein; (ii) the financial information contained in these SEC filings violated GAAP and was the unreliable product of known material weaknesses in controls; and (iii) Bioventus suffered from undisclosed, material weaknesses in internal controls and disclosure controls and procedures, as the Company later admitted. Indeed, by September 2021—months before the 3Q21 Form 10-Q was filed—Defendants Reali, Anglum and Stalnecker knew that a multi-million-dollar rebate claim from United had caught the Company by surprise because its existing rebate accruals were inadequate, and had received the internal audit "red report" that explicitly told them that Bioventus lacked effective controls concerning rebates and related financial reporting. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures.

244.    Bioventus's 2020 Form 10-K stated:

**Evaluation of Disclosure Controls and Procedures** [Emphasis in original]

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2020. . . .

During 2020 we remediated a material weakness associated with the proper processing of Exogen reimbursement claims in accordance with regulations and contractual terms.

These statements were materially false when made because Bioventus's "disclosure controls and procedures were" not "effective at the reasonable assurance level as of December 31, 2020." In truth, Bioventus had an undisclosed material weakness in internal controls over financial reporting, and its disclosure controls were ineffective. These statements were also materially misleading when made because they gave reasonable investors the false impression that any GAAP violations or material controls weaknesses had been disclosed, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures.

245. Bioventus's 1Q21 Form 10-Q stated:

***Evaluation of Disclosure Controls and Procedures*** [Emphasis in original]

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure

controls and procedures were effective at the reasonable assurance level as of April 3, 2021.

The 2Q21 Form 10-Q and 3Q21 Form 10-Q repeated this statement "as of July 3, 2021," and "as of October 2, 2021," respectively.

These statements were materially false when made because Bioventus's "disclosure controls and procedures were" not "effective at the reasonable assurance level as of" the date provided in each Form 10-Q. In truth, Bioventus had an undisclosed material weakness in internal controls over financial reporting, and its disclosure controls were ineffective. Indeed, by September 2021—months before the 3Q21 Form 10-Q was filed—Defendants Reali, Anglum and Stalnecker knew that a multi-million-dollar rebate claim from United had caught the Company by surprise because its existing rebate accruals were inadequate, and had received the internal audit "red report" that explicitly told them that Bioventus lacked effective controls concerning rebates and related financial reporting. These statements were also materially misleading when made because they gave reasonable investors the false impression that any GAAP violations or material controls weaknesses had been disclosed, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures.

246. Bioventus's 2021 Form 10-K stated:

***Evaluation of Disclosure Controls and Procedures*** [Emphasis in original]

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Annual Report on Form 10-K. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of December 31, 2021.

***Management's Report on Internal Control over Financial Reporting*** . . . .
[Emphasis in original]

In connection with the preparation and filing of this Annual Report, the Company's management, including our Chief Executive Officer and our Chief Financial Officer, conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2021, based on the framework set forth in "Internal Control—Integrated Framework (2013)" issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). Our assessment of, and conclusion on, the effectiveness of internal control over financial reporting did not include Misonix and Bioness, both acquired by the Company in 2021 and included in our 2021 consolidated financial statements. Misonix and Bioness are now wholly-owned subsidiaries of the Company and comprised approximately 51.2% and 6.4%, respectively, of total assets, and approximately 3.6% and 7.9%, respectively, of total net sales, of the Company's related consolidated financial statement amounts as of and for the year ended December 31, 2021. Based on its evaluation, the Company's management concluded that, as of December 31, 2021, the Company's internal control over financial reporting is effective.

These statements were materially false and misleading when made because: (i) Bioventus's "disclosure controls and procedures were" not "effective at the reasonable assurance level as of December 31, 2021"; and (ii) "the Company's internal control over financial reporting" was not "effective" as of December 31, 2021. In truth, Bioventus had an undisclosed material weakness in internal controls over financial reporting, and its disclosure controls were ineffective. Defendants Reali, Anglum, and Stalnecker—who signed the 2021 10-K—knew this at the time of their statements because by

September 2021, they knew that a multi-million-dollar rebate claim from United had caught the Company by surprise because its existing rebate accruals were inadequate, and had received the internal audit "red report" that explicitly told them that Bioventus lacked effective controls concerning rebates and related financial reporting, and the issues were not remediated by the end of 2021. (FE-3, FE-4.) These statements were also materially misleading when made because they gave reasonable investors the false impression that any GAAP violations or material controls weaknesses had been disclosed, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures, and that these material weaknesses had been internally reported to its CEO, CFO, and Audit Committee Chair without being disclosed to investors.

247.   Bioventus's 1Q22 Form 10-Q stated:

***Evaluation of Disclosure Controls and Procedures*** [Emphasis in original]

Our management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures as of the end of the period covered by this Quarterly Report on Form 10-Q. Based on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level as of April 2, 2022.

The 2Q22 Form 10-Q repeated this statement "as of July 2, 2022."

These statements were materially false and misleading when made because Bioventus's "disclosure controls and procedures were" not "effective at the reasonable assurance level

as of" the date provided in each Form 10-Q. In truth, Bioventus had an undisclosed material weakness in internal controls over financial reporting, and its disclosure controls were ineffective. Defendant Reali knew this at the time of his statement because by September 2021, he knew that a multi-million-dollar rebate claim from United had caught the Company by surprise because its existing rebate accruals were inadequate, and had received the internal audit "red report" that explicitly told him that Bioventus lacked effective controls concerning rebates and related financial reporting, and the issues were not remediated by the end of 2021. (FE-3, FE-4.) These statements were also materially misleading when made because they gave reasonable investors the false impression that any GAAP violations or material controls weaknesses had been disclosed, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures, and that these material weaknesses had been internally reported to its CEO, CFO, and Audit Committee Chair without being disclosed to investors.

248. The 2021 Form 10-K contained signed certifications by Reali and Anglum, who each certified that: (i) the 2021 Form 10-K did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; (ii) the financial information contained in the Form 10-K "fairly present in all material respects the financial condition, results of

operations, and cash flows" of Bioventus; (iii) they had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles"; and (iv) Defendants Reali and Anglum Defendants had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting." The 1Q22 Form 10-Q, 2Q22 Form 10-Q, and 3Q22 Form 10-Q included substantively identical certifications by Defendants Reali and Singleton. These statements were materially false when made because: (i) the 2021 Form 10-K, 1Q22 Form 10-Q, 2Q22 Form 10-Q, and 3Q22 Form 10-Q each contained materially false and misleading statements as set forth herein; (ii) the financial information contained in these SEC filings was false, violated GAAP, and was the direct product of material weaknesses in controls; and (iii) Bioventus suffered from undisclosed, material weaknesses in internal controls and disclosure controls and procedures, as the Company later admitted. Indeed, by September 2021, Defendants Reali and Anglum knew that a multi-million-dollar rebate claim from United had caught the Company by surprise because its existing rebate accruals were inadequate, and had received the internal audit "red report" that explicitly told them that Bioventus lacked effective controls concerning rebates and related financial reporting, and the issues were not remediated by the end of 2021. (FE-3, FE-4.) These statements were also materially misleading when made because they gave reasonable investors the false impression that

Bioventus was properly recognizing revenue in compliance with GAAP, while omitting the material facts that Bioventus was improperly recognizing millions of dollars of revenue in violation of GAAP as a result of material weaknesses in its internal controls concerning rebates and related financial reporting and ineffective disclosure controls and procedures, and that these material weaknesses had been internally reported to its CEO, CFO, and Audit Committee Chair without being disclosed to investors.

### 4. False and Misleading Statements Regarding the Purportedly "Net-Neutral" Shift from WAC to ASP Pricing

#### a. 4Q21 Earnings Call on March 10, 2022

249. During the 4Q21 Earnings Call, a Morgan Stanley analyst asked, "[Y]ou just mentioned the HA market remains very strong. Reimbursement is robust. It's – heard some concerns from investors that Medicare might be potentially cutting prices in the not-too-distant future. But can you maybe spend a moment there, talk about how Bioventus might be better situated versus competitors? And any idea of precise timing for or implementation of the pricing cuts?" Defendant Reali responded:

> Yes. Thanks for the question, Drew, on that. We've looked at this very carefully, and this is not a Medicare cut per se, but it's focused on ASP reporting and ASP reimbursement, average selling price reimbursement. One of the things that we've historically done at Bioventus in our HA business is focused on market access. And what that means is having specific contracts with insurance carriers such as United Healthcare, the largest private carrier in the country today. And with those contracts, gives us unfettered access to accounts and the ability to cross sell to what we call non-contracted, non-United patients. But we also spend a lot of money relative to getting those contracts through rebates back to insurance companies where we have that unfettered access in that exclusive contract. So **when we look at this analysis for us, and this is specific to Bioventus, I can't speak for other countries or**

*other companies, rather, it's a net-neutral for Bioventus. While we may lose a little on the ASP reimbursement, we gain by paying less rebates because of that reimbursement change.*

*So for Bioventus, it provides us with basically a balanced footing on the HA reimbursement side.* We may see some choppiness as we go through this, and we're projecting this would occur in the third quarter this year. But we feel that choppiness will be very short-lived as we work through the ASP reimbursement and, of course, the rebate change associated with that, that we pay back to insurance companies.

These statements were materially false when made because the shift from WAC to ASP was not "net-neutral for Bioventus," and Bioventus was not in a position to "gain by paying less rebates because of that reimbursement change," much less stand on "balanced footing on the HA reimbursement side."  Instead, these statements had no factual basis because Bioventus:  (i) suffered from controls and systems that were known to be grossly ineffective and inadequate, preventing any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements.  These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and that its controls and systems were internally known to be grossly inadequate to do so.

### b.    1Q22 Earnings Call on May 10, 2022

250.    During the 1Q22 Earnings Call, an analyst from Goldman Sachs Group, Inc. asked, "[Y]ou touched on the potential pricing mechanism change here coming in the second half of the year.  I think if you could maybe just provide a little bit more detail on sort of the mechanism of how that pricing change could affect your business.  And any quantification you might be willing to sort of characterize over the next 12 months or as you annualize the potential pricing change."  Defendant Reali answered:

> Sure. So the way we look at this is we do expect the ASP reporting to happen. It's not 100%, but we think it's likely in the second half of the year. And that impacts Medicare pricing specifically to ASP reporting. But on the other side of the equation is our contracted business where we pay rebates. Very specifically, with contracts like United and Cigna, we pay rebates. Within our contracts with these payers, we have very specific clauses to reduce the rebates based on ASP reporting.
>
> So ***when we do our analysis of volume in our business, volume of syringes, the actual reduction in rebates offsets any reduction in reimbursement, specifically based on ASP reporting. We've run these calculations very carefully, and we feel strongly that not only will we be basically neutral through this process, but we can gain market share as we go forward in the medium term.***

These statements were materially false when made because the "actual reduction in rebates" did not "offset[] any reduction in reimbursement," and Bioventus had not "run these calculations very carefully" by analyzing "volume in our business, volume of syringes."  Instead, these statements had no factual basis because Bioventus:  (i) suffered from controls and systems that were known to be grossly ineffective and inadequate, preventing any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that

Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and that its controls and systems were internally known to be grossly inadequate to do so.

### c. 2Q22 Earnings Call on August 11, 2022

251. In his introductory remarks on the 2Q22 Earnings Call, Defendant Reali stated:

> As we highlighted on previous earnings calls, reimbursement for HA shifted from wholesale acquisition cost to average selling price at the end of June. Given the sales mix of our HA portfolio, this new pricing dynamic has not fundamentally impacted our overall growth opportunity. ***As expected, we have been able to lower our reimbursement rebate rates on all of our preferred contracts with private payers, which has offset lower pricing for other areas of our HA business.***
>
> ***The modifications to these agreements are consistent with our modeling exercises done over the past several months as we prepared for this new environment.***

These statements were materially false when made because Bioventus had not "been able to lower our reimbursement rebate rates on all of our preferred contracts with private payors" and had not "offset lower pricing for other areas of our HA business," nor were "[t]he modifications to these agreements . . . consistent with our modeling exercises done

over the past several months as we prepare[d] for this new environment." Instead, these statements had no factual basis because Bioventus: (i) suffered from controls and systems that were known to be grossly ineffective and inadequate, preventing any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements, as the Company later admitted in its 2022 Form 10-K. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and that its controls and systems were internally known to be grossly inadequate to do so.

252. During the 2Q22 Earnings Call, an analyst from Craig-Hallum Capital Group LLC asked, "[J]ust on the HA pricing. What have you seen in July and August here with the changes around CMS? Are you seeing HA volumes and the price that you could charge the docs relatively consistent with the first half?" Defendant Reali answered:

> Well, we did see, based on ASP reporting a dip in our pricing for DUROLANE and GELSYN, in particular, [Supartz] was already ASP reported. But as we've talked about **that has been countered by our rebate adjustments that per our planning**, and we're very pleased with the results of this and it's a credit to our market access team. **We've been able to adjust all of our rebates on our contracted business, which is a significant portion to a lower amount that net effect, Alex, negates any impact on the ASPs because we're paying less rebates on our contracted business**.

So *as we've modeled that over the past several months that turned out exactly the way we thought it would*. So the first phase of this has gone well.

These statements were materially false when made because the shift to ASP had not "turned out exactly the way we thought it would" based on "model[ing] that over the past several months"; Bioventus had not "been able to adjust all of our rebates on our contracted business . . . to a lower amount" or to "negate[] any impact on the ASPs"; and the "dip in our pricing for Durolane and Gelsyn" was not "countered by our rebate adjustments [] per our planning." Instead, these statements had no factual basis because Bioventus: (i) suffered from controls and systems that were known to be grossly ineffective and inadequate, preventing any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements, as the Company later admitted in its 2022 Form 10-K. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and that its controls and systems were internally known to be grossly inadequate to do so.

253.    Later in the call, an analyst from Morgan Stanley asked, "[J]ust to go back to the HA component for a moment.  I know we've kind of talked about this before.  But I was hoping we could maybe get a better sense of what's embedded in guidance from a volume perspective. And if you are – I think you mentioned maybe some volatility, but are you seeing any initial signs of like surgeon preference changes or anything within the portfolio or within the HA market?"  Defendant Reali responded:

> So what's built into our forecast going forward is continued volume growth in our HA business as we've seen before because ***we've seen no indication of impact on the volume*** and that's certainly something we'll take advantage of. And as I talked about in the prior question on HA, a lot of our ASP impact, ***all of our ASP impact has been negated by our ability to renegotiate our rebates on a contracted business, which is a significant portion and that has been true to our model*** and it's something that we're excited about.

These statements were materially false when made because "all of our ASP impact" was not "negated by our ability to renegotiate our rebates on a contracted business," the results after the pricing shift were not "true to our model," and Bioventus had seen "indication of impact on the volume."  Instead, these statements had no factual basis because Bioventus: (i) suffered from controls and systems that were known to be grossly ineffective and inadequate, preventing any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements, as the Company later admitted in its 2022 10-K.  These statements were also materially misleading when made because they gave

reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and that its controls and systems were internally known to be grossly inadequate to do so.

<strong>d.    September 14, 2022 Morgan Stanley Global<br>Healthcare Conference</strong>

254.    On September 14, 2022, Defendant Singleton participated in the Morgan Stanley Global Healthcare Conference. The Morgan Stanley analyst asked, "[E]arlier in the year, there was the big debate about what Medicare changes in pricing regime will kind of [do] to the HA market. And I think if I kind of go back and look at your updated guidance, I mean, it sounds like you're kind of baking in some potential disruptions in the marketplace. But for 2 months, roughly 2 months after the change, I mean, are you seeing anything from an underlying utilization perspective that's giving you concern that there is going to be disruption in the HA market as a result of the change?" Defendant Singleton responded:

> Yes, obviously I'm new to the HA market, but I will tell you, I really have a lot of confidence in the team that we have navigating us through that. And so far, ***for the first 2 months, it's progressing as we had it expected and have modeled into our numbers. And so that's kind of as expected.***

The Morgan Stanley analyst then asked, "[I]s there any disruption though that was kind of baked in there?" Singleton responded:

> Yes. I guess I guess what adjective you want to put on it disrupted or choppiness, Yes, we expect a little bit of choppiness in the back half as we

make the transition from WAC to ASP, but ***it's kind of all built into our models***.

These statements were materially false when made because it was not true that the shift to ASP had "progress[ed] as we had it [sic] expected and have modeled into our numbers" and ended up "kind of as expected," and it was not "all built into our models." Instead, these statements had no factual basis because Bioventus: (i) suffered from controls and systems that were known to be grossly ineffective and inadequate, preventing any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements, as the Company later admitted in its 2022 Form 10-K. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and that its controls and systems were internally known to be grossly inadequate to do so.

255. The Morgan Stanley analyst also asked about Bioventus's contracts with insurers after the change in Medicare pricing: "[Y]ou have UnitedHealthcare and Cigna, just post kind of this regime change or Medicare pricing change? I mean, is there additional opportunity? Or are you even looking for more exclusive contracts with commercial

insurers. Is that more important now than it was before kind of Medicare pricing changed?"

Singleton stated in response:

> I think we're going to – we feel really good. I mean, Cigna has just come on. I mean between Cigna and United that gives us really access to preferred lives and a lot of leverage in the market. We believe that's going to help us going through the WAC to ASP transition, *we have adjusted our contract with them from the standpoint of the rebates favorability that was associated with the WAC going to the ASP world.*

These statements were materially false when made because Bioventus had not "adjusted our contract with them from the standpoint of the rebates favorability that was associated with the WAC going to the ASP world." Instead, Bioventus had not secured reduced rebates to offset the impact of lower pricing and reimbursements, as the Company later admitted in its 2022 Form 10-K, and in the fourth quarter of 2022 United submitted a $4 million rebate claim that drove a "double-digit price loss" on Durolane, and meant that "Durolane revenue declined high single digits for the quarter." These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced rebates would offset the impact of lower pricing and reimbursements, while omitting the material facts that Bioventus had not performed such an analysis and that its controls and systems were internally known to be grossly inadequate to do so.

### e. 3Q22 Earnings Call on November 8, 2022

256.    In his introductory remarks during the 3Q22 Earnings Call, Reali stated:

> While we expect to see continued pressure on GELSYN revenue through the first half of 2023, we believe that the mechanics of ASP reporting will resolve this issue as full ASP reporting takes effect and GELSYN pricing stabilizes

to a more competitive position. As a reminder, ASP reporting is based on a 4-quarter look back. While both GELSYN and DUROLANE moved from WAC to ASP pricing, *this dynamic did not impact DUROLANE, which maintained strong double-digit growth for the quarter*.

These statements were materially false when made because it was not true that "the mechanics of ASP reporting will resolve this issue as full ASP reporting takes effect and Gelsyn pricing stabilizes to a more competitive position," or that the reduced pricing "dynamic did not impact Durolane." Instead, these statements had no factual basis because Bioventus: (i) suffered from controls and systems that were known to be grossly ineffective and inadequate, preventing any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) due to its inability to analyze pricing and volume changes and account for rebates, Bioventus experienced "double-digit price loss" on Durolane, as the Company later admitted on March 31, 2023. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced pricing did not impact Durolane, while omitting the material facts that Bioventus had not performed such an analysis and that its controls and systems were internally known to be grossly inadequate to do so.

257. Later in the call, a Morgan Stanley analyst asked Reali, "[A]s you're looking at these issues, and I get that some of these are transitory, what's giving you really the confidence on the visibility to maybe label some of these as transitory. And maybe

specifically with the HA side, you talked about being like kind of mid next year until these kind of resolved.  But again, kind of what gives you confidence –that level of confidence and that there's not broader implications for the other parts of the HA portfolio to come?"  In response, Reali stated:

> So **we model this out, and we have a full understanding of where our pricing is going to go over the next year with all 3 HA products**, DUROLANE, GELSYN as well as SUPARTZ. So if you look at it that way, **we have a really good understanding of that as well as the market dynamics**.

These statements were materially false when made because Bioventus did not "have a full understanding of where our pricing is going to go over the next year," did not "have a really good understanding of" pricing or "market dynamics," did not "know the markets" or "where the pricing is going to be," and, with regard to Durolane, did not "know where the pricing is going relative to ASP."  Instead, these statements had no factual basis because Bioventus:  (i) suffered from controls and systems that were known to be grossly ineffective and inadequate, preventing any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) had not secured reduced rebates to offset the impact of lower pricing and reimbursements, as the Company later admitted in its 2022 Form 10-K.  These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis of the impact of lower pricing and reimbursements, while

128

omitting the material facts that Bioventus had not performed such an analysis and that its controls and systems were internally known to be grossly inadequate to do so.

### f. January 11, 2023 JPMorgan Healthcare Conference

258. On January 11, 2023, Defendant Reali participated in the JPMorgan Healthcare Conference. The JPMorgan analyst opened the Q&A portion of the event by asking, "If we do start with the short term, there's been some disruption in the HA market. They switched how they measure pricing, and it's led to a market decline, not just with you but also across your competitors. So maybe spend a minute there exactly what's happening? How much of an impact it's have on Bioventus and when it should resolve?" In response, Defendant Reali stated:

> First of all, with DUROLANE, ***we have seen sustained double-digit volume growth and that has counteracted any impact on reduction of the transfer price from wholesale acquisition to average selling price***.

These statements were materially false when made because it was not true that "with Durolane, we have seen sustained double-digit volume growth and that has counteracted any impact on reduction of the transfer price from wholesale acquisition to average selling price" Instead, these statements had no factual basis because Bioventus (i) suffered from controls and systems that were known to be grossly ineffective and inadequate, preventing any meaningful analysis of the impact of pricing or volume changes; (ii) lacked controls to track to whom HA products were sent, as Reali later admitted in stating that Bioventus did not know where products had been sent "until quarters later, 2 quarters or even later"; and (iii) due to its inability to analyze pricing and volume changes and account for rebates,

Bioventus experienced "double-digit price loss" on Durolane and "Durolane revenue declined high single digits" in the fourth quarter of 2022, as the Company admitted on March 31, 2023. These statements were also materially misleading when made because they gave reasonable investors the false impression that Bioventus had performed a meaningful, fact-based analysis to determine that reduced pricing did not impact Durolane, while omitting the material facts that Bioventus had not performed such an analysis and that its controls and systems were internally known to be grossly inadequate to do so.

### B. Additional Allegations of Scienter

#### 1. The Exchange Act Defendants Received Internal Reporting on the Company's Grossly Deficient Controls and Inability to Account for Rebates

259. Before the IPO and throughout the Class Period, the Officer Defendants regularly received internal reports showing the true facts that their public statements misstated and concealed.

260. As an initial matter, senior leadership knew, or recklessly disregarded, that the Company's revenue recognition was contrary to the requirements of ASC 606 and the Exchange Act Defendants' representations to investors because the Company's revenue recognition was entirely directed and controlled by senior management. Rather than carefully consider historical experience and contract requirements, and only recognize revenue only when there is a "high degree of confidence that revenue will not be reversed in a subsequent reporting period," the Company's senior leadership issued "crazy," unachievable and inaccurate forecasts for revenue and rebate estimates, even as Bioventus

never had any system or process to track revenue or rebates, and lacked effective controls over these functions.  (FE-1, FE-2, FE-3, FE-4, FE-5.)

261.    In fact, senior leadership knew that they were not recognizing revenue consistent with ASC 606 and their investor representations because the systems needed to do so did not exist at the Company.  That is, Bioventus never had any system or process to track revenue, rebates, and discounts for each insurer.  (FE-1, FE-3, FE-4.)  The Company's accounting processes were so bad that "we didn't even know which bills had been paid or not paid," the Company had "no supporting documents" for its bills, and "we were blindly paying stuff."  (FE-6.)  Senior leadership was aware of the Company's difficulties and problems with its accounting—in fact, at the Company, "everybody knew it."  (FE-6.)

262.    The Exchange Act Defendants' knowledge was a hard fact by summer 2021, when they received the internal audit "red report" stating that Bioventus failed its internal audit of its processes and controls for managing and estimating rebate claims.  (FE-3, FE-4.)  The audit found that the Company did not have effective controls over rebates, rebate payments, or rebate accruals; that remediation was required for internal controls and SOX compliance with respect to rebates; and that there were problems with Bioventus's operational practices with respect to rebates.  (FE-3.)  CFO Anglum acknowledged and agreed that the audit's findings were accurate, and by early September 2021, CEO Reali, Anglum, and Defendant Stalnecker, the chair of the Audit Committee, personally received the audit report.  (FE-3, FE-4.)  Further, the audit report was placed on the agenda for the Audit Committee of the Board of Directors and distributed to and discussed by the entire

Audit Committee at the quarterly meeting of the Company's Board of Directors. (FE-3, FE-4). But Defendants did not take the internal audit function or internal controls seriously and did not prioritize compliance with SOX regulations, causing FE-3 and FE-4 to resign on the same day in January 2022, at which time the Company still had not completed the required action items in the audit report with respect to rebate accrual and estimating. (FE-3, FE-4.) The findings of the September 2021 "red report" directly contradict Defendants' public statements about Bioventus's purportedly "effective" controls, revenue recognition, and compliance with GAAP.

263. The fact that Defendants Reali, Anglum, and Stalnecker personally received the audit report documenting the Company's lack of effective controls over rebates and rebates accruals—yet failed to remediate these deficiencies, while falsely telling investors that the Company's controls were "effective"—supports a strong inference that the Officer Defendants knew or recklessly ignored that their public statements were materially false and misleading.

264. What's more, Reali and Anglum personally approved large rebate payments every quarter, with Reali personally signing off on two or three rebate payments of $1 million or more every quarter. (FE-5.) Indeed, FE-5 recalled that Reali once signed off on a $3.5 million rebate payment. (FE-5.) Under the policy observed by FE-5, Reali would have personally signed off on the extremely large rebate invoice from United in summer 2021 that caused Bioventus to pay millions of dollars and prompted the Company to start its internal audit of the rebate process. (FE-4.) Reali and Anglum's personal approval of

large rebate payments—coupled with their personal knowledge that the Company lacked effective controls over rebates and rebate accruals—underscores the strong inference that they knew or recklessly ignored that their public statements were materially false and misleading.

265. In addition to receiving the audit report and personally approving large rebate payments—both of which made clear that the Company had a pervasive problem with rebate accruals and that its controls were not effective—Reali, Anglum, VP of Finance Ben Fishburn, and the Company's financial team personally attended Quarterly Finance Meetings each quarter where employees objected that the rebate and revenue estimating was inaccurate and significantly underestimated rebate payments. The Quarterly Finance Meetings were held at the "Board Room" at Bioventus's headquarters. (FE-5.) During these meetings, Reali and Anglum heard complaints about inaccurate rebate estimates and problems with the Company's inaccurate estimating. (FE-5.) For example, Bioventus's Controller objected that the significantly higher rebate payments than Bioventus had estimated were "messing up our numbers." (FE-5.) Further, during Quarterly Finance Meetings held at Bioventus's headquarters, the sales team expressed concerns with inaccurate rebate estimating and improperly recognizing revenue. (FE-1.) Given the poor systems and uncertainty over rebates, they urged that Bioventus should be more conservative to avoid reversing or lowering its revenue figures when the Company was later hit with rebate requests. (FE-1.)

266. Bioventus's Payment Specialist (FE-6) also specifically raised the Company's accounting difficulties and problems with Corrie Rittenhouse, Accounting Manager of Accounts Payable and T&E, who reported to the CFO. (FE-6.) Yet, the Company failed to remediate these issues, and in August 2022 FE-6 resigned because, following the Misonix acquisition, the situation was getting even worse. (FE-6.)

267. Additionally, Bioventus's Financial Planning and Analysis Manager was vocal about the Company's poor systems for managing its finances. (FE-2.) Specifically, Bioventus's financial management and forecasting systems were not set up correctly and lacked basic functionalities, which severely limited the Company's ability to track and report accurately: it was "like they were in the stone age." (FE-2.) "I flagged it to them immediately" and "I kept bringing it up," FE-2 confirmed. (FE-2.) Bioventus's Financial Planning and Analysis Manager reported these concerns about the poor systems directly to Singleton, telling Singleton that the financial systems were a "mess." (FE-2.) These same concerns were reiterated to CFO Anglum (later CFO Singleton), VP of Finance Ben Fishburn, and Director of FP&A and Business Intelligence Diane Schabinger in Monthly Financial Close Meetings. (FE-2.)

### 2. The Exchange Act Defendants' Statements Indicate Knowledge of the False and Misleading Nature of Their Statements

#### a. Defendants' Statements Indicate Knowledge Regarding Bioventus's Lack of Effective Controls

268. The Officer Defendants' public statements and certifications regarding their evaluations and the effectiveness of Bioventus's disclosure controls and internal controls

over financial reporting corroborate their knowledge and access to the internal facts that their public statements concealed, supporting a strong inference of scienter.

269.  Bioventus's 2020 Form 10-K filed on March 26, 2021, and each subsequent Forms 10-Q and 10-K filed during the Class Period, stated that Bioventus's "management, with the participation of our Chief Executive Officer and Chief Financial Officer, conducted an evaluation of the effectiveness of our disclosure controls and procedures" as of each relevant period and "[b]ased on this evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective at the reasonable assurance level" as of the respective date of each report.

270.  The 2020 Form 10-K and the 1Q21, 2Q21, and 3Q21 Forms 10-Q each contained substantively identical certifications signed by Defendants Reali and Anglum confirming that the reports disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation or internal control over financial reporting."  The 2021 Form 10-K , and the 1Q22, 2Q22, and 3Q22 Forms 10-Q included substantively identical certifications by Defendants Reali and Anglum (2021 Form 10-K) or Singleton (1Q22, 2Q22, and 3Q22 Forms 10-Q) that repeated this certification, and additionally certified that Defendants Reali and Singleton had "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."

271. In addition, the 2021 Form 10-K stated that, the "Company's management, including our Chief Executive Officer [Reali] and our Chief Financial Officer [Anglum], conducted an evaluation of the effectiveness of our internal control over financial reporting as of December 31, 2021" and "concluded that, as of December 31, 2021, the Company's internal control over financial reporting is effective."

272. These statements confirm that Defendants Reali and Anglum were personally involved in evaluating the effectiveness of the Company's disclosure controls and procedures, and in designing, reviewing, and evaluating the Company's internal control over financial reporting. At the same time, when they signed the corresponding filings, Defendants Reali and Anglum knew their statements about the effectiveness of those controls were false: both Officer Defendants had personally approved large rebate payments and both knew that the Company lacked effective controls over rebates and rebate accruals, because by early September 2021, both had received the audit report saying exactly that.

### b. Defendants' Statements Indicate Knowledge Regarding the WAC-to-ASP Shift

273. The Officer Defendants' public statements about the shift from WAC to ASP further corroborate their knowledge and access to the internal facts that their public statements concealed, supporting a strong inference of scienter.

274. For example, during the March 10, 2022 Q4 2021 Earnings Call, an analyst from Morgan Stanley asked about Medicare's "cutting prices in the not-too-distant future" and whether Bioventus could "talk about how Bioventus might be better situated versus

competitors?"  In response, CEO Reali explained that "We've looked at this very carefully" and that "when we look at this analysis for us . . . it's a net-neutral for Bioventus.  While we may lose a little on the ASP reimbursement, we gain by paying less rebates because of that reimbursement change."

275.  Similarly, during the May 10, 2022 Q1 2022 Earnings Call, an analyst from Goldman Sachs asked if Bioventus could "provide a little bit more detail on sort of the mechanism of how that pricing change could affect your business."  CEO Reali replied that:

> [W]hen we do our analysis of volume in our business, volume of syringes, the actual reduction in rebates offsets any reduction in reimbursement, specifically based on ASP reporting. We've run these calculations very carefully, and we feel strongly that not only will we be basically neutral through this process, but we can gain market share as we go forward in the medium term.

CEO Reali further explained that this was the case because Bioventus's "contracts with these [private health insurers] have very specific clauses to reduce the rebates based on ASP reporting."

276.  Confirming that the Officer Defendants were closely monitoring the WAC to ASP pricing shift, during the August 11, 2022 Q2 2022 Earnings Call, CEO Reali responded to a question from a Craig-Hallum Capital analyst about what Bioventus has seen "in July and August here with the changes around CMS."  CEO Reali explained that:

> Well, we did see, based on ASP reporting a dip in our pricing for DUROLANE and GELSYN, in particular, subparts was already ASP reported. But as we've talked about that has been countered by our rebate adjustments that per our planning, and we're very pleased with the results of this and it's a credit to our market access team. We've been able to adjust all

137

of our rebates on our contracted business, which is a significant portion to a lower amount that net effect, Alex, negates any impact on the ASPs because we're paying less rebates on our contracted business.

So as we've modeled that over the past several months that turned out exactly the way we thought it would. So the first phase of this has gone well. I would say there could continue to be some volatility in the coming quarters as we continue to adjust to the ASP environment. But we're very pleased with what we're seeing and in fact, gaining some key competitive accounts as the playing field has been leveled. Once again, we feel very confident in our ability to continue to grab market share in the HA area.

We have the largest sales force, we have the largest portfolio of products, and we think we have the market-leading product in DUROLANE, our single-injection product with the highest molecular weight. So from our perspective, Alex, first phase went really well and we're optimistic as this continues to unfold.

277. The Officer Defendants spoke about the WAC to ASP pricing shift and its effects in detail because analysts were frequently concerned about this issue. For example, a March 31, 2022 Craig-Hallum Capital report stated that "physician reimbursement will change from WAC to ASP. Due to Bioventus's rebate structure this is expected to have minimal impact, however failure to maintain net pricing for its HA products would be a risk to Bioventus shares." A May 10, 2022 Craig-Hallum Capital report stated that "[t]he shift of HA from WAC to ASP is an item to watch, though contracts should cover most of the changes." A May 16, 2022 Craig-Hallum Capital report stated "BVS continues to be very optimistic in its ability to drive 20% organic growth from this business for the next 4-6 years. . . . BVS has demonstrated it has a superior product and proof point being its exclusive payor deals and pricing contracts. This also supports the segment during pricing changes, such as CMS' move from WAC to ASP which is anticipated to have minimal

Case 1:23-cv-00032-CCE-JEP    Document 58    Filed 07/31/23    Page 143 of 172

disruption on BVS' business and likely pushes more volume towards a product with known prices."

### 3. Stalnecker Was Chair of the Audit and Risk Committee Tasked with Overseeing the Company's Controls, Yet Falsely Claimed the Controls Were "Effective" After Being Told the Opposite

278. Defendant Stalnecker's role as Chair of the Audit and Risk Committee—coupled with her false statements that the Company's internal controls over financial reporting and disclosure controls and procedures were effective, after Stalnecker was told in writing that they were not—further supports a strong inference of scienter.

279. Audit Committees play a crucial role in ensuring the integrity of public companies' financial reporting to investors, as the SEC has explained. In an October 26, 2021 statement, the SEC's then-Acting Chief Accountant, Paul Munter, wrote:

> Audit committees play a vital role in the financial reporting systems of public companies through their oversight of financial reporting, including internal controls over financial reporting . . . . Effective oversight by strong, active, knowledgeable and independent audit committees significantly furthers the collective goal of providing high quality, reliable financial information to investors. . . . Because audit committees have financial reporting and audit oversight authority and responsibility, they also are instrumental in setting the tone at the top for the quality of the issuer's financial reporting to investors.

280. The Audit Committee Chair plays a central role. The auditing firm KPMG has emphasized that the Chair "plays a critical role in focusing the agenda on the important issues: quality financial accounting, corporate reporting and effective internal controls." Similarly, PwC has written, "A strong chair also makes him or herself available to senior

management, internal audit, and the independent auditors in between scheduled committee meetings for important matters."

281. Bioventus publicly stated that its Audit Committee oversaw the accuracy of the Company's disclosures and the effectiveness of its controls. For example, Bioventus's 2022 Proxy Statement filed on April 29, 2022 claimed that the Audit and Risk Committee was responsible for "coordinating the Board's oversight of our internal control over financial reporting and disclosure controls and procedures" and "reviewing and discussing with management and the independent registered public accounting firm our annual and quarterly financial statements and related disclosures." The Company's Audit and Risk Committee Charter (as of November 10, 2021) stated that the Committee must (among other things) "review any major issues as to the adequacy of the Company's internal control over financial reporting and any special audit steps adopted in light of any significant deficiencies or material weaknesses," review whether any "previously approved recommendations have been implemented and any other significant changes in internal control over financial reporting," and "review the disclosure controls and procedures of the Company designed to ensure timely collection and evaluation of information required to be disclosed in the Company's filings with the SEC."

282. Defendant Stalnecker was Chair of Bioventus's Audit and Risk Committee since the close of the IPO in February 2021. In this role, Defendant Stalnecker was required to ensure that Bioventus provided truthful and accurate information to investors and to

focus on "quality financial accounting, corporate reporting and effective internal controls" (KPMG).

283. Instead, Defendant Stalnecker did the opposite: after receiving the internal audit report by September 2021 concluding that the Company's grossly deficient controls over rebates had material weaknesses, even as those issues remained unremediated at year-end, Defendant Stalnecker signed the 2021 10-K falsely stating that the Company's internal controls over financial reporting and disclosure controls and procedures were effective. Given the Audit and Risk Committee's crucial oversight role, Defendant Stalnecker's false statement strongly supports an inference of scienter.

### 4. HA Products Were Core Operations Central to Bioventus's Business

284. As Bioventus's leading products and principal source of revenue and growth, HA products constituted core operations of the Company. Sales of HA products accounted for over 50% of Bioventus's revenue from 2019 to 2021 (and 42% in 2022). Bioventus admitted in the Registration Statement that it was "highly dependent on a limited number of products"—its HA products—and that "our ability to execute our growth strategy and maintain profitability will depend upon the continued demand for these products."

285. Further, Reali explained in Bioventus's March 25, 2021 Q4 2020 earnings call that HA products were expected "to be the largest contributor to our organic growth on a total dollar basis in 2021, led by our Durolane single-injection product" and characterized Durolane as a "truly special product." Indeed, growth in Durolane alone

constituted 22% of Bioventus's sales growth in Q1 2021, the first quarter of the Class Period.

286.  Bioventus's sales of its HA products were thus crucial for the Company. Given these facts, it would be absurd to suggest that the Officer Defendants were without knowledge of the true facts concerning the HA products' rebates and pricing that existed at the time of their false and misleading statements.

### 5.  The Magnitude and Duration of the Fraud

287.  The most compelling inference from the large magnitude and relatively short duration of the fraud is that the Officer Defendants knew or recklessly disregarded the falsity of their statements.

288.  As to magnitude, the facts that, between Q4 2021 and Q4 2022, Bioventus persistently overstated Pain Treatments revenues, net sales, and Adjusted EBITDA—a key metric tracked by analysts—by up to 61.4% are all material and could not plausibly have occurred without the knowledge or recklessness of senior management.  Indeed, as detailed above, Defendants Reali and Anglum personally approved large rebate payments, and by no later than early September 2021, received the internal audit report specifically advising them that Bioventus's purported controls regarding rebates and rebate accruals were grossly ineffective and deficient.  Even after receiving this report calling for urgent remediation, Reali and Anglum did nothing in response and Bioventus overstated its financial performance for more than a year before the scheme collapsed.

289.    Further demonstrating the large impact of the improper rebate accounting on the value of the business, the fraud resulted in a $189.2 million impairment charge. Specifically, Bioventus's 3Q 2022 Form 10-Q filed on November 21, 2022 announced the $189.2 million impairment charge and attributed it to the November 8, 2022 "decline in our market capitalization."  That decline was driven in substantial part by the Company's grossly inadequate controls and resulting failure to accrue properly for rebates for over a year, as well as Defendants' misstatements about the impact of the ASP shift.  At bottom, the $198.2 million impairment acknowledged that Bioventus's business was worth materially less as a result of the Company's improper rebate accruals and the material weaknesses in its controls.

290.    The relatively short duration of the fraud also supports a strong inference of scienter.  The Exchange Act Defendants commenced the IPO on February 11, 2021.  Just months later, Bioventus received an extremely large rebate invoice from United for millions of dollars (FE-4), triggering a confidential internal audit of the rebate process that led to a "red" internal audit report sent to Defendants Reali, Anglum, and Stalnecker by September 2021.  (FE-3, FE-4.)  The audit report explicitly told them that Bioventus lacked effective controls concerning rebates and related financial reporting, but the issues still were not remediated by the end of 2021.  (FE-3, FE-4.)  None of this was disclosed to investors, and the glaring control weaknesses left Bioventus exposed to the heightened risk of material errors in its public financial statements.  That is exactly what happened:  in November 2022, the scheme collapsed when Bioventus reversed material revenue and

EBITDA due to two more rebate claims from United, and belatedly admitted that it suffered from a material weakness in internal controls and ineffective disclosure controls and procedures.

### 6. The Officer Defendants and Defendant Stalnecker Were Motivated to Conceal the Fraud to Complete a Series of Acquisitions

291.    The Officer Defendants were motivated to make false statements to inflate the price of Bioventus stock in order to complete a series of acquisitions.

292.    With the IPO proceeds, Defendants Reali and Anglum embarked on an acquisition spree in 2021, purchasing healthcare companies Bioness and Misonix and making a $50 million escrow deposit with the intent to acquire CartiHeal.  To fund these costly acquisitions and their integration costs, the Officer Defendants needed to keep Bioventus's share price high and present positive cash flow from its HA products.

293.    <u>Bioness</u>:   Bioness was a company with a product portfolio focused on rehabilitation therapies.  Bioventus acquired Bioness on March 30, 2021 for $48.9 million cash.  The deal would also require Bioventus to pay an additional $50 million in cash by the end of 2024 and/or first half of 2025 if certain contingencies were met.

294.    During Bioventus's May 12, 2021 earnings call, Anglum acknowledged that the Bioness acquisition would not be "accretive" to income for at least a year.  In the meantime, the Company incurred tens of millions of dollars in costs to integrate Bioness in 2021.

295. <u>Misonix</u>: On July 29, 2021, Bioventus announced that it would acquire Misonix, Inc. ("Misonix"), a provider of ultrasonic technologies and regenerative medicine, in a cash-and-stock transaction. Bioventus completed the Misonix acquisition on October 29, 2021 and paid Misonix shareholders (a) $182,988,467 in cash and (b) 18,340,790 shares of Bioventus Class A common stock. The total consideration was $525.3 million. Because Bioventus did not have the cash, it borrowed $223.1 million in a term loan to finance the cash consideration, transaction costs, and ongoing operating expenses. In total, Bioventus had over $360 million in debt as of the end of 2021.

296. As with Bioness, Bioventus spent tens of millions of dollars to integrate Misonix, and Defendants did not expect to achieve the integration, including planned synergies, until the end of 2022.

297. <u>CartiHeal</u>: In July 2020, Bioventus entered an Option and Equity Purchase Agreement with CartiHeal, a company working to produce a knee implant, that gave Bioventus the option to purchase CartiHeal under certain conditions.

298. Bioventus was required to spend cash to continue pursuing the CartiHeal acquisition. On August 2, 2021, Bioventus deposited $50 million in escrow towards the future purchase of CartiHeal. On November 9, 2021, Reali told investors that Bioventus intended to move forward with the deal, but planned to "finance the remaining portion of the potential acquisition of CartiHeal with additional debt."

299. Bioventus's 2021 Form 10-K filed on March 11, 2022, stated that Bioventus "expect[ed] to acquire all of the shares of CartiHeal, excluding those we already own, for

$314.9 million, payable at closing in the second quarter of 2022. Upon the achievement of certain sales milestones, an additional $135.0 million could become payable after closing."

300. Bioventus's HA products played a central role in inflating and maintaining the Company's stock price and generating sufficient cash flow to fund these costly acquisitions and their integration costs and future milestone payments. Thus, when a JPMorgan analyst asked during Bioventus's May 12, 2021 Q1 Earnings Call "about your M&A strategy going forward"; CEO Reali touted the Company's HA products as "the growth drivers for the company," explaining that he "want[ed] to make sure we highlighted that for" the analyst "because it is very compelling." And Reali told investors on March 25, 2021 that Bioventus's "long-term growth profile" hinged on its acquisition strategy, which in turn depended on its "robust" and "best-in-class" "free cash flow generation."

301. Indeed, CEO Reali was adamantly focused on acquisitions and there was significant pressure on employees to keep Bioventus's stock price high in order to finance acquisitions and pay for them, as Bioventus's National Account Director of Market Access confirmed. (FE-1.) Likewise, Bioventus's Senior Manager of SOX & Internal Audit observed that CEO Reali was focused on acquiring new companies to such an extent that he ignored the Company's failure to comply with SOX regulations. (FE-4.)

302. To reveal that Bioventus was overstating revenue and EBITDA in violation of GAAP, faced steeply declining pricing and sales on its key HA products, and had material weaknesses in its controls would have immediately collapsed Bioventus's share

price and terminated the Officer Defendants' acquisition strategy for two reasons. First, Bioventus used its stock as part of the consideration paid to acquire Misonix, meaning that a higher stock price provided more valuable currency, reducing the number of shares and the amount of cash the Company would have to pay to purchase Misonix. Second, the Bioness and CartiHeal deals required large future milestone payments, and the Misonix and CartiHeal deals required Bioventus to take on debt, both of which made Bioventus increasingly dependent on sales and cash flow from its HA products.

303. After Defendants Reali's and Anglum's buying spree in 2021, Bioventus was left swimming in more than $360 million of debt, anticipating hundreds of millions of dollars in future milestone payments, and expending tens of millions in cash to integrate the acquisitions and make them profitable. This provided a powerful further motive for the Officer Defendants to commit fraud by overstating Bioventus's financial performance, concealing the Company's material weaknesses in controls, and falsely downplaying any threats to the HA products' pricing.

304. The Officer Defendants' motive became particularly acute as Reali caused Bioventus to release aggressive financial guidance in March 2022 that projected large growth, particularly from sales of HA products, even as HA products were not growing, leading FE-1 to describe the revenue forecast as "crazy."

305. To make matters worse, immediately after issuing Reali's aggressive guidance, the Company's financial strains increased: On April 4, 2022, Bioventus exercised its option to complete the expensive purchase of CartiHeal, but on May 10, 2022,

reported that market conditions had forced it to abandon its prior funding plans. On June 17, 2022, CartiHeal agreed to allow Bioventus to pay the remaining $215 million for CartiHeal via deferred milestone payments post-closing (with costly 8% interest), which would begin coming due in 2023. Bioventus completed the deal on July 11, 2022, subject to its future milestone payment obligations to CartiHeal shareholders.

306. Tasked with achieving Reali's "crazy" 2022 guidance in the face of these looming liabilities—while knowing of Bioventus's collapsing HA business, grossly deficient controls, and the existential threat from reduced Medicare pricing on the Company's most lucrative drugs—the Officer Defendants were highly motivated to misstate and conceal the truth. Indeed, it is no coincidence that their fraudulent overstatements of Bioventus's revenues and Adjusted EBITDA peaked in the first three quarters of 2022, as detailed above, before the scheme collapsed.

### 7. Reali's Termination Supports Scienter

307. Underscoring scienter, Reali was terminated by Bioventus's Board after presiding over a catastrophic decline in its share price since the IPO. In particular, Reali's termination followed two successive quarters that revealed, contrary to his prior statements, that the impact of Bioventus's deficient controls, inability to account for rebates, and the WAC-to-ASP shift was far from an isolated, short-term issue.

308. For example, as detailed above, on January 11, 2023, Reali claimed that the rebate problem was limited to "one specific payer" and that "we do feel that going forward we can be accurate," and that Bioventus was seeing "sustained double-digit volume

growth" for Durolane that "counteracted any impact" from reduced pricing. Just two months later, however, on March 31, 2023, the Company revealed that another large rebate claim for $4 million (from the same payer, United) had materially decreased revenue in the fourth quarter of 2022, driving a year-over-year decrease of 3.5%, and that "Durolane revenue declined high single digits for the quarter."

309. Given Reali's false statements and the Company's stock price decline under his tenure, Bioventus's Board terminated Reali's employment just five days later.

### 8. Corporate Scienter

310. Bioventus possessed scienter for two independent reasons. First, the Officer Defendants, who acted with scienter as set forth above, had binding authority over the Company and acted within the scope of their apparent authority in making the misstatements at issue. The scienter of the Officer Defendants is imputed to the Company.

311. Second, certain allegations herein establish Bioventus's corporate scienter based on (i) the state of mind of employees whose intent can be imputed to the Company, and/or on (ii) the knowledge of employees who approved the statements alleged herein despite knowing the statements' false and misleading nature. It can be strongly inferred that senior executives at Bioventus possessed scienter such that their intent can be imputed to the Company. For instance, Bioventus's VP of Finance, Ben Fishburn, and Director of FP&A and Business Intelligence, Diane Schabinger, attended the Company's Monthly Financial Close Meetings, where the inaccurate rebate estimating was raised. (FE-2.)

312. Given the severity of Bioventus's internal controls failures, and the fact that Bioventus's executives were informed of the Company's inaccurate rebate estimating, it can be strongly inferred that additional executives unknown at this time and sufficiently senior to impute their scienter to Bioventus (i) knew of the misstatements alleged herein, and (ii) approved the false statements despite knowing of their false and misleading nature.

## C. Loss Causation

313. As alleged herein, the Exchange Act Defendants' conduct, misstatements, and omissions of material facts directly and proximately caused Plaintiff and the Class to suffer substantial losses. Those losses were a result of Plaintiff's and the Class's purchases of Bioventus Class A common stock at artificially inflated prices during the Class Period.

314. The Exchange Act Defendants, through each category of false and misleading statements, concealed throughout the Class Period that: (i) Bioventus presently had existing, unremediated material weaknesses in its internal controls and ineffective disclosure controls and procedures; (ii) these existing deficiencies allowed Bioventus to improperly recognize millions of dollars in revenue in violation of GAAP, misrepresenting the Company's true financial performance; and (iii) the shift from WAC to ASP pricing was decimating the sales of Bioventus's key HA products, and the Exchange Act Defendants' claims to the contrary lacked any reliable factual basis. The Exchange Act Defendants also concealed the foreseeable risks and uncertainties arising from the facts known to them at the time of their statements, including, but not limited to, that:

a. Bioventus would fail to properly account for large rebate claims due to its material weaknesses in internal controls over financial reporting;

b. Bioventus would report inflated financial metrics to investors as a result of its deficient internal controls and ineffective disclosure controls and procedures, and later would be required to revise those reported results, causing a significant revenue reversal; and

c. Bioventus would be forced to take a large impairment charge when it belatedly recognized the impact of large rebate claims and reduced pricing and revenues on its HA products and its share price dropped.

315.    These concealed risks bear directly on Bioventus's true operational and financial condition and the value of its Class A common stock.

316.    The concealed risks began to materialize through a series of negative events and disclosures that constructively revealed, on a piecemeal basis, the truths that the Exchange Act Defendants' Class Period false and misleading statements concealed.  As these events and disclosures partially revealed the truth, the Exchange Act Defendants continued to make materially false and misleading statements that had the effect of, at least temporarily, concealing their fraud.

317.    As the relevant truth leaked out into the market, Plaintiff and the Class suffered losses.  The losses that Plaintiff and the Class suffered were foreseeable and caused by the materialization of the risks that the Exchange Act Defendants' fraudulent conduct concealed from investors.

318. The cascade of events and disclosures that were the materialization of the concealed risks and the revelation of the truth include the significant revenue reversal announced in November 2022, large rebate claims in successive quarters, the Company's admissions of material weaknesses in internal controls over financial reporting and disclosure controls and procedures, the impact of the ASP reporting shift on HA products' pricing and revenue, and a $189.2 million impairment charge driven by the material weaknesses and deteriorating performance of the HA products. Together, these events and disclosures revealed the material weaknesses in Bioventus's controls, Bioventus's GAAP violations, and the reality that the ASP reporting shift decimated its business.

### 1. November 8, 2022

319. On November 8, 2022, Bioventus filed a Form 8-K announcing 3Q22 financial results. Bioventus reported total revenue of $137.1 million and EBITDA of $22.7 million—well below consensus estimates of $141.6 million and $25.3 million—and $55.419 million in net sales for its Pain Treatments vertical and U.S. geographic region, and that demand for the 3-injection Gelsyn treatment plummeted, causing revenue from the company's pain business to decline approximately 13% quarter over quarter. Given this material underperformance, Bioventus reduced guidance of net sales of $527 million to $532 million, a significant decline from the prior guidance of $547.5 million to $562.5 million.

320. The Exchange Act Defendants held the 3Q22 earnings call that same day. Reali admitted that the "revenue shortfall" was "primarily . . . attributed to transitory

headwinds related to GELSYN," citing "two primary headwinds specific to Gelsyn": (1) "higher than normal rebate claims due to unexpected prior period rebate charges from a private payer who found errors in their earlier claims reporting," and (2) "the recent change in pricing to average selling price, or ASP, from wholesale acquisition cost, or WAC."

321.    Reali attempted to offset these negative facts by claiming that the pricing "dynamic did not impact Durolane," and that the rebate claim was an isolated incident as it had been submitted by "a private payer who found errors in their earlier claims reporting."

322.    On this news, the share price of Bioventus Class A common stock declined $4.06, or 57.5%, from $7.06 at the close of trading on Monday, November 7, 2022, to $3.00 at the close of trading on Tuesday, November 8, 2022.

323.    Analysts were surprised at the sudden negative announcement.    A November 9, 2022 Craig-Hallum analyst report stated that the announcements were a "surprise after comments of relative calm," and "*the impact [due to the change in pricing] was much more than management previously stated*."    A November 8, 2022 Canaccord Genuity analyst report called the poor results "*thesis changing*," stating that it was "clear the shift to ASP reporting from WACC has impacted the commercial stability here; this comes in *sharp contrast to prior management commentary that called for ASP declines to be offset by reduced rebate levels*."    The report added that the "dynamic is disappointing given *BVS had previously communicated that it would offset the HA reimbursement shift*

to ASPs from WACC with lower reimbursement rebate rates on its preferred HA contracts with private payors." In other words, Defendants simply had not done what they claimed. Canaccord Genuity downgraded the stock to a "Hold" rating and lowered their price target. A November 9, 2022 Morgan Stanley analyst report bemoaned the "***material*** '22 revenue guidance revision."

### 2. November 16, 2022

324. On November 16, 2022, after the close of trading, Bioventus filed a Form 8-K announcing that the Company would be unable to timely file its 3Q22 Form 10-Q. The Exchange Act Defendants also announced additional rebate claims from a large payer. The Exchange Act Defendants disclosed that the "recognition of additional rebates may impact Bioventus' recently announced revenue guidance." The Exchange Act Defendants also stated that Bioventus's "internal controls related to the timely recognition of quarterly rebates were inadequate specifically for the period ended October 1, 2022." The Exchange Act Defendants further disclosed that, as a result of the stock drop caused by the pricing decline and rebate errors disclosed on November 8, 2022, Bioventus expected to take an impairment charge in the range of $185 million to $205 million.

325. As these facts materialized, the price of Bioventus's stock declined $1.00 per share, or over 33%, from a close of $2.97 on Wednesday, November 16, 2022, to close at $1.97 per share on Thursday, November 17, 2022.

326. Morgan Stanley issued an analyst report on November 18, 2022, acknowledging that Bioventus had "received an invoice for rebate claims," which Morgan

Stanley expected "will be a multiple of the ~$2m headwind stated on the 3Q22 call for '22 guidance." Morgan Stanley also removed its rating and price target.

### 3. November 21, 2022

327. On November 21, 2022, after the close of trading, Bioventus filed its 3Q22 Form 10-Q, disclosing that the recently received rebate claims had resulted in an $8.4 million reduction in previously reported 3Q22 revenue, which also drove a $4.3 million reduction in Adjusted EBITDA. This resulted in the Company reporting a year-over-year decline of $8.953 million, or 16.0% for its U.S. Pain Treatments business, whereas the Company had previously reported a decline of only $544,000, or 1%. Bioventus reported that the change in U.S. Pain Treatments sales was "due to more treatments being sold under contracts with major issuers at lower prices and price competition within the osteoarthritic joint pain treatment market." Bioventus also disclosed that it had incurred an impairment charge of $189.2 million due to the stock price decline following the November 8, 2022 disclosures and acknowledged that the unexpected rebates had a "cascading effect on future revenue projections [that] materially impacted the Company's evaluation of its ability to meet debt covenants, resulting in liquidity and going concern disclosures in the" Form 10-Q.

328. In the Form 10-Q, the Company admitted that its "internal control over financial reporting was not performed at a sufficient level of precision to ensure that the third quarter 2022 rebates accrual was complete and accurate." The Company admitted that it had received the large invoice "subsequent to the initial calculation for the third

quarter rebates accrual," but that "there were not processes in place to ensure it was reviewed timely in order to update the accrual" by the time the Company disclosed 3Q22 results. To remediate the weakness, the Company disclosed that it was: (i) "[r]eassessing open rebates accruals and changing the estimation method for calculating the rebate accruals"; (ii) "[i]mplementing enhanced controls and status tracking to ensure that rebates invoices . . . are received and reviewed timely;" and (iii) "[i]ncreasing rigor of documenting key conversations with payers." In addition, the Form 10-Q admitted that Bioventus's "disclosure controls and procedures were not effective as of October 1, 2022." These glaring control deficiencies were not new: they had been reported in writing to Defendants Reali, Anglum, and Stalnecker by September 2021, well over a year before the Company publicly admitted their existence.

329. As these facts materialized, the price of Bioventus Class A common stock declined $0.07, or 3.7%, from $1.88 at the close of trading on Monday, November 21, 2022, to $1.81 at the close of trading on Tuesday, November 22, 2022.

330. A November 22, 2022 Craig-Hallum analyst report stated, "[W]e learn there are in-fact more errors in store and are moving to the sidelines until faith in financials/operating business can be restored and hard decisions around BVS' future are made," downgrading the stock to a "Hold" rating. A December 1, 2022 Canaccord Genuity analyst report noted that the "additional rebate resulted in a $8.4M reduction to reported revenues and $4.3M reduction to adjusted EBITDA."

### 4. March 31, 2023

331. On March 31, 2023, Bioventus filed a Form 8-K announcing its 4Q and FY22 financial results. Reali was quoted as stating, "Our results reflect additional pressure in our Pain Treatments vertical, primarily due to additional rebate claims previously not billed to us from a private payer, which offset the double-digit growth we are seeing in the Surgical Solutions vertical." The press release further stated, "Total net sales were $125.8 million compared to $130.4 million for the fourth quarter of 2021, a decrease of $4.6 million, or 3.5%, year-over-year, due to a decline in the Pain Treatments vertical, primarily driven by a decline in price resulting from higher than expected rebate claims, mostly offset with growth within the Surgical Solutions vertical."

332. During the 4Q and FY22 earnings call held that same day, Reali attributed the poor results to "continued pressure across our HA franchise" and an "[u]nanticipated rebate claims from one private payer," *i.e.*, United, "along with lower volume growth and decreased selling price across our HA business." Reali admitted that Bioventus had once again not expected the rebate claims and was working "on the reporting of rebate claims in an effort to avoid future volatility." He also noted that, as a result of the rebate claims, Bioventus's "***average selling price, or ASP, for both Durolane and Gelsyn is now lower than previously expected***," that Bioventus experienced "***double-digit price loss***" on Durolane, and that "Durolane revenue ***declined high single digits*** for the quarter." These admissions directly contradicted Reali's prior claims that the Company had offset any reduced pricing by lowering "all of our rebates on our contracted business."

333.	Also on March 31, 2023, Defendants filed Bioventus's 2022 Form 10-K, reporting that U.S. Pain Treatments net sales had declined to $194.830 million in 2022 compared to $201.068 million in 2021, a decline of 3.1%. The 2022 Form 10-K stated that the decline was "due to more treatments being sold under contracts with major insurers resulting from higher than expected rebate claims and price competition within osteoarthritic joint pain treatment market, partially offset with an increase in sales volume." In the Form 10-K, the Company also admitted that "due to the manner in which rebates are calculated and paid under certain of our contracts with private payers, changes in the ASP for our HA viscosupplements may result in *larger than expected rebates payments* for the sale of these products." This was directly contrary to Reali's prior claims that the Company had adjusted "all of [its] rebates" on "contracted business" with a "reduction in rebates" to "negate[]" "all of" the impact of lower ASP.

334.	As these facts materialized, the price of Bioventus Class A common stock declined $0.14, or 11.6%, from $1.21 per share at the close of trading on Thursday, March 30, 2023, to $1.07 per share at the close of trading on Friday, March 31, 2023.

335.	Analysts attributed the stock decline to these disclosures. Craig-Hallum issued an analyst report on April 3, 2023 stating that the "unexpected rebate claims from UnitedHealth in combination with a higher mix in contracted Pain revenues and transition to ASP from WAC drove a 20%+y/y decline in revenue." A Canaccord Genuity analyst report published that same day stated, "BVS saw weakness in Pain Treatments as it continued to experience headwinds in its HA business. HA-specific issues include

1) another swath of unexpected rebate charges from a private payor and 2) reduced ASP given higher rebate claims from a higher volume or private payer contracts."

*       *       *

336.    In total, from November 7, 2022 (the last day of trading prior to the first partially corrective disclosure) to March 31, 2023, the price of Bioventus Class A common stock declined from $7.06 to $1.07, a decline of approximately 84.8%.

**D.    Presumption of Reliance and Fraud-on-the-Market Doctrine**

337.    Plaintiff is entitled to a presumption of reliance on the Exchange Act Defendants' material misrepresentations pursuant to the fraud-on-the-market doctrine.  At all relevant times, the market for Bioventus Class A common stock was an efficient market for the following reasons, among others:

a.   Bioventus Class A common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.   The average weekly trading volume of Bioventus Class A common stock was significant;

c.   As a regulated issuer, Bioventus filed periodic public reports with the SEC;

d.   Bioventus regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major

newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

e. Bioventus was followed by many securities analysts employed by major brokerage firms who wrote reports that were published and distributed.

338. As a result of the foregoing, the market for Bioventus Class A common stock promptly digested current information regarding Bioventus from all publicly available sources and reflected such information in the price of Bioventus Class A common stock. Under these circumstances, all purchasers of Bioventus Class A common stock during the Class Period suffered similar injury through their purchase of Bioventus Class A common stock at artificially inflated prices, and the presumption of reliance applies.

## XII. CLAIMS FOR RELIEF PURSUANT TO THE EXCHANGE ACT

### COUNT III

**Section 10(b) of the Exchange Act and Rule 10b-5
(Against the Exchange Act Defendants)**

339. Plaintiff repeats, incorporates, and re-alleges each and every allegation contained above as if fully set forth herein.

340. During the Class Period, the Exchange Act Defendants made, disseminated or approved the false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that the statements contained material misrepresentations and failed to disclose material facts necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading.

341. The Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder in that they:

a. Employed devices, schemes, and artifices to defraud;

b. Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

c. Engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and other similarly situated in connection with their purchases of Bioventus Class A common stock during the Class Period.

342. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Bioventus Class A common stock. Plaintiff and the Class would not have purchased Bioventus Class A common stock at market prices, or at all, if they had been aware that the market prices of Bioventus Class A common stock were artificially inflated and maintained by the Exchange Act Defendants' false and misleading statements.

## COUNT IV

### Section 20(a) of the Exchange Act
### (Against the Officer Defendants and Defendant Stalnecker)

343.    Plaintiff repeats, incorporates, and re-alleges each and every allegation set forth above as if fully set forth herein.

344.    The Officer Defendants and Defendant Stalnecker acted as controlling persons of Bioventus within the meaning of Section 20(a) of the Exchange Act.  By virtue of their positions and their power to control Bioventus's public statements, the Officer Defendants and Defendant Stalnecker had the power and ability to control the actions of Bioventus and its employees.  By reason of such conduct, the Officer Defendants and Defendant Stalnecker are liable pursuant to Section 20(a) of the Exchange Act.

## XIII.  JURY DEMAND

345.    Plaintiff, on behalf of itself and the Class, demands a jury trial.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

DATED: July 31, 2023

Respectfully Submitted,

*/s/ Gagan Gupta*
Gagan Gupta (NCSB #: 53119)
**TIN FULTON WALKER
& OWEN PLLC**
115 East Main Street
Durham, NC 27701
Telephone: (919) 370-8807
ggupta@tinfulton.com

*Local Counsel for Lead Plaintiff Wayne
County Employees' Retirement System*

*/s/ Joseph A. Fonti*
Javier Bleichmar*
Joseph A. Fonti*
**BLEICHMAR FONTI & AULD LLP**
7 Times Square, 27th Floor
New York, NY 10036
Telephone: (212) 789-1340
Facsimile: (212) 205-3960
jbleichmar@bfalaw.com
jfonti@bfalaw.com

Nancy A. Kulesa*
75 Virginia Road
White Plains, NY 10603
Telephone: (914) 265-2991
Facsimile: (212) 205-3960
nkulesa@bfalaw.com

* reflects attorneys appearing pursuant to
LR 83.1(d)

*Counsel for Lead Plaintiff Wayne County
Employees' Retirement System and
Lead Counsel for the Proposed Class*

# Exhibit A

## CERTIFICATION

I, Gerard Grysko, on behalf of Wayne County Employees' Retirement System ("WCERS"), as Deputy Executive Director of WCERS, hereby certify as follows:

1.      I am fully authorized to enter into and execute this Certification on behalf of WCERS.

2.      I have reviewed the Second Amended Complaint – Class Action filed against Bioventus Inc. ("Bioventus") and others alleging violations of the federal securities laws (the "Complaint") and have authorized its filing.

3.      WCERS did not purchase or sell securities of Bioventus that are the subject of the Complaint at the direction of counsel in order to participate in any private action under the federal securities laws.

4.      WCERS is willing to serve as Lead Plaintiff on behalf of the Class in this matter, including providing testimony at deposition and trial, if necessary.

5.      WCERS's transactions in Bioventus Class A common stock that is the subject of the Complaint during the Class Period specified in the Complaint (February 11, 2021 to March 30, 2023, both inclusive) are reflected in Schedule A, attached hereto.

6.      WCERS has sought to serve as a lead plaintiff and representative party in a class action filed under the federal securities laws during the last three years, and was appointed, in the following:

- *San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, No. 1:22-cv-06339 (S.D.N.Y.)

1

- *In re Sotera Health Company Securities Litigation*, No. 1:23-cv-00143 (N.D. Ohio)
- *Genesee County Employees' Retirement System v. FirstCash Holdings, Inc.*, No. 4:22-cv-00033 (N.D. Tex.)
- *In re AstraZeneca plc Securities Litigation*, No. 1:21-cv-00722 (S.D.N.Y.)

7.    WCERS has also sought to serve as a lead plaintiff and representative party in a class action filed under the federal securities laws during the last three years, but was not appointed or its motion is pending, in the following:

- *Schaeffer v. Signature Bank*, No. 1:23-cv-01921 (E.D.N.Y.)
- *City of Warwick Retirement System v. Catalent, Inc.*, No. 3:23-cv-01108 (D.N.J.)
- *In re PayPal Holdings Inc. Securities Litigation.*, No. 3:22-cv-05864 (D.N.J.)
- *Ohio Public Employees Retirement System and The State Teachers Retirement System of Ohio v. Discovery, Inc.*, No. 1:22-cv-08171 (S.D.N.Y.)
- *City of Hollywood Police Officers' Retirement System v. Citrix Systems, Inc.*, No. 0:21-cv-62380 (S.D. Fla.)
- *Building Trades Pension Fund of Western Pennsylvania v. Insperity, Inc.*, No. 1:20-cv-05635 (S.D.N.Y.)

8.    Beyond its *pro rata* share of any recovery, WCERS will not accept payment for serving as Lead Plaintiff on behalf of the Class, except the reimbursement of such reasonable costs and expenses including lost wages as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this 3/1ˢᵗ day of July, 2023.

_____
Gerard Grysko
Deputy Executive Director
*Wayne County Employees' Retirement System*

2

| Transaction Type | Trade Date | Shares | Price Per Share | Cost/Proceeds |
|---|---|---|---|---|
| Purchase | 04/14/2022 | 60.00 | 12.77 | ($766.44) |
| Purchase | 04/14/2022 | 596.00 | 12.91 | ($7,696.98) |
| Purchase | 04/18/2022 | 2,258.00 | 12.67 | ($28,611.12) |
| Purchase | 04/19/2022 | 9,206.00 | 12.89 | ($118,704.93) |
| Purchase | 04/20/2022 | 8,120.00 | 13.05 | ($105,985.49) |
| Purchase | 04/21/2022 | 1,883.00 | 13.22 | ($24,883.85) |
| Purchase | 04/21/2022 | 2,281.00 | 13.05 | ($29,763.86) |
| Purchase | 04/22/2022 | 8,940.00 | 12.80 | ($114,397.13) |
| Purchase | 04/25/2022 | 3,625.00 | 13.01 | ($47,146.75) |
| Purchase | 04/26/2022 | 4,768.00 | 12.86 | ($61,336.03) |
| Purchase | 04/26/2022 | 13,099.00 | 12.86 | ($168,423.01) |
| Purchase | 04/27/2022 | 596.00 | 12.99 | ($7,742.04) |
| Purchase | 04/27/2022 | 1,645.00 | 12.99 | ($21,368.55) |
| Purchase | 04/27/2022 | 9,534.00 | 12.76 | ($121,647.17) |
| Purchase | 04/28/2022 | 2,580.00 | 12.35 | ($31,852.16) |
| Sale | 09/22/2022 | -6,551.00 | 6.90 | $45,220.90 |
| Sale | 11/17/2022 | -24,837.00 | 2.06 | $51,251.15 |
| Sale | 11/17/2022 | -6,989.00 | 2.01 | $14,019.93 |
| Sale | 11/17/2022 | -2,643.00 | 2.08 | $5,497.44 |
| Sale | 11/18/2022 | -17,557.00 | 1.85 | $32,419.00 |
| Sale | 11/18/2022 | -5,307.00 | 1.89 | $10,003.70 |
| Sale | 11/18/2022 | -4,691.00 | 1.84 | $8,607.99 |
| Sale | 11/18/2022 | -616.00 | 1.91 | $1,176.56 |